REPORTER'S RECORD
VOLUME 2 OF 12 VOLUMES
TRIAL COURT CAUSE NO. C-6015-14-F

PALMER CRAVENS,                    )        IN THE DISTRICT COURT
                                   )
        Plaintiff(s),              )
                                   )
VS.                                )        HIDALGO COUNTY, TEXAS
                                   )
NATIONAL FIRE INSURANCE COMPANY    )
OF HARTFORD AND D.L. PHILLIPS      )
CONSTRUCTION D/B/A JA-MAR ROOFING, )
                                   )
        Defendant(s),              )        332ND JUDICIAL DISTRICT

_____

EXCERPT OF OPENING STATEMENTS

_____

    On the 12th day of June, 2018, the following excerpted proceedings

came on to be heard in the above-entitled and numbered cause before the

Honorable Mario E. Ramirez, Jr., Judge presiding, held in Edinburg, Hidalgo

County, Texas:

    Proceedings reported by stenograph method.

```
 1                    A P P E A R A N C E S

 2   Mr. Raymond L. Thomas
     SBOT NO. 19865350
 3   Mr. David O. Sanchez
     SBOT NO. 24102457
 4   Ms. Kristen Lamar Vela
     SBOT NO. 24107950
 5   RAY THOMAS, PC
     4900-B North 10th Street
 6   McAllen, Texas 78504
     Phone: (956) 686-8797
 7   Fax: (956) 630-5199
     rthomas@raythomaspc.com
 8   ATTORNEY FOR THE PLAINTIFF

 9        - AND -

10   Mr. David L. Treat
     SBOT NO. 20205300
11   Ms. Amanda N. James
     SBOT NO. 24092570
12   LINDOW STEPHENS TREAT, LLP
     One Riverwalk Place
13   700 N. St. Mary's St., Suite 1700
     San Antonio, Texas 78205
14   Phone: (210) 227-2200
     Fax: (210) 227-4602
15   dlt@lstlaw.com
     ATTORNEY FOR THE DEFENDANT
16
          - AND -
17
     Mr. Wesson H. Tribble
18   TRIBBLE | ROSS
     SBOT NO. 20213960
19   6371 Richmond Avenue
     Houston, Texas  77057
20   Phone: (713) 622-0444
     Fax: (713) 622-0555
21   wtribble@tribblelawfirm.com
     ATTORNEY FOR THE DEFENDANT
22   D.L. PHILLIPS CONSTRUCTION, INC.

23

24

25
```

**CICMSJ0305**

```
 1                           I N D E X

 2                           VOLUME 2
                   EXCERPT OF OPENING STATEMENTS
 3
```

```
    JUNE 12, 2018                                         PAGE    VOL.
 4  Requested excerpt as follows --------------------------   4      2

 5  Opening statement by Mr. Thomas -----------------------   4      2

 6  Opening statement by Mr. Treat ------------------------  21      2

 7  Adjournment -------------------------------------------  33      2

 8  Court Reporter's Certificate --------------------------  34      2
```

```
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    If you can't do that, I understand, that's fine, I'll find somebody else

2    that can get the job done.

3                    Oh, no, no, no.  We'll do it anyway.

4                    And so Ja-Mar found a way to get the job done and to

5    cover the deductible.  And you'll hear more about that evidence as well.

6                    Go to the time line.

7                    This time line was put together just to give you a sort

8    of a concept of the timeframe that we are talking about.  Do you recall

9    that in the -- in 2012, in March of 2012 was the first hailstorm.  And then

10   it was quickly followed up in April by another hailstorm.

11                   And by June the 5th Ja-Mar had signed up Palmer.  They

12   had sent a team down here to sign up as many hail victims that they could

13   get.  And Ja-Mar was able to sign up Palmer on June the 5th.

14                   They start doing the work.  And by February the 1st of

15   2013 the repairs are completed -- or at least they claimed that they were

16   completed.  But you can see what happened.  Immediately after the roof was

17   repaired, it starts leaking.

18                   In March we got a leak.  In April we have a leak.  And in

19   May we have a leak.  In June we have a leak.  In September we have a leak.

20                   This is -- this is the VA who is in there who is telling

21   us, hey, landlord, we got a problem here.  We got -- we got water coming

22   in.  And the water is even getting into these electrical boxes and that

23   creates safety problems.

24                   And so -- and then in September of 2014 there was a --

25   there was a big storm.  I don't know if you remember that in September 2014

1    McAllen got several inches of rain.  And when that happened, the roof

2    completely failed and there was massive water intrusion into the building.

3                    And -- and -- and in many ways there was so much interior

4    damage it was worse than after the hailstorm.  And so that's the reason for

5    this field trip that we are getting ready to go on.

6                    Because as you heard from Mr. Treat in Jury selection, we

7    have a big dispute over what is going to be the cost of the repair.  They

8    want you to believe, oh, it just -- it just needs a little clean up, it

9    needs a little touch up, just put band-aids over it, and -- and then put it

10   back out on the market and everything will be okay.

11                   Well, no, you will see for yourself when we go on this

12   field trip the massive damage that occurred especially over in the lab and

13   in the pharmacy and in places like that where all the water had come into

14   the building.  This roof, brand new $600,000.00 roof completely failed and

15   allowed massive water intrusion.

16                   So how does that happen when you have the best roofing

17   company in Texas?  It's called, bait and switch.  Bait and switch means,

18   right, they promise one thing and they deliver another.  They say highest

19   standards that they are the master elite contractor, that they use only

20   highly trained and certified employees -- or technician -- installers.

21                   And you heard Mr. Treat in Jury selection -- I wrote this

22   down -- he said, you know, we had to use subcontractors because of the

23   hailstorm because, you know, we were very busy and we needed to hire extra

24   people.  We had a hard time covering all the jobs.

25                   Okay.  So the bait is that they use only the best.  The

1  switch is these guys don't have any employees who are installers, who are

2  repair people, alls they are is a company of sales people and they don't

3  have one person employed by that company who installs a roof.  They don't

4  have one person who is employed by that company that repairs a roof.

5                   Mr. Palmer didn't know that at the time that he hired

6  them.  He thought they were using only certified installers.  And so

7  Mr. Treat says, Hey, everybody knows contractors subcontract.  Right?

8  Remember that?  Everybody knows a contractor hires subcontractors.

9                   Well, yeah, but we weren't hiring a general contractor.

10 We were hiring a roofing contractor.  A roofing company is a subcontractor.

11 Roofing companies don't subcontract to roofing companies.  But if they did,

12 you would at least expect them to -- to subcontract to qualified and

13 certified subcontractors.

14                   But that's not what happened here.  Instead what Ja-Mar

15 does -- remember they don't have anybody to install the roof, so they get

16 on Craig's List and they hire some guy named Guy Hardy.  He is called

17 Dripping Springs Roofing.  But he's a sole practitioner.  He doesn't even

18 have his own -- he doesn't even have a company.  It's just himself.

19                   And Guy Hardy comes down here.  And he is, like, okay,

20 yeah, I can do this job.  And then it turns out he is too busy so he puts

21 the job on Craig's List and some guy from Laredo named Joel Ortegon

22 responds to that and he ends up doing the job.

23                   That's what you call a bait and switch.  We are the best.

24 We -- we -- we only have certified people and the switch is anybody they

25 can find off Craig's List.  And by the way you will hear testimony that the

1          Mr. Palmer didn't even -- didn't get a penny.  It all

2  went to Ja-Mar.  That's how they get the 50 percent profit on a ten percent

3  deal.

4          Next slide.

5          I've already told you about Mr. Jay Palmer.

6          Here is Doug Schneider.  Somebody said during Jury

7  selection that they thought he worked at D.H.R.  But he is the property

8  manager for Mr. Jay Palmer, has worked for him for a very long time.  He

9  had a lot of interaction.  When the VA had a problem and said, Hey, the

10  roof is leaking, they go to Doug Schneider.  And Doug was expected to make

11  arrangements to fix the problem.

12          Mr. Lupe Garza.  Mr. Lupe Garza is from Corpus Christi.

13  He has been with Baldwin Roofing for over 30 years.  And he's the guy that

14  we had -- that Mr. Palmer had to hire to come in and fix the problems that

15  Ja-Mar couldn't fix.

16          You know, Mr. Treat said in opening -- in opening -- in

17  opening that, well, why didn't Mr. Palmer use his own contractors like

18  Wilson Construction?  Number one, Wilson Construction is not a roofer.

19  They are not a roofing company.  They are a general contractor.  If he has

20  got a roof problem, he is going to call a roofer.  So he calls Baldwin

21  Roofing who is a contractor that Mr. Palmer had used before on their

22  buildings.  And so Mr. Lupe Garza is going to come forward and testify and

23  tell you about the defects that he found on the roof, and about the

24  problems that he had to fix.  And he was able to fix them.

25          Now, Ja-Mar wants you to believe, Hey, the roof is fixed.

1   It hasn't leaked since 2015.  Well, if it hasn't leaked since 2015, it

2   ain't thanks to Ja-Mar.  It's thanks to Mr. Lupe Garza.  But Mr. Lupe Garza

3   is going to tell you this roof is -- is -- it needs -- it needs work.  Alls

4   I did was put band-aids and did a temporary fix.  That doesn't solve the

5   problem.  It's still a bad roof.

6              And you are going to hear from Mr. Thomas McCoy.  He is a

7   roof expert out of San Antonio who can more scientifically talk about all

8   the defects in this roof that were installed.

9              And then Mr. Rick Guerra-Prats, he is the guy that -- he

10  is the cost estimator.  He is -- he is a cost estimator.  And he can tell

11  you -- because the damages are the cost to re-do the roof, the cost to

12  repair all of the interior damages that were done when the roof they put in

13  failed and allowed all that water intrusion into the building, and then --

14  that's what he can testify about.

15             And then the other component of this is this building has

16  not been usable since September of 2014.  And the VA was paying $52,000.00

17  a month in rent.  And since this storm in 2014 when this property suffered

18  all this damage, it has not been rentable since.

19             Now, Ja-Mar, again, they say, Well, just clean it up, put

20  some band-aids on and put it back on the market.  That wouldn't be honest.

21             And last slide.

22             This is what a built-up tar-and-gravel roof looks like.

23  That's the roof that was there before Ja-Mar ripped it out.

24             Next one.

25             This is what a TPO membrane roof looks like.  This is the

1  THE STATE OF TEXAS                )

2  COUNTY OF HIDALGO                 )

3      I, Regina Vasquez, Official Court Reporter in and for the 332nd

4  District Court of Hidalgo County, State of Texas, do hereby certify that

5  the above and foregoing contains a true and correct transcription of all

6  portions of evidence and other proceedings requested in writing by counsel

7  of the parties to be included in this volume of the Reporter's Record, in

8  the above-styled and numbered cause, all of which occurred in open court or

9  in chambers and were reported by me.

10     I further certify that this Reporter's Record of the proceedings truly

11 and correctly reflects the exhibits, if any, admitted, tendered in an offer

12 of proof or offered into evidence.

13     WITNESS MY OFFICIAL HAND this the 20th day of September, 2019.

14

15

16                     /s/Regina Vasquez_____
                       REGINA VASQUEZ, TEXAS C.S.R. 7227
17                     Expiration Date:  12-31-19
                       Official Court Reporter, 332nd District Court
18                     Hidalgo County, Texas
                       100 North Closner, Texas
19                     Edinburg, Texas 78541
                       Phone: (956) 318-2275
20                     Fax:  (956) 318-2698

21

22

23

24

25

Regina Vasquez, CSR
332nd District Court Reporter

CICMSJ0312

REPORTER'S RECORD
VOLUME 3 OF 12 VOLUMES
TRIAL COURT CAUSE NO. C-6015-14-F

PALMER CRAVENS,                    )        IN THE DISTRICT COURT
                                   )
        Plaintiff(s),              )
                                   )
VS.                                )        HIDALGO COUNTY, TEXAS
                                   )
NATIONAL FIRE INSURANCE COMPANY    )
OF HARTFORD AND D.L. PHILLIPS      )
CONSTRUCTION D/B/A JA-MAR ROOFING, )
                                   )
        Defendant(s),              )        332ND JUDICIAL DISTRICT

_____


JURY TRIAL PROCEEDINGS


_____


    On the 13th day of June, 2018, the following excerpted proceedings

came on to be heard in the above-entitled and numbered cause before the

Honorable Mario E. Ramirez, Jr., Judge presiding, held in Edinburg, Hidalgo

County, Texas:

    Proceedings reported by stenograph method.

CICMSJ0313

1                    A P P E A R A N C E S

2  Mr. Raymond L. Thomas
   SBOT NO. 19865350
3  Mr. David O. Sanchez
   SBOT NO. 24102457
4  Ms. Kristen Lamar Vela
   SBOT NO. 24107950
5  RAY THOMAS, PC
   4900-B North 10th Street
6  McAllen, Texas 78504
   Phone: (956) 686-8797
7  Fax: (956) 630-5199
   rthomas@raythomaspc.com
8  ATTORNEY FOR THE PLAINTIFF

9        - AND -

10 Mr. David L. Treat
   SBOT NO. 20205300
11 Ms. Amanda N. James
   SBOT NO. 24092570
12 LINDOW STEPHENS TREAT, LLP
   One Riverwalk Place
13 700 N. St. Mary's St., Suite 1700
   San Antonio, Texas 78205
14 Phone: (210) 227-2200
   Fax: (210) 227-4602
15 dlt@lstlaw.com
   ATTORNEY FOR THE DEFENDANT
16
         - AND -
17
   Mr. Wesson H. Tribble
18 TRIBBLE | ROSS
   SBOT NO. 20213960
19 6371 Richmond Avenue
   Houston, Texas  77057
20 Phone: (713) 622-0444
   Fax: (713) 622-0555
21 wtribble@tribblelawfirm.com
   ATTORNEY FOR THE DEFENDANT
22 D.L. PHILLIPS CONSTRUCTION, INC.

23

24

25

```
1                          I N D E X

2                          VOLUME 3
                    JURY TRIAL PROCEEDINGS
3
   JUNE 13, 2018                                      PAGE   VOL.
4  Proceedings ------------------------------------- 10     3

5  Hearing outside the Presence of the Jury --------- 10    3
   Hearing concluded -------------------------------- 18    3
6
   PLAINTIFF'S WITNESSES        DIRECT    CROSS    VOIR DIRE   VOL.
7  PHILLIPS, DAVID LYNN         20, ---   ---, ---  ---, ---    3
       (BY VIDEOTAPED DEPOSITION)
8
                                                     PAGE   VOL.
9  Hearing outside the Presence of the Jury --------- 69    3
   Hearing concluded -------------------------------- 72    3
10
   PLAINTIFF'S WITNESSES        DIRECT    CROSS    VOIR DIRE   VOL.
11 MCCOY, DANIEL JOSEPH         73, ---   84, ---  ---, ---    3
       (BY VIDEOTAPED DEPOSITION)
12
   BLOOMER, DAVID JEFFREY       87, ---   ---, ---  ---, ---    3
13     (BY VIDEOTAPED DEPOSITION)
                                                     PAGE   VOL.
14 Hearing outside the Presence of the Jury --------- 96    3
   Hearing concluded -------------------------------- 97    3
15
   PLAINTIFF'S WITNESSES        DIRECT    CROSS    VOIR DIRE   VOL.
16 BLOOMER, DAVID JEFFREY       99, ---   113, ---  ---, ---    3
       (BY VIDEOTAPED DEPOSITION)
17
   HARDY, GUY WILLIAM           117, ---  148, ---  ---, ---    3
18     (BY VIDEOTAPED DEPOSITION)

19 ORTEGON, JOEL                155, ---  173, ---  ---, ---    3
       (BY VIDEOTAPED DEPOSITION)
20
   MCKINNEY, JAMES MONTAQUE     174, ---  ---, ---  ---, ---    3
21
                                                     PAGE   VOL.
22 Adjournment -------------------------------------- 193    3

23 Court Reporter's Certificate --------------------- 194    3

24

25
```

1      A.    To the best of his ability, yes, that was his role.

2      Q.    Okay.  And to help make sure that Mr. Palmer's insurance

3 company properly compensated for those damages?

4      A.    Correct.

5            We -- one thing I want to clarify.  We don't control what

6 they pay.

7      Q.    Absolutely.

8      A.    We control the scope and we identify the scope of what needs to

9 be done to correctly make the repairs.  As a contractor, that's our role.

10     Q.    And I have marked as Deposition Exhibit No. 4 and ask you to

11 identify this.

12     A.    This is the contract for the work we did.

13     Q.    Okay.

14     A.    Or the signed proposal for the work we did.

15     Q.    Okay.  Yeah.  I mean, is this -- this is -- it says "Proposal,"

16 but is this the contract once it's signed off on by the customer?

17     A.    We accept it as a contract, yes.

18     Q.    Okay.  You don't have a separate written contract somewhere, do

19 you?

20     A.    No, sir.

21     Q.    This is a proposal made by -- do you pronounce it Ja-Mar or

22 Ja-Mar?

23     A.    Ja-Mar.

24     Q.    Okay.  So this is a proposal that was made by Ja-Mar to Palmer

25 Cravens, doing business as Park Place Ventures, L.L.C. out of McAllen,

1    Q.    Yeah.  I mean, from what I -- the paperwork I've seen, it looks

2    like you guys got started with the actual work in early December of 2012

3    and finished up towards the end of January of 2013?

4    A.    That sounds right.

5    Q.    So you are saying that sometime in 2013 after the work was done

6    and you guys went to collect the last draw, Mr. Palmer held you guys

7    hostage?

8    A.    Yes, sir.  That's what I -- that's what was reported to me

9    by -- by David Bloomer.

10   Q.    By David Bloomer?

11   A.    Yeah.

12   Q.    And prior to that, did you have any idea that there was going

13   to be an arrangement whereby the amount of the deductible would be

14   reimbursed to Mr. Palmer?

15   A.    No, sir.  No.

16   Q.    Well, were you aware that Mr. Palmer had a manager out there by

17   the name of Doug Schneider who was helping you guys out?

18   A.    I was aware that he was his representative on the project.

19   Q.    Right.

20   A.    I don't know that he helped us out.

21   Q.    Well, do you know whether or not -- did your company agree with

22   Mr. Palmer to -- to pay Mr. Doug Schneider for helping you guys on that

23   project?

24   A.    That was the remedy we came up with to allow Mr. Palmer to not

25   pay his deductible and get -- and get the remainder of our funds.

1      Q.      Have you seen the correspondence and the photographs that

2  followed April 1st of 2013, and seen all the problems that this roof has

3  had?

4      A.      No, sir, I have not.

5      Q.      Let me hand you what's been marked as Exhibit 19, which is a

6  collage of a group of e-mails that I want to start on the 4th page.  We

7  discussed earlier that the tenant in the building was the VA and that they

8  were operating an outpatient clinic and pharmacy?

9      A.      Yes, sir.

10      Q.      And we can see that there were two water leaks on April the 22,

11  of 2013, 22 days after the GAF warranty was issued?

12      A.      Yes, sir.

13      Q.      April 26th, Doug Schneider, the owner representative, is asking

14  David Bloomer to address the roof leaks identified by the VA, correct?

15      A.      Yes, sir.

16      Q.      On April the 30th, the owner representative is asking David

17  Bloomer -- or advising David Bloomer that a VA representative, the tenant

18  representative had called and said there are several tiles -- ceiling tiles

19  that are wet and water in the light fixtures on both the south middle side

20  of the pharmacy.  Do you see that?

21      A.      Yes, sir.

22      Q.      I mean, kind of common sense, but having water in light

23  fixtures is not a good idea, is it?

24      A.      No.

25      Q.      It's a safety problem?

1      A.    Sure.

2      Q.    May the 16th the owner representative is telling David Bloomer

3    that again the VA representative has reported another roof leak over room

4    128, which is on the northeast side of the building.

5             Have you seen these before?

6      A.    I have not seen these e-mails, no sir.

7      Q.    The next one is June the 13th, 2013, owner representative to

8    David Bloomer, saying, "David, have not been able to follow up on our

9    conversation of June 10th, 2013 regarding water in the pan of electrical

10   panel M-1 on the south side of the roof.  Water has seeped into the

11   electrical conduit serving line panel and is leaking over Room 164 on the

12   south side of the clinic.  Please address the M-1 panel ASAP as water has

13   been noticed around the conduit in the ceiling.  Also, water is standing on

14   the roof around the south side roof drains.  Please check this out for

15   correction."

16             Had you seen this one before?

17     A.    No, sir.

18     Q.    August 13th, the next one, Doug Schneider owner representative

19   to David Bloomer, "VA advised today that a water leak over the lab on the

20   southwest corner of the building.  Evidently the A/C roof drain is not

21   connected properly and requires correction."

22             September 4th, 2013:  "Had a report from the VA that

23   there was a leak under the feeder box."

24             And then there is a laundry list of things from August

25   16th that Ja-Mar apparently said they would address.

1              September 18th:  "I know you've worked to correct water

2  pooling on the base of the south side roof electrical panel, but it has a

3  small leak in Room 164.  Please address."

4              You were around for at least the first two years, Ja-Mar

5  has a contractor warranty that it stands behind the product?

6      A.    Yes, sir.

7      Q.    Is that in writing somewhere?

8      A.    The NDL requires us to service the roof for the first two years

9  of the warranty, yes.

10      Q.    And so the way a GAF warranty works is, it's a long-term

11  warranty, isn't it?

12      A.    Yes, sir.

13      Q.    In this case, 20 years?

14      A.    Right.

15      Q.    But one of the ways that GAF, the manufacturer, protects itself

16  from -- is it requires the contractor who installed the roof to be

17  responsible for the first two years --

18      A.    Correct.

19      Q.    -- for any problems --

20      A.    Yes, sir.

21      Q.    -- that arise during that two-year period?

22      A.    Right.

23      Q.    And if any problems arise after the two-year period, then the

24  manufactures will pick it up?

25      A.    That's right.

1   Xactware.  It was just really the scope that was -- where -- where any

2   negotiation was taking place.

3        Q.   Did you end up ever having any discussions or negotiations

4   directly with Mr. Palmer before you guys generated a proposal?

5        A.   I believe I did.  I couldn't really tell you what they were

6   about, though.

7        Q.   What do you remember specifically at all about who actually did

8   the work down there?  I mean, it started out that -- that Guy Hardy and

9   Dripping Springs Roofing did the work.  Did you -- were you the person

10  responsible for subcontracting to Guy Hardy?

11       A.   That wasn't specifically my job.  I definitely took some --

12  some of the role in that.  Again, it was kind of a team effort on -- on

13  that.

14       Q.   Who would have ultimately made the decision to retain Mr. Hardy

15  or Mr. Hardy's company?

16       A.   Well, ultimately it would probably go to David Phillips to make

17  that final decision.

18       Q.   Had you worked with Dripping Springs Roofing before?

19       A.   I hadn't.

20       Q.   All right.  So I take it as far as Guy Hardy and his crew

21  showing up to do any work down there, you weren't really aware one way or

22  the other about skill, competency, anything like that?

23       A.   No.  I believe he came from Dripping Springs.  I think he

24  had -- may have had a relationship with Ja-Mar, but I am not 100 percent

25  sure about that.

1     Q.   Hardy or Dripping Springs Roofing then subbed some of the work
2  to another company called J.O. Roofing or Joe Ortegon Roofing.  Did you
3  actually play any part in that decision?
4     A.   I recall that, but I don't recall exactly how the transaction
5  went down.
6     Q.   So you weren't the -- you weren't the guy who made the decision
7  to put Joe Ortegon on the roof?
8     A.   That would have been Guy Hardy if he hired him.  I honestly
9  don't recall that.  But --
10    Q.   Do you actually remember any of the work being done up there on
11  the roof?
12    A.   I do.
13    Q.   Who do you recall doing the work, that is, taking up the old
14  roof, putting down installation board, putting down TPO, all that kind of
15  work?
16    A.   There was a number of crew members up there.  I --
17  specifically, I wouldn't know who they are.
18    Q.   Would any of the crew members doing the work actually have been
19  employees of Ja-Mar?
20    A.   Unlikely.
21    Q.   How about for fixing the collapsed roof and some of the
22  interior damage?  Would that have been Ja-Mar employees at all?
23    A.   No.
24    Q.   You would have subbed that out, too?
25    A.   Exactly, yes.

```
 1        Q.    Do you think that that's good business?

 2        A.    I do it now every day.  I have -- that's how this business

 3   runs.

 4        Q.    What do you mean?

 5        A.    So I do think it's good business.

 6        Q.    To not tell the customer?

 7        A.    I didn't realize it was a question.  I would never hide that if

 8   someone asked me, but it's not something we bring up.

 9        Q.    And so when you-all signed up Mr. Palmer to do the work, it

10   wasn't just the roof you-all were doing, right?

11        A.    No, it was also the structural issues at the VA there as

12   well.

13        Q.    Okay.  And there was also some air-conditioners that had to be

14   replaced?

15        A.    That's correct.

16        Q.    That the insurance company agreed to actually replace, right?

17        A.    Uh-huh, if I remember correctly.

18        Q.    Okay.  And -- and then -- so how do you go about -- you --

19   basically, what you were doing is Ja-Mar was assuming the role of a general

20   contractor?

21        A.    That is correct.

22        Q.    Correct?

23              And then also in the contract that Ja-Mar had, you had

24   something in the -- in the contract with Mr. Palmer generally that says we

25   are -- we are willing to do all the work and -- and negotiate and deal with
```

1      Q.    Was he on this job?

2      A.    He was part of it.  I don't remember what his compensation was,

3  if he had any or not.

4      Q.    Okay.  And Mr. Hardy is -- December 14th, is -- it's just more

5  materials that he's requesting that he needs, right?

6      A.    Correct.

7      Q.    Okay.  So Mr. -- Mr. Hardy stated that -- that the materials

8  that this job required it to be fully adhered and  that when the glue for

9  the adhering was there on the job, that someone from Ja-Mar told him to

10 ship the glue back.  Do you recall that?

11     A.    I do not.

12     Q.    And a TPO roof, manufacturers require a roofing contractor to

13 be certified, right, to put on a particular type of roof?

14     A.    I believe most manufacturers do, yes.

15     Q.    Okay.  So the roofing company has to meet whatever

16 qualifications that that manufacturer requires?

17     A.    Yes.

18     Q.    Okay.  I am going to mark Exhibit 10.  And that's the GAF

19 warranty, it appears.  Do you agree?

20     A.    Yeah, it looks like that.

21     Q.    And it says -- what does it say for the date completed?

22     A.    4-1-2013.

23     Q.    Okay.  Do you have any -- any reason to dispute that the -- the

24 job was finished as of April 1st, 2013?

25     A.    No.

1    Q.    And the GAF, they are not going to give a warranty if the roof

2    is leaking, are they?

3    A.    No.

4          You know, I mean, ultimately that's the inspector's job

5    to make sure the roof was installed properly.

6    Q.    I am going to hand you Exhibit 11.  And if you would -- I'm

7    sorry.  Let me mark it as 12.  I am sorry.

8          And if you would, tell us what that is.

9    A.    Looks like an e-mail to me from Doug Schneider.

10   Q.    And what is Mr. -- what is the date on it?

11   A.    April 26.

12   Q.    And what is Mr. Schneider informing you of as of April 26 of

13   '13?

14   A.    That there are some roof leaks identified by the VA.

15   Q.    And he is wanting you-all to come fix it, right?

16   A.    That's correct.

17   Q.    And did you do that?

18   A.    I don't recall, honestly.  I wasn't there at this time.  I

19   probably passed this to James McKinney.

20   Q.    Okay.  I am going to hand you what I've marked as 14.

21         And the date, sir?

22   A.    May 16th.

23   Q.    Of '13?

24   A.    Of 2013.

25   Q.    And that's from -- an e-mail from Doug Schneider to you,

1   Mr. Bloomer, right?

2       A.    It is.

3       Q.    And what is he telling you in May of '13?

4       A.    He is reporting a potential roof leak.

5       Q.    Did you -- do you recall?

6       A.    I don't recall that specifically, no.  I do not, no.

7       Q.    Would you -- I mean, as your role at that time for Ja-Mar,

8   would you get an e-mail like this and pick up the phone and call Guy Hardy

9   or --

10      A.    I would probably forward the e-mail.  I wasn't -- again, I

11  wasn't down in the Valley at that time, so I would get it to somebody that

12  was to go see if there was an actual roof leak or not and then I am sure

13  they would fix it.

14      Q.    I am going to hand you Exhibit 13.  Tell us -- tell us what

15  that e-mail is about.

16      A.    It says that there was several ceiling tiles that are wet and

17  water in a light fixture on the south middle side of the pharmacy.

18      Q.    Another roof leak apparently?

19      A.    I -- I guess.

20      Q.    I mean, wouldn't that be a concern of yours that you-all have

21  finished a job.  It's been inspected, and has continued --

22      A.    Had it been inspected at that time?

23            Yeah, I guess it would be.  It -- there could be many

24  other reasons that there is water besides the roof leaking.  Again, I

25  wasn't in the Valley.  I would have forwarded -- forwarded this to James.

1      Q.    I am going to hand you what I've marked as 15, Mr. Bloomer.

2    And this is an e-mail from Doug Schneider to you, June 13th of '13.  And

3    just ask if you can recognize that and --

4      A.    Not specifically, no.

5      Q.    Okay.  What -- what is Mr. Schneider telling you in June of '13

6    in that particular e-mail?

7      A.    Looks like there is -- he is saying there is water in the pan

8    of Electrical Panel M-1 on the south side of the roof.

9      Q.    Does he say anything about water ponding on the roof?

10     A.    Also, water is standing on the roof around the south side roof

11   drains; please check this as well for correction.

12     Q.    Okay.  Did you do that?

13     A.    I wouldn't have done that, no.

14     Q.    Why not?

15     A.    Because I wasn't in the Valley at this time.  I would have sent

16   this to James.

17     Q.    James McKinney?

18     A.    Uh-huh.

19     Q.    Did McKinney ever communicate anything to you after June of

20   '13 --

21     A.    No.

22     Q.    -- saying that we've fixed these problems?

23     A.    I did not know that, no.

24     Q.    Did you ever follow up with McKinney or anyone from Ja-Mar to

25   say, Hey, are you-all taking care of these problems?

```
 1              MR. TREAT:  All right.  Is that chair better, Mr. Hardy?

 2              THE WITNESS:  Yeah.  This one here's got it going on.

 3              MR. TREAT:  All right.

 4              THE WITNESS:  We good.

 5      Q.   All right.  So my question was:  What was your -- how did you

 6   initially get involved in any way in doing any work on that particular

 7   building?  Who contacted you?

 8      A.   Oh, it's easy.  What happened was I met Ja-Mar, and they had a

 9   bunch of jobs in the Valley.  And they -- they called me and said, Hey, we

10   got this metal job and we're really in trouble on it.  Do you want to come

11   down and take over it?

12              It was Pete Palmer's job.  It was a -- it was a -- it was

13   a 1-and-a-half-inch or 1-and-three-quarter-inch snap-lock panel.  We get

14   down there, and some crew had just done the easy stuff and got a check and

15   left.

16              And so we jumped on it.  And we are getting down, man.

17   And we're about three quarters of the way of being done and -- and James

18   McKinney, the cofounder -- or one of the original founders of Ja-Mar, he

19   sold the company to Dave Phillips and now he was working for David Phillips

20   as a salesman in the project manager capacity.  But David Bloomer --

21              THE REPORTER:  Excuse me.  Can you slow down a little,

22   please?

23              THE WITNESS:  Oh, I am sorry.

24              THE REPORTER:  Thank you.

25              MR. TREAT:  I am not -- I'm not having any trouble
```

1        A.      Uh-huh.

2        Q.      I'm guessing from your testimony so far that the reason a GAF

3    warranty was actually issued was because of work you did on the roof to

4    make sure it was in compliance with their requirements?

5        A.      Well, the reason the warranty was issued was because after

6    Ortegon was gone, we ended up finishing the job ourselves.  And for, I

7    don't know, probably a couple weeks of that, it was on my coin.  And then

8    after that, it became so grandiose that Ja-Mar actually picked up the

9    ticket and paid us to redo all the areas that they had done.  So I don't

10   know how much Ja-Mar was actually out-of-pocket for the repairs.

11               And then Bobby came down and did -- and Bobby's the

12   hardest inspector there is.  And when he came down and did his -- one of

13   his inspections, he got pissed and walked off the roof.  He was mad.  And

14   he told James, he goes, I'll come back in a couple of weeks but -- you

15   know, blah, blah, blah.  Okay?

16               So all the stuff he marked, we took -- we reseamed seams.

17   We put the T-patches.  We redid the skirts.  We did all kinds of stuff,

18   redid pitch pans, all kinds of stuff.  And when he came, he walked and he

19   passed it and gave us a ten.  Ten's the highest score you can get.

20               Yes, but -- but did I do the work on my coin?  No.  I

21   only did about two weeks of it on my coin.  We did about three or four

22   weeks of it on Ja-Mar's coin.  That's how much work there was.

23       Q.      And so ultimately after you had done -- are you saying about

24   six weeks worth of work --

25       A.      Yes.

CICMSJ0329

1    Q.    -- on the roof --

2    A.    Yes.

3    Q.    -- then it was warranty ready?

4    A.    Yes.  Then it passed the inspection of GAF, who actually holds

5    the 20-year warranty.

6    Q.    When Bobby came back with his inspection and gave you the ten,

7    did he know anything that needed to be done on the roof?

8    A.    No, not all.  In fact, Bobby took pictures of everything --

9    or a lot of the things that he didn't like the first time.  Then when he

10   came back to do the -- do the inspection and we passed, during that time,

11   if I had a question about something that he had made a mention to, I would

12   take a picture and I'd send it to him and say, Bobby, what about this, and

13   what about that?  And, in fact, I have those e-mails still.

14          Anyway, Bobby'd say, Well, here is what I want you to do,

15   here is what I want you to do.  Right?  And the stuff we already knew --

16   because, you know, the rules for putting on a roof and the rules for NDL,

17   they're almost the same, but not quite.  There's a little stuff that's a

18   little bit more stringent when it comes to NDL.  And -- and basically, he

19   was familiarizing us with it.

20   Q.    And then you laid the TPO over that -- that drop-off of an

21   inch?

22   A.    Uh-huh, yeah.  And we asked Bobby about it.  And we had made

23   sure it was cool before we did it.

24   Q.    Well, that --

25   A.    And -- and --

1          THE COURT:  All right, sir.

2          (Video deposition being played as follows:)

3          (Witness sworn.)

4                    JOEL ORTEGON,

5    having been first duly sworn, testified through the interpreter as follows:

6                    DIRECT EXAMINATION

7    BY MR. TREAT:

8        Q.    Will you please state your complete name for record.

9        A.    Joel Ortegon Alvarez.

10       Q.    All right.  Do you understand why we are here or what the

11   lawsuit is about?

12       A.    Yes, it's clear to me.

13       Q.    All right.  Tell me what your understanding is about what the

14   lawsuit is about.

15       A.    He has had problems with leaks in his roof.

16       Q.    All right.  And when you say problems with the leaks, who are

17   you talking about as having leaks?

18       A.    To the lawsuit, I guess.

19       Q.    All right.  What I'm getting at is do you know what building

20   we're talking about?

21       A.    Well, when I performed this job, that's a Veteran's Hospital.

22       Q.    Okay, the Veteran's Hospital.  And that was -- who was it that

23   hired you to do that work?

24       A.    The person I had the contract with when he hired me, it was

25   this company.  Here is its name.  I am sorry.  I cannot pronounce it.

156

1    Q.    All right.  Guy Harding d/b/a Dripping Springs Roofing; is that

2  correct?

3    A.    Yes.

4    Q.    And what were you hired to do specifically?

5    A.    To remove the existing roofing all the way to get to the

6  decking itself, install the new insulation and install the TPO.

7    Q.    Had you worked for Hardy before?

8    A.    No.

9    Q.    How did you and Mr. Hardy get in touch about this particular

10  job?

11   A.    Okay.  They were looking at some of the computer -- I mean,

12  through the Internet.  I don't know much about Internet, but there was a

13  job being offered there.  They were looking for a roofer to do this job,

14  and that's how the connection occurred.

15   Q.    Let me ask you a little bit about your background, then, too.

16  First of all, can you tell me how far you've gone in school?

17   A.    I attended college.

18   Q.    And where was that?

19   A.    In Mexico, Nuevo Laredo.

20   Q.    Did you obtain a degree?

21   A.    No, I quit two years before finishing my career.

22   Q.    And when did you quit going to college, what year?

23   A.    I don't remember the year.

24   Q.    Since you got out of college, have you served in the

25  military?

1   did Mr. Hardy ever complain to you or say that what you were doing was not

2   right?

3          A.    No, there was no complaint.  Actually, when he went there, he

4   said we need to cover this and we need to secure it and we did.

5          Q.    Mr. Ortegon, I represent Ja-Mar Roofing.  Did you ever talk

6   with anybody from Ja-Mar Roofing about your work at the VA Clinic?

7          A.    Yes, I had a meeting with one of these people and then this

8   other man.

9          Q.    And what was the name of the other man, do you remember?

10         A.    You mean the Ja-Mar Roofing?

11         Q.    Yeah.

12         A.    I don't know because I didn't deal with him.  I just dealt with

13  Hardy.

14         Q.    Do you know if his name was David Phillips?  David Bloomer?

15         A.    I don't talk to other people.  Hardy, I talk only to him.

16         Q.    So as far as the work you were going to do or perform there,

17  all of your conversations were with Mr. Hardy?

18         A.    Yes.

19         Q.    One of Mr. Hernandez's criticisms was that there was a step

20  down between two insulations thicknesses.  In parts of the roof it was four

21  inches thick, and parts of it was 3.5 inches thick.

22         A.    Uh-huh.

23         Q.    Is that true, was there a step down?

24         A.    Yes, that's true.

25         Q.    All right.  And what was the cause of that step-down?

1    with names or anything.  But it was the three of them who made that

2    decision.

3         Q.    Do you remember ever talking to a man named Doug Schneider?

4         A.    Does he speak Spanish?

5         Q.    You know, he's lived down there for ever, so I suspect he does

6    but I do know that he works for Jay Palmer.  So do you know either Jay

7    Palmer or Doug Schneider?

8         A.    I don't know who those persons are.

9         Q.    All right.  Because there's invoices in the file that indicate

10   Mr. Schneider was paid for inspecting your work.  Do you remember

11   Mr. Schneider ever inspecting your work?

12        A.    No.  The only person that went to inspect is Mr. Hardy.

13        Q.    So I take it that during this meeting these three people all

14   told you to do the TPO over the drop-down or step-down?

15        A.    Yes.

16        Q.    And who was it that told you?  Was it Mr. Hardy?

17        A.    Yes.  Between the three of them, made the decision and then

18   Mr. Hardy turned around and told me to do what had been agreed.

19        Q.    Did you think it was a good idea to cover the step-down with

20   TPO?

21        A.    Well, the contract was for everything, for all of it.  And then

22   they had a different idea.  And, to me, I don't think it was a good idea.

23        Q.    But you did it because they told you to?

24        A.    Well, those were the people paying me and telling me what to

25   do.

1      Q.    If you'll just look at the bottom photographs of that page

2   you'll see Photographs 3 and 4 show where water has ponded on the roof.

3                  Should it be doing that?

4      A.    This is typical in roofs like this one that have very little

5   slope.

6      Q.    And just because it's ponding, does that mean it's leaking?

7      A.    There is a probability that water can -- can leak from there.

8      Q.    How long should it -- is there any rule that you're aware of or

9   have any kind of guidelines on how long to have ponding water before it

10  evaporates?  If you know?

11     A.    No.  At least myself, I don't know.

12     Q.    Okay.  Another criticism of Mr. Hernandez was that the rooftop

13  A/C units are missing crickets, which results in ponding along the upslope

14  edge of the curb; is that true?  Do you agree these crickets were

15  missing?

16     A.    Yes, I agree.

17     Q.    All right.  And the next thing it says is ponded water on the

18  TPO roof will accelerate the deterioration of the TPO.

19     A.    Yes.

20     Q.    Do you agree with that?

21     A.    Yes.

22     Q.    All right.  In other words the water will age this sort of

23  rubber or the material more quickly than it would otherwise?

24     A.    Yes.

25     Q.    Now, the other thing I asked you to do was to look at any

1  pictures and see if you saw any of the work that you guys -- you had done

2  but it did not look like the work had been done properly.  Did you see

3  anything like that?

4      A.   Yes, I found some.

5      Q.   All right.  Tell me which photographs those are, please.

6      A.   Photo 99.

7      Q.   And what do we see in photograph 99?

8      A.   Okay.  Here's a connection box where we should have it

9  continued.

10     Q.   Why don't you circle or put a square around the area?

11     A.   (Witness complies.)

12     Q.   All right.  You've drawn a square on photograph 99 on

13  Exhibit 3.

14     A.   Yes.

15     Q.   And what should you have done in that area?

16     A.   Okay.  This is a patch where we made a repair one day and

17  continued the following day.  And this patch should have gone all the way

18  to the par --

19     Q.   I see.

20     A.   -- showing right now.

21     Q.   So the patch that we see there should have extended all the way

22  to the seam running up and down the photograph?

23     A.   Yes.

24     Q.   Okay.  All right.  Any other photographs that you saw that

25  showed work that wasn't done properly?

1      A.    Well, actually on the air-conditioning units, yes, they could

2  take more crickets.

3      Q.    And there's several pictures in here of ponding around the A/C,

4  and what you are saying is there could be more crickets to make sure

5  there's no ponding?

6      A.    Yes, that's a recommendation.  It's recommended to install

7  crickets.

8      Q.    And did you guys put in crickets?

9            THE INTERPRETER:  The interpreter needs clarification.

10           Okay.  Mr. Ortegon says that he did not buy the

11 materials.

12     A.    I did not buy the materials and the materials they brought to

13 me did not include crickets, but I would have recommended to have crickets

14 installed there.

15     Q.    So Mr. Hardy didn't bring the crickets?

16     A.    That's correct.

17     Q.    Did you ask him for any?

18     A.    Okay.  No, I do not --

19     Q.    I was going to write some other stuff.

20     A.    I did not order the -- I did not request the crickets to

21 Mr. Hardy because I never saw the list of materials that he had ordered.  I

22 have nothing to do with that.

23     Q.    Should you have asked for crickets so we can avoid the

24 condition we see in Photograph 100?

25     A.    Okay.  Should I have?  I don't know because I didn't see the

1   contract he signed with his client because in the contract you specifies

2   the number of crickets you are going to install.

3       Q.   And you've never had any discussions with Mr. Hardy about the

4   need for crickets?

5       A.   Well, no, I couldn't tell him what he needed to do.

6       Q.   Were there any other photographs that you saw where there was

7   work that you don't think you did properly?

8       A.   The rest of the work, I performed exactly as he requested.

9       Q.   From what you've seen from looking at the photographs, it

10  sounds to me like there's some minor things that you think could be done on

11  the roof, is that correct?

12      A.   Of course, yes.

13      Q.   All right.  Do you think the whole roof is defective and needs

14  to be ripped off and they need to start over?

15      A.   I believe that what is defective is that we were working to a

16  certain point and did not continue with the rest of the roof going down,

17  and that's the part that is defective.

18      Q.   But that's not quite my question.  Do you think the entire roof

19  needs to be ripped off, or can we just repair the few areas that need some

20  work?

21      A.   Certain areas need to be reworked.

22      Q.   Can you take a look at Exhibits -- I mean Photograph 45 and 46?

23      A.   Okay.

24      Q.   All right.  You'll see in there that it shows connections on

25  the fasteners on the parapet wall.  Do you see that?

1     A.     Yes, I can see them.

2     Q.     And according to -- according to the report, the fasteners are

3  too far apart.  Do you agree?

4     A.     Yes, I agree.

5     Q.     Take a look at 61, Photograph 61.

6            All right.  Should water be ponding on the parapet wall,

7  on the top of the wall there?

8     A.     No.  If it's properly installed, it should not.

9     Q.     All right.  And J.O. Roofing did that installation, right?

10    A.     No.

11    Q.     You didn't do the top, this part of the wall?

12    A.     No.

13    Q.     Who did that?

14    A.     This man the one who pays me.

15    Q.     Mr. Hardy?

16    A.     Yes.

17    Q.     Generally, do you think that J.O. Roofing did a good job here

18  or a bad job?

19    A.     J.O. Roofing followed the recommendations of Mr. Hardy.

20    Q.     So I take it that means you think you did what you were hired

21  to do?

22    A.     Yes.  And I did as best as I could, following their

23  recommendations.

24    Q.    Prior to the work that you did at this address, had you ever

25  been hired to do any work by Ja-Mar?

Regina Vasquez, CSR
332nd District Court Reporter

CICMSJ0339

194

```
1    THE STATE OF TEXAS                )

2    COUNTY OF HIDALGO                 )

3         I, Regina Vasquez, Official Court Reporter in and for the 332nd

4    District Court of Hidalgo County, State of Texas, do hereby certify that

5    the above and foregoing contains a true and correct transcription of all

6    portions of evidence and other proceedings requested in writing by counsel

7    of the parties to be included in this volume of the Reporter's Record, in

8    the above-styled and numbered cause, all of which occurred in open court or

9    in chambers and were reported by me.

10        I further certify that this Reporter's Record of the proceedings truly

11   and correctly reflects the exhibits, if any, admitted, tendered in an offer

12   of proof or offered into evidence.

13        WITNESS MY OFFICIAL HAND this the 20th day of September, 2019.

14

15

16                    /s/Regina Vasquez_____
                      REGINA VASQUEZ, TEXAS C.S.R. 7227
17                    Expiration Date:  12-31-19
                      Official Court Reporter, 332nd District Court
18                    Hidalgo County, Texas
                      100 North Closner, Texas
19                    Edinburg, Texas 78541
                      Phone: (956) 318-2275
20                    Fax:  (956) 318-2698

21

22

23

24

25
```

CICMSJ0340

1

```
1                         REPORTER'S RECORD
                         VOLUME 4 OF 12 VOLUMES
2                    TRIAL COURT CAUSE NO. C-6015-14-F

3    PALMER CRAVENS,                )        IN THE DISTRICT COURT
                                    )
4           Plaintiff(s),           )
                                    )
5    VS.                            )        HIDALGO COUNTY, TEXAS
                                    )
6    NATIONAL FIRE INSURANCE COMPANY )
     OF HARTFORD AND D.L. PHILLIPS  )
7    CONSTRUCTION D/B/A JA-MAR ROOFING, )
                                    )
8           Defendant(s),           )        332ND JUDICIAL DISTRICT

9

10   _____

11

12

13                      JURY TRIAL PROCEEDINGS

14

15

16   _____

17

18

19       On the 14th day of June, 2018, the following excerpted proceedings

20   came on to be heard in the above-entitled and numbered cause before the

21   Honorable Mario E. Ramirez, Jr., Judge presiding, held in Edinburg, Hidalgo

22   County, Texas:

23       Proceedings reported by stenograph method.

24

25
```

CICMSJ0341

```
 1                    A P P E A R A N C E S

 2  Mr. Raymond L. Thomas
    SBOT NO. 19865350
 3  Mr. David O. Sanchez
    SBOT NO. 24102457
 4  Ms. Kristen Lamar Vela
    SBOT NO. 24107950
 5  RAY THOMAS, PC
    4900-B North 10th Street
 6  McAllen, Texas 78504
    Phone: (956) 686-8797
 7  Fax: (956) 630-5199
    rthomas@raythomaspc.com
 8  ATTORNEY FOR THE PLAINTIFF

 9       - AND -

10  Mr. David L. Treat
    SBOT NO. 20205300
11  Ms. Amanda N. James
    SBOT NO. 24092570
12  LINDOW STEPHENS TREAT, LLP
    One Riverwalk Place
13  700 N. St. Mary's St., Suite 1700
    San Antonio, Texas 78205
14  Phone: (210) 227-2200
    Fax: (210) 227-4602
15  dlt@lstlaw.com
    ATTORNEY FOR THE DEFENDANT
16
         - AND -
17
    Mr. Wesson H. Tribble
18  TRIBBLE | ROSS
    SBOT NO. 20213960
19  6371 Richmond Avenue
    Houston, Texas  77057
20  Phone: (713) 622-0444
    Fax: (713) 622-0555
21  wtribble@tribblelawfirm.com
    ATTORNEY FOR THE DEFENDANT
22  D.L. PHILLIPS CONSTRUCTION, INC.

23

24

25
```

```
 1                        I N D E X

 2                        VOLUME 4
                   JURY TRIAL PROCEEDINGS
 3
       JUNE 14, 2018                                  PAGE    VOL.
 4     Proceedings -------------------------------------   4      4

 5     PLAINTIFF'S WITNESSES          DIRECT    CROSS    VOIR DIRE   VOL.
       MCKINNEY, JAMES MONTAQUE        4,  89   39, 111   ---, ---    4
 6                                    113

 7     GARZA, GUADALUPE JR.          116, 193, 157, 197,  ---, ---    4
                                     199, 203  201, 204
 8
       MCCOY, THOMAS BERNHARD        205, ---  232, ---   ---, ---    4
 9       (BY VIDEOTAPED DEPOSITION)

10                                                    PAGE    VOL.
       Adjournment -------------------------------------  236      4
11
       Court Reporter's Certificate ------------------------  237      4
12
                          EXHIBIT INDEX
13     PLAINTIFFS'
       NO.  DESCRIPTION                    OFFERED    ADMITTED   VOL.
14     25.  Landlord Repairs                143         144       4

15     95.  Report by Baldwin Roofing       152         153       4

16     101. Photographs                     125         126       4

17     102. Roof Investigation Report       135         136       4

18     103. 1-15-15 Letter                  137         137       4

19

20

21

22

23

24

25
```

1  that were entered into by Ja-Mar with Palmer Craven.  You are aware of

2  that, sir?

3        A.    Yes, sir.

4        Q.    The first one was the insurance authorization agreement that

5  allowed or authorized Ja-Mar to negotiate on behalf of the insured --

6        A.    Right.

7        Q.    -- with the insurance company, right?

8        A.    Uh-huh.

9        Q.    And the second contract -- I am sorry, that's not the second

10 contract.  That's my fault.  It's Exhibit 12.

11              In the second contract even though it's called Proposal

12 it's already -- it's signed off by Mr. Palmer; is it not?

13       A.    Right.

14       Q.    And this becomes the contract for Ja-Mar to do the work; is

15 that right?

16       A.    Yes, sir.

17       Q.    So we have two contracts:  The insurance contract and the

18 contract to do the work.  And -- and so this is a situation where Ja-Mar is

19 acting as a unlicensed public adjuster and also is doing -- participating

20 in doing the work that -- on a claim that they settled --

21       A.    Right.

22       Q.    -- correct?

23       A.    Yes.

24       Q.    All right.  And as we see from the statutes that we just looked

25 at that's against the law, isn't it?

1    serviced, don't they?

2        A.    Yes.

3        Q.    In order to service those systems that are on the roof, you've

4    got to have foot traffic, don't you?

5        A.    Yes.  But it doesn't hurt to walk on a mechanically fastened.

6        Q.    Well, don't the GAF manual and specifications require that if

7    you are going to have foot traffic, that you have to -- there are certain

8    extra requirements in the specifications for creating walkways?

9        A.    I wasn't aware of that.

10       Q.    Let's pull up the warranty, which is Exhibit No. 22.  And under

11   Exclusions there is a paragraph No. 4.  And it says exclusions from

12   coverage -- do you see that up at the top left?

13       A.    Uh-huh, yes, sir.

14       Q.    It says this guarantee does not cover conditions other than

15   leaks and this guarantee does not cover leaks.  They don't even cover

16   leaks -- caused by, No. 4, traffic of any nature on the roof unless GAF

17   walkways applied in accordance with GAF's application and specifications

18   manual.  Do you see that?

19       A.    Yes.

20       Q.    Now, in looking at the installation of this mechanically

21   attached roof that was installed by Hardy and Ortegon, there were no GAF

22   walkways that were applied in accordance with GAFs application and

23   specification manual, were there?

24       A.    No.  But I was with the inspector and he never said anything

25   about that or we would have put walkways on there.

1           Did you ever tell Mr. Hardy that you were trying to do

2 this job on the cheap or anything like that because of insurance?

3      A.   No.

4      Q.   And did you ever tell him that you were mechanically fastening

5 it because you were trying to be cheap?

6      A.   No.

7      Q.   Did you ever -- Mr. -- do you remember Mr. Hardy's testimony

8 about you were trying to do it cheap because Mr. Palmer was going to sell

9 the building?  Did you ever say anything like that to Mr. Hardy?

10     A.   No.

11     Q.   You did hear Mr. Hardy testify that he didn't think the entire

12 roof needed to be ripped off to do any repairs?

13     A.   Right.

14     Q.   Do you agree with that?

15     A.   Yes.

16     Q.   Okay.  Now, let's talk a little bit about the leaks that

17 occurred that you've already told the Ladies and Gentlemen of the Jury you

18 weren't happy about after you guys were done and the warranty was issued,

19 okay?

20     A.   Right.

21     Q.   How did you find out or learn that there had been leaks on the

22 roof?

23     A.   In the first two years?

24     Q.   Yes.

25     A.   Dough Schneider would -- would either call me or send an e-mail

1   and notify the office or me that he had a leak, or they had a maintenance

2   man named Martin and he would also meet with me there with Guy Hardy and

3   we'd fix the leaks, check it and fix the leaks.

4       Q.   And -- and how many times do you remember coming down to do

5   that?

6       A.   I think it was six or seven.

7       Q.   All right.  And -- and I take it the fact that you had to

8   repair leaks six or seven times did not make you happy?

9       A.   No.

10      Q.   Why not?

11      A.   It was embarrassing to have roof leaks on a new roof.

12      Q.   All right.  Is it -- is it uncommon to have leaks on a new

13  roof?

14      A.   No.  I mean, it -- it happens.  And as long as you go back and

15  fix it.  And any time there is a leak, we fixed -- changed the ceiling tile

16  out.

17      Q.   But I am guessing that if you have a new roof having one or two

18  small leaks might not be that uncommon.  But getting up to six, that was

19  what was embarrassing to you?

20      A.   Yes.  But it's a big building so, you know, if you have a small

21  building and you have seven leaks that's a disaster.

22      Q.   Right.

23      A.   But on 400 squares and seven leaks is -- is not good, but I

24  mean, it's -- it happens.

25      Q.   What did you -- when you say you fixed the leaks, tell the

1   Ladies and Gentlemen what you had to do to fix the leaks?

2        A.   We'd have to power wash the roof in that area and then get on

3   your hands and knees and in that pick and find the seams.  The only way it

4   would leak would be a seam or a T-patch, so you find that and then clean it

5   and patch it.

6        Q.   And you think you did that six or seven times?

7        A.   Yes.

8                 Most of them were small leaks except when the drain came

9   loose.

10       Q.   Were there any -- were there any leaks through penetrations at

11  all?

12       A.   Some of the exhaust fans a couple of them leaked.

13       Q.   All right.

14       A.   One of them was the top of the fan itself was split, which we

15  never noticed.  And one of them was the T-patch around the flashings of the

16  drain.  Do the drain and then you turn up and then down there on the roof

17  surface is where we put the T-patch and sometimes they didn't do a good

18  job.

19       Q.   And then you also mentioned that the drain came loose --

20       A.   Right.

21       Q.   -- once.

22                 And you actually heard Mr. Hardy testify about that

23  yesterday, right?

24       A.   I don't know that it was nine inches, but there was a lot of

25  water.  It evidently rained that day.

1     Q.    And -- and what was your understanding of what happened when

2  they got all that rain?

3     A.    The elbow somehow came loose.  They are glued together.  And

4  after 20 years or 25 -- however old the building is -- sometimes that glue

5  gets brittle and then it doesn't really hold the PVC pipe.  And I think

6  that's what happened is that the glue either wasn't enough of it.  For

7  years it lasted, but then all of a sudden it turned loose.  It didn't

8  split, it just turned loose.

9     Q.    And is this pipe where this elbow came loose, is this below the

10  roof?

11    A.    Yes.

12    Q.    So this isn't work that you had even -- that wasn't even repair

13  work you had done?

14    A.    No.

15    Q.    But you guys went back and reconnected that pipe after all the

16  water came in?

17    A.    Right.  And cleaned up the floor.

18    Q.    Now, I want to talk about -- the Jury saw and I am sure you saw

19  too, all the sheetrock torn out on the south end of the building when we

20  went on Tuesday, correct?

21    A.    Yes.

22    Q.    You were called down to look at the roof at some point in time.

23  It was January of 2015?

24    A.    Yes.

25    Q.    All right.  Who did you go up on the roof with at that point in

1  time?

2        A.    Bobby Whitman, and Isi Secula is our commercial salesman.

3  And -- and he came down with me and we went up there and Martin was up

4  there, and I believe a roofer was up there.

5        Q.    Was Lupe Garza there?

6        A.    I think so.

7        Q.    When you say, "Martin," who is Martin?

8        A.    Martin the maintenance man.

9        Q.    Oh, you mean Doug Schneider?

10       A.    No.

11       Q.    Oh, a different maintenance man?

12       A.    No, there is a maintenance man that stays at the VA to do

13  stuff.  But Doug Schneider was up there, too, I think.

14       Q.    All right.

15       A.    I'm pretty sure.

16       Q.    And -- and what was communicated to you about what had

17  happened?

18       A.    They said that it was -- had been leaking.  But we were never

19  notified that we had leaks.  And I don't think GAF was notified that they

20  had leaks, otherwise we would have fixed it.  We would have come down

21  and -- and fixed the leaks.

22       Q.    Were you told that repairs had been done to the roof?

23       A.    They -- they said that some repairs had been done, yes.

24       Q.    And were those pointed out to you?

25       A.    A couple of them were.  There was some fresh clean spots --

1    Q.    Uh-huh.

2    A.    -- on a dirty roof.

3    Q.    Right.

4    A.    And so, I could see those.  But if there was any others that

5    had been done previous, maybe a month ago or something, then every time it

6    rains, all the dirt and dust goes back over those cleaned areas and then it

7    all looks the same so you don't see where they were repaired.

8    Q.    But I guess my point was were you -- were you actually able to

9    see the leaking conditions so you could make a repair down there at the

10   south end?

11   A.    I didn't see anything that would cause a leak.

12   Q.    Did you ever have the opportunity to see the damage that was

13   extensively caused by these leaks that then allegedly necessitated ripping

14   out all that sheetrock?

15   A.    No.

16   Q.    That was a done deal before you got there?

17   A.    Yes.

18   Q.    Did you ask the roofer up there if he had taken any photographs

19   of the leaks or the damage before the sheetrock was ripped out?

20   A.    Well, when he was standing there asking -- when they were

21   pointing out those two patches, I said, did you take pictures of it before

22   you patched it, and he said, no.

23   Q.    And did you ask him any further questions about that?

24   A.    No.

25   Q.    All right.  Did you ask him any questions about whether they

1    had documented damages downstairs before Servpro came in and took out all

2    the sheetrock?

3         A.    No.

4         Q.    Do you have experience with Servpro?

5         A.    Do what?

6         Q.    Do you have experience with Servpro at all?

7         A.    I know of them.

8         Q.    Have you ever -- have you ever been on jobs or anything like

9    that --

10        A.    Yes.

11        Q.    -- where you had to deal with them?

12        A.    Yes.

13        Q.    All right.  Did you ever talk to anybody about Servpro about

14   why they tore out so much or what they were doing?

15        A.    No, they weren't there.

16        Q.    Now, another change of topic.  I know I've already talked about

17   the reimbursement for insulation and/or ceiling tiles.  Is there some

18   repair work that needs to be done on that roof?

19        A.    Yes.

20        Q.    All right.  Tell us in your view what it is that needs to be

21   done.

22        A.    The area over the pharmacy is -- they call it a step down.

23        Q.    Right.

24        A.    That needs to be brought up level with the roof and a new roof

25   put over that area.

1    Q.    Right.  Were you involved in the decision in anyway that led to
2  that drop off?
3    A.    No.
4    Q.    Does that drop off make the roof leak?
5    A.    No.
6    Q.    But why do you think it needs to be lifted up?
7    A.    It just doesn't look good, and it shouldn't have been that
8  way.
9    Q.    Anything else on the roof that needs to be fixed?
10    A.    Behind the air condition units I noticed in a picture that it's
11  ponding water so that needs to have a little cricket back there.
12    Q.    You are not talking about the bug?
13    A.    What?
14    Q.    You are not talking about the bug?
15    A.    No.
16    Q.    Just in case somebody doesn't know --
17    A.    It's tapered insulation that forms a little cricket so when the
18  water comes down instead of hitting the air-condition unit it goes by that
19  cricket and it makes it flow around the unit so it doesn't pond back there.
20  And it makes the roof a little higher back there so it makes the water
21  flow.
22    Q.    Just like a little dam almost?
23    A.    Right.
24    Q.    Anything else that needs to be fixed?
25    A.    The area above the front door entrance, it ponds a lot of water

1   there at the edge.  Evidently the edge is either higher and that creates a

2   dam and backs the water up.  That needs to be fixed.

3        Q.   And how would you do that?

4        A.   Tear that off and -- and put more insulation or whatever it

5   takes to level it out so it flows off.

6        Q.   All right.  And how about the cap flashing?

7        A.   That -- that needs to be replaced in my opinion.

8        Q.   And why is that?

9        A.   Because of the lapse in the -- in the way that it ponds water.

10  If I was going to do it, I would put a tapered insulation on there first

11  after the sheet is up so that -- so that the water would run back on the

12  roof and not lay on the -- with the negative drain up there, you'd want to

13  taper it a little bit so the water would come back.

14       Q.   I am going to put -- I am going to put a photo up there, too,

15  so the Jury can understand it.

16       A.   Okay.

17       Q.   It's Exhibit 16, page 40, please.  The top photograph.

18            Okay.  What do we see in that top photograph on page 40

19  of Exhibit No. 16?

20       A.   That's over the entryway and that's the cap flashing parapet

21  wall cap flashing.  And you can see where it's ponding water.

22       Q.   Right.

23       A.   And it's ponding water right by those caps, which is not a real

24  good idea.  That's why you would want to taper it and get the water off of

25  there.

1    Q.    And when you say you want to taper it, do you want the water to

2    run off the front of the building or you want it to run back on the roof?

3    A.    Onto the roof.

4    Q.    And why do you want it to run on the roof?

5    A.    So it doesn't stain the -- the brick down the front.

6    Q.    And then -- then it, obviously, should get pushed down the

7    drains and run out that way, right?

8    A.    Right.

9    Q.    So that needs to be done as well, too?

10    A.    Right.  I would change all the cap flashings.

11    Q.    Is there anything else that you think needs to be done to fix

12    the roof based on what your observations and what you've learned?

13    A.    The areas around the drains need to be taken up and -- and get

14    it to flow into that drain better.

15    Q.    I thought we had already covered that.  But you need to taper

16    it, so you have better flow?

17    A.    Right.

18    Q.    Can that be done?

19    A.    Yes.

20    Q.    Anything else?

21    A.    That pretty well does it, I think.

22    Q.    And -- and so you think those repairs can be done on this roof

23    and we don't have to rip the --

24    A.    No.

25    Q.    -- whole thing off and start all over?

```
 1   was an April fool's joke.  Do you recall that?

 2        A.    Yes.

 3        Q.    As it applies to this case and to the problem that we have at

 4   Mr. Palmer's building, this warranty doesn't even come close to covering

 5   the damages that are at that building, does it?

 6        A.    Were they ever notified?

 7        Q.    Well, yeah, we saw where GAF came out and did inspections.

 8        A.    Well, yeah, that's -- that's for the installation.

 9        Q.    No, sir.

10              You recall when GAF was notified of a leak, Bobby

11   Whitman, the inspector, comes out and he -- and he toured the building with

12   Mr. Lupe Garza.  Is he still here?  Here is Mr. Lupe Garza.

13        A.    Okay.

14              MR. THOMAS:  Can you stand up, sir?

15        Q.    (BY MR. THOMAS:)  He is with Baldwin Roofing.  Do you remember

16   him?

17        A.    Uh-huh.

18              THE WITNESS:  I believe you are the one I met on the

19   roof?

20        Q.    (BY MR. THOMAS:)  Yes, sir.

21        A.    Okay.

22        Q.    In January of 2015, almost a year after this warranty was

23   issued, Bobby Whitman, the inspector, came out -- came out on location, the

24   GAF inspector, with you and with --

25        A.    Isi Secula.
```

1    Q.    -- Mr. Garza and some others.  And Mr. Garza was pointing out
2   various places where it had leaked and where there had been repairs.
3              And do you recall what the result was of the GAF
4   inspection?
5    A.    No.
6    Q.    Mr. Whitman said he found no problems, no leaks were
7   identified.  Do you remember that?
8    A.    Yes.
9    Q.    So the problems that are at this building, the property damage,
10  in particular the interior damage that is going to cost so much money to
11  fix, that's not even covered by this warranty, is it?
12   A.    I don't know.
13   Q.    Well, let's take a good look.  Let's look at the exclusions.
14  First of all, it says this guarantee does not cover conditions other than
15  leaks, right?
16   A.    Yes.
17   Q.    And so, I mean, a roof can have all kind of defects that are --
18  that don't -- that aren't leaks?
19   A.    Right.
20   Q.    And so any roofing defects that are out there that are not
21  leaks are, obviously, not covered by this warranty?
22   A.    Right.
23   Q.    And then it goes on to say that even if it is a roof leak, the
24  guarantee is not going to cover leaks that are caused by all those things
25  that are listed there 1 through 8.

1            And if we look at No. 3 it says they don't cover damage
2   to the roof constructed of GAF roofing materials due to B.
3                MR. THOMAS:  Highlight B.
4        Q.    (BY MR. THOMAS:)  Improper installation.
5                Do you see that?
6        A.    Uh-huh.  Yes, sir.
7        Q.    Okay.  And then if we go to -- we already looked at No. 4.  And
8   we know that any leaks that are caused because of traffic, people walking
9   on the roof --
10       A.    Yes, sir.
11       Q.    -- of any nature on the roof unless these GAF walkways were
12   applied in accordance with the GAF application and specifications manual.
13  And we know that wasn't done on this roof, right?
14       A.    Right.
15       Q.    And speaking of traffic, remember I asked you how many
16  air-conditioners that were up on the building?
17       A.    Yeah.
18                There was 12 I think you said.
19       Q.    Yes.
20                I think you said six.  My memory --
21       A.    I said about 6 or 8.
22       Q.    Yeah.
23       A.    But it's been 6, 7 years.  6 years since we've --
24       Q.    Yes, sir.
25                Let me show you one of the aerial photos.  And I count

```
 1                 Any lawsuit or proceeding --
 2        A.    Oh.  Oh, okay.
 3        Q.    -- other than or before --
 4        A.    Right.
 5        Q.    You got to go to the State of New Jersey to -- to the Courts of
 6   New Jersey --
 7        A.    Hmm.
 8        Q.    -- to collect the 300 bucks to -- to cover -- to get the
 9   band-aid to cover the patch, the hole.  Did you know that?
10        A.    No.
11              I see it on there.
12        Q.    Yeah.  So in relation to the kind of damages that were caused
13   by the defects in the roof in this particular case, this may be the best
14   warranty on the market, but it -- it really doesn't do anything for
15   Mr. Palmer, does it, for the damages that were caused that we are talking
16   about in this case?
17        A.    For the inside damages, no.
18        Q.    Right.  Thank you.
19        A.    But I think every manufacturer has almost the same wording on
20   the bottom of their warranties, too.
21        Q.    Yes, sir.
22        A.    I mean, that's -- I think that's just the way it is.
23        Q.    You are right.  It's just the way it is.
24              So if anybody wants to stand before the Jury and say, you
25   know, what's -- why are we even here before this Jury, Mr. Palmer's got a
```

1  20 year warranty, all's he has to do is take advantage of it.  There is

2  no -- this is not the kind of warranty that is going to fix the scope of

3  the problems that we have with this building, correct?

4       A.     Yes.

5       Q.     Mr. Treat asked you whether the roof is -- yeah, the roof has

6  got problems, but it's performing, right, it keeps the rain out?

7       A.     Yes.

8       Q.     What kind of vehicle do you drive?

9       A.     A Ford.

10       Q.     Me too.

11              A truck or a vehicle?

12       A.     Pickup.  F-150.

13       Q.     Yes, sir.

14       A.     I used to drive the 350, but I can't get in them anymore.

15       Q.     They got those --

16       A.     It's too high.

17       Q.     Yes, sir.

18              If you were to get in an accident in your car, hopefully

19  you don't get hurt, and the insurance company gives you money to get your

20  truck fixed and let's say it wasn't drivable.  And the insurance company

21  gives you money to get your truck fixed and you take it to the body shop

22  and you give the body shop the check.  And they just make some temporary

23  little repairs, some little patch jobs, just enough for you to be able to

24  get back on the road and use it, but they don't finish the repairs, right,

25  they don't -- it's still all banged up but it's able to be driven on the

1    Q.    -- and that you were answering to.  But I want you to look

2    at -- let's look at Ja-Mar's final bill to the insurance company.  And that

3    would be Exhibit 90.

4                See this is from Mr. David Bloomer, which is consistent

5    with what you said.  He is the one who --

6    A.    Yes.

7    Q.    -- is in charge of this project.  And this is on February 8 of

8    2013.  That's about the time the work got wrapped up, right?

9    A.    Yes, I think so.

10   Q.    And he's writing and he says, Derek, please see attached final

11   invoice for the VA outpatient clinic, for the release of the depreciation

12   and the supplements.

13               And let's look at the second page.  If we see balance due

14   it was $597,128.63.  Did I read that right?

15   A.    Yes.

16   Q.    So we are about $2900.00 short of $600,000.00, aren't we?

17   Correct?

18   A.    But in that figure that took care of the pharmacy, and the A/C

19   work, the electrical work.  I believe that's all --

20   Q.    Yes, sir.

21   A.    -- in there.

22   Q.    Sure.  But this is what Ja-Mar got paid and then, of course,

23   Ja-Mar had to pay some others?

24   A.    Correct.

25   Q.    Had to pay, among others -- well, Mr. Bloomer, right?

1    Q.    On my office?

2    A.    Yes, sir.

3    Q.    I remember that.

4              That was as a result of the hailstorm?

5    A.    Yes, sir.

6    Q.    And we are there on 10th Street across from Luby's.

7    A.    Yes, sir.

8    Q.    And was our building in pretty bad shape?

9    A.    It was at the time, yes, sir.

10   Q.    How did you get involved in this particular project working on

11   the -- what was the VA Clinic?

12   A.    I was asked to come out by Rick Guerra-Prat to come out to go

13   inspect his property.  And we went in and out and did a walk through to see

14   where the roof leaks were occurring inside the building and then we went up

15   on the roof to see where the roof leaks were attributed to.

16   Q.    Okay.  Let me put the time line up.

17              Mr. Garza, I hope you'll be able to see it from there,

18   but we are going to put the time line up.  And if you can't see the dates,

19   just let me know.  Do you remember what month it was when it was that you

20   first went out there?

21   A.    I remember it was towards the end of the year, beginning first

22   part of the year.

23   Q.    First part of the year?

24   A.    Around that time, yes, sir.

25   Q.    Here we go.  The hailstorms were in 2012.  The roof repairs

1   were completed in February of 2013.  And the leaks start in March.  The GAF

2   warranty was issued on April the 1st.  And then we have leaks throughout

3   the rest of the year.  And some time at the end of 2013, early 2014, is

4   when you went out there?

5       A.   Yes, sir.

6       Q.   And when you first went out there, who was there?

7       A.   Rick Guerra-Prat and the consultant that asked me to be there,

8   my brother Alonzo Garza was there.

9       Q.   Okay.  And at some point did you have another inspection out

10  there with the GAF inspector?  The GAF inspector, was he asked to come out

11  to look at the leaks that -- and the other defects that you noted?

12      A.   Yes, sir, at -- a later date.

13      Q.   That one was later?

14      A.   Yes, sir.

15      Q.   About how much later?

16      A.   A couple of months later.

17      Q.   So when you went out there that first time, did you take some

18  pictures?

19      A.   Yes, sir.

20              MR. THOMAS:  And I don't know whether you've got 101

21  loaded?

22              Let's look at the exhibit -- Your Honor, we move to admit

23  Plaintiff's Exhibit 101, which are photographs that were taken.

24              (Plaintiff's Exhibit No. 101 offered.)

25              MR. TREAT:  No Objection, Your Honor.

```
 1                    THE COURT:  That's admitted.

 2                    (Plaintiff's Exhibit No. 101 admitted.)

 3                    MR. THOMAS:  Your Honor, I am going to give the witness a

 4  pointer.

 5                    Oh, you've got one.

 6                    MR. TREAT:  Please don't blind me, Mr. Garza.

 7      Q.    (BY MR. THOMAS:)  Can you tell us what we are looking at there?

 8      A.    Okay.  The first picture up above, this is the sheet metal

 9  coping cap that was installed.  This is a seam on the parapet wall.  You

10  can see how the seams are coming apart.  All along the edge you can see

11  that there is some loose membrane that is not fully adhered to the parapet

12  wall.

13      Q.    Are we looking at defects?

14      A.    Yes, sir.

15                    We have improper welding along this area here.  Here, we

16  cut -- we go to the roof scuppers where it's been constantly repaired with

17  T-patches throughout the circumference of the roof terrain, the over flow

18  scupper, I am sorry.

19      Q.    And these areas that you are pointing out are those areas of

20  potential water intrusion?

21      A.    Yes, sir.

22      Q.    Like, for example, at the top photograph you pointed out where

23  there's a -- where it's coming undone?

24      A.    Yes, sir.

25      Q.    And that's where water can get in?
```

1      A.    Yes, sir.

2      Q.    Let's go to the next page.

3      A.    On that particular seen it was just loose.  It was poorly

4   welded.  And if you would have pulled it, the whole thing would have come

5   apart.

6      Q.    Okay.  And is this part of 101?  And what are we looking at

7   here on this -- on this page of 101?

8      A.    There is some -- you see loose seams with the parapet base

9   flashing membrane not properly adhered to the roof membrane and all along

10  these areas here.

11     Q.    And, Mr. Garza, I am going to need you to speak up a little

12  bit.  I can barely hear you.

13     A.    I am sorry.  These areas right here --

14     Q.    Yes.

15     A.    -- where there is some seams were not properly welded.

16     Q.    Right.

17     A.    And like I said, we just cleaned them off to take a better

18  picture.  We didn't try to disturb it or make -- make the problems worse

19  than they already were along these areas here where the membrane was not

20  properly welded to the roofing membrane.

21     Q.    All right.  And then what about the bottom picture?

22     A.    The bottom picture, it's the same thing.  This is a roof

23  exhaust vent up on the roof.  You got the same areas here along there where

24  we cleaned off the dirt around the areas and found the membranes to be not

25  properly adhered or properly welded.

1     Q.    Are all of these areas of potential danger for water

2  intrusion?

3     A.    Water was coming in.

4     Q.    Okay.  Water was coming in?

5     A.    Yes, sir.

6     Q.    And so it wasn't just a danger it was -- it was already

7  happening?

8     A.    It was already happening, yes, sir.

9     Q.    And that's the result of roof defects?

10    A.    Correct.

11    Q.    Caused by whoever installed this roof?

12    A.    Yes, sir.

13    Q.    Next page.

14          What are we looking at there?

15    A.    Here is another scupper detail where there is a lot of

16  T-patches.  The roof areas here you can see where somebody has been up

17  there trying to weld it.  The problem is I don't see any cut edge sealant

18  around the perimeter of the lap.  It doesn't stop from any water from

19  building and migrating inside the membrane to stop the roof leak.

20    Q.    Okay.  And the bottom picture?

21    A.    This is the probe that people talk about that they've been --

22  not people -- they've been talking about throughout the trial.  This is

23  what we call a probe.  This is what the manufacturer's rep comes out when

24  he inspects his roofs.  He has a probe like this that he has it taped on to

25  a brush handle that way he probes the membrane up and down to see if it's

1    fully adhered.

2                    Here, it didn't take much effort to pull the membrane

3    apart.  You can see it was loose there, and loose there, and loose there.

4    So we just kind of stuck the prong into the membrane to show that it wasn't

5    properly welded.

6        Q.    And so this is another place where water gets in?

7        A.    Water was getting in.

8        Q.    All right.  Next page.

9        A.    This area here is where the numerous attempts of repairs have

10   been done with multiple T-patches trying to stop the water.  And like I

11   said, they were just one on top of each other.  But, again, there is no

12   type of cut edge sealant, no type of caulking or sealant anywhere along

13   these areas here.

14       Q.    Next page -- or the next photo.

15             Same thing?

16       A.    Same thing, loose membrane.  Like you can see how it's not

17   properly welded along the edges there.

18       Q.    All right.  Next page.

19       A.    Same thing, loose seams along this area here.  We cleaned them

20   off to show the seams are not properly welded.

21       Q.    Okay.  And same thing in the area that you've got cleaned out

22   there?

23       A.    Yes, sir, along this area here.  Yes, sir.

24       Q.    All right.  Next page.

25             Same thing?

130

1    A.    Same thing.  Just cleaned them off so you can see where they

2 weren't properly welded along the areas here, improperly sealed.

3    Q.    Next page.  Next page.  Next page.  And the next page.  And

4 next page.  And the next page.  And the next page.

5          All right.  Up until now, the previous photographs that

6 we were looking at, they all have similar defects?

7    A.    Yes, sir.

8    Q.    Okay.  Now what are we looking at here?

9    A.    Here is where we are using the probe where the T-patch wasn't

10 properly welded around this corner.

11   Q.    That probe shouldn't go in there, should it?

12   A.    No, sir.

13   Q.    Because if that -- that probe can go in, then certainly water

14 can get in?

15   A.    Most definitely.

16   Q.    Next page.

17          This is where I wanted to get.  Tell us what we are doing

18 here.

19   A.    This right here is the bottom edge of the roof curb.  Right

20 here there is no type of termination bar.  This membrane was all loose

21 underneath this membrane.  It was just dripping.

22   Q.    Okay.

23   A.    Right here, this is the top of the roof runner of the blocking

24 of the roof curb.  And this is the underneath.  There is no termination bar

25 underneath there to hold the membrane in place.

1     Q.    And the next photo.  And that's showing the same thing?

2     A.     This is a roof exhaust vent that we took off, the same thing.

3  The membrane is loose.  It's not properly fastened or wrapped over the top

4  of the curb and then fastened in place to keep it from falling down.

5     Q.    And are we starting to see some -- some rot as a result of

6  moisture?

7     A.    Well, there is water.  You can see how the insulation is yellow

8  and --

9     Q.    And that's the --

10    A.    You can see the rust spots -- you can see the rust spots along

11 the edge of the fan curb.

12    Q.    Yes, sir.

13                Next photo.  And that's just the same thing but looking

14 at it a little further away?

15    A.    Yes, sir, that's correct.  You can see how the membrane is not

16 even fully adhered to the -- to the curb itself.

17    Q.    And why is that --

18              MR. THOMAS:  Can you zoom in, Carlos, on that top photo?

19    Q.    (BY MR. THOMAS:)  And with your fingers -- I don't know if

20 those are your fingers or somebody else's but, those fingers that are

21 there, that's between the membrane and the -- and the structure?

22    A.    Yes, sir.  That's the woodblocking of the curb and so we pulled

23 it back to show that it was all loose.  And it's all loose all the way

24 around.

25    Q.    And you shouldn't be able to do that?

1     A.     No, sir.

2     Q.     Massive amounts of water can go in there during a storm?

3     A.     The membrane should be up on top of the blocking with some

4  anchors holding it in place.

5              MR. THOMAS:  Next photo.  Next photo.  Next page, I mean.

6  Next one.  I think that's it.  Right.  Zoom in on this top one there.

7     A.     Yes, sir.

8     Q.     (BY MR. THOMAS:)  What are we looking at there?

9     A.     Here is where they used some type of aluminum base vent that

10 wasn't properly sealed and properly anchored and set in place.  And it's

11 wide open along the bottom edge.

12    Q.     And so any kind of rain that is getting on that roof or water

13 is going to go right into the structure, right?

14    A.     Correct.

15    Q.     Next photo.  And what are we looking at there?

16              MR. THOMAS:  Can you rotate it?

17    A.     This area there is where the -- the water -- all the ponding

18 water stands along the edge.  The water was improperly draining to the roof

19 drain.  You can see it there, it just stands there.  It doesn't have the

20 proper flow to drain into -- into the drain itself.

21    Q.     (BY MR. THOMAS:)  And we've heard about water ponding.  What is

22 water ponding on a roof?

23    A.     Water ponding on top of a roof is when you have like a little

24 birdbath so people understand.  It's just where a low divot in the roof

25 system where water just ponds and accumulates.

1    Q.   And if we have water ponding on the roof, is that evidence of

2 improper drainage?

3    A.   Not -- not -- not really, sir.

4    Q.   Or what would that be evidence of?

5    A.   It's just when the -- when there is either in the deck itself

6 or in the structure itself and then when you first start putting insulation

7 in, they didn't properly -- they didn't even bring the insulation properly

8 to the right height.  It caused to make the water drain into the thing

9 because this one has all the drainage goes to the back of the building.  So

10 that could be just an area in the structural of the deck itself.

11    Q.   Are you aware of a GAF technical advisory bulletin that talks

12 about how long water ponding should -- it shouldn't be -- it -- water

13 should evaporate by a certain amount of time?

14    A.   The normal has been 48 hours.

15    Q.   And how long has been -- water been allowed to be standing --

16 has the water ponding on this particular roof of the former VA Clinic been

17 longer than 48 years?

18    A.   It had been there for weeks.

19    Q.   Weeks?

20    A.   Yes, sir.

21    Q.   And that is contrary to GAF and industry standard?

22    A.   Yes, sir.

23    Q.   Next.

24    A.   Here's the same type of pipe boots that weren't properly

25 welded.  And you can see all the water getting up underneath there.

1    Q.   All right.  Next.  Okay.  Let me show you Exhibit 86.  Exhibit

2  86, what are we looking at there?

3    A.   That is a floor plan of the hospital.  And all those

4  highlighted areas some is where the air-condition is in place and then also

5  where water is coming into the building.

6    Q.   Are you -- is that your handwriting on this exhibit?

7    A.   Yes, sir.

8    Q.   And the highlighting that is on there, is that your

9  highlighting?

10    A.   Which part, sir?

11    Q.   The yellow?

12    A.   Yeah, the yellow -- yes, sir.

13    Q.   Okay.  So what is it that you were trying to show with all the

14  yellow that you've got on there?

15    A.   Where the water was coming inside the building.  Water in -- in

16  the building itself, the floor plan of the building.

17    Q.   Okay.  And this was prepared by you when you were first called

18  out --

19    A.   Yes, sir.

20    Q.   -- to the building?

21    A.   Between myself and my brother.

22    Q.   Okay.  And you did a personal inspection on that roof, you took

23  photographs to document what is being shown, and you've highlighted all the

24  areas that where you saw water going into the building?

25    A.   Correct.

CICMSJ0372

1    Q.   And this was in January of 2015?

2    A.   Yes, sir.

3    Q.   I am sorry, in -- it was just -- it was whenever you were first

4  called out?

5    A.   Yes, sir.

6    Q.   Let me go to the Elmo.  Were you asked not only to come and

7  inspect and make that evaluation of the building, were you asked to make

8  some repairs?

9    A.   Afterwards.

10   Q.   That came later?

11   A.   Came later, yes, sir.

12   Q.   And was that -- did you do the repairs before or after the GAF

13  inspector came out?

14   A.   I did them before.

15   Q.   So the repairs would have been after you created this --

16  this -- the floor plan and -- and made the -- made the yellow highlights.

17  And then after that you did the repairs and then after that the GAF

18  inspector came out?

19   A.   Correct.

20   Q.   Let me show you what I am going to mark as Exhibit 102.

21        MR. TREAT:  Your Honor, we are going to use it.  It's

22  already Defense 3 -- or are you going to actually mark it?

23        MR. THOMAS:  I'll actually Mark 102.

24        (Plaintiff's Exhibit No. 102 offered.)

25        MR TREAT:  Okay.  All right.  Your Honor, I have no

1   the way to the south side of the building without damaging the membrane?

2       A.    No walk pads were installed.

3       Q.    No walk pads were installed?

4       A.    No, sir.

5       Q.    So if Mr. Palmer wants to comply with GAF specifications and --

6   and clean the roof on a periodic basis, is there any way for him to get to

7   the south side of the building without violating the GAF manual by walking

8   on areas that aren't walkways?

9       A.    There is no way.  Correct.

10      Q.    Did Mr. Whitman take these picture, or did you?

11      A.    No, that's their report.

12      Q.    So Mr. Whitman took these?

13              And he has some -- like, for example, area of reported

14  leaks, no leaks currently.

15      A.    Correct.

16      Q.    And the reason why there was no leaks currently is because who

17  did some repairs?

18      A.    Baldwin Roofing Company did.

19      Q.    You did, you were hired to make some repairs?

20      A.    Yes, sir.

21      Q.    And who had to pay for those repairs?

22      A.    The landlord.

23              MR. THOMAS:  Can you put the timeline back up?

24      Q.    (BY MR. THOMAS:)  So just getting back to this timeline.  After

25  Ja-Mar had installed the roof in February of 2013, there was a leak -- or

1  there were already leaks within the next month in March of '18.  The GAF

2  warranty is issued and they get a 10 out of a 10 on a April 1st, and there

3  is already leaks within a few weeks thereafter.  Do you see that?

4       A.    Yes, sir.

5       Q.    In fact -- I am sorry.  The 10 out of a 10, Mr. Garza, which

6  was the report on 102, this final report from Mr. Whitman is dated April

7  the 22nd of 2013.  So just four days after Mr. Whitman gave this roof and

8  Ja-Mar a 10 out of 10 we already have leaks on the roof, correct?

9       A.    Correct.

10      Q.    And then we have continued leaks throughout the year.  And so

11 you are brought in at the beginning of 2014 to make the repairs that these

12 folks can't seem to make?

13      A.    Correct.

14      Q.    And after you did your repairs, no more leaks?

15      A.    As the best of my knowledge, they haven't reported anymore

16 leaks to me on that property.

17      Q.    Did you have to bill Mr. Palmer or his -- his company Palmer

18 Cravens, L.L.C. for the work that you did?

19      A.    Yes, sir.

20      Q.    And are -- is that work -- are those invoices part of this

21 record?

22      A.    Yes, sir.

23                  MR. THOMAS:  Your Honor, we move to admit Plaintiff's

24 Exhibit 25.

25                  (Plaintiff's Exhibit No. 25 offered.)

Regina Vasquez, CSR
332nd District Court Reporter

CICMSJ0375

1          MR. TREAT: I don't have any objection to 25, Your Honor,

2   with the understanding at this point this witness is only going to talk

3   about his own invoices in that cluster.

4          THE COURT:  All right.

5          MR. THOMAS:  May I approach?

6          THE COURT:  Yes.

7          It's admitted into evidence.

8          (Plaintiff's Exhibit No. 25 admitted.)

9          MR. THOMAS:  Thank you, Your Honor.

10     Q.   (BY MR. THOMAS:)  Mr. Garza, I am showing you part of Exhibit

11   No. 25.  Is this an invoice from Baldwin Roofing?

12     A.   Yes, sir.

13     Q.   And this was addressed to -- who did you bill?

14     A.   Park Place Ventures.

15     Q.   And Park Place Ventures is -- the Jury has heard is the new

16   name of Palmer Craven, L.L.C., correct?

17     A.   Correct.

18     Q.   And this was -- this particular invoice was for labor and

19   material to reflash one of the A/C units, correct?

20     A.   Correct.

21     Q.   And how much was the invoice?

22     A.   $1840.25.

23     Q.   $1,840.25, correct?

24     A.   Yes, sir.

25     Q.   And what was the problem that caused you to have to fix this?

1      A.    We had to re-weld the skirting around it and put a termination

2  bar to properly hold the base flashing in place.

3      Q.    Was there water getting in?

4      A.    Yes, sir, there was.

5      Q.    And the date of that particular invoice was September of

6  2014?

7      A.    Yes, sir.

8      Q.    And I am showing you another invoice from July of 2015 and what

9  was going on here?

10     A.    It was labor and materials to prepare various roof leaks over

11  the pharmacy section of the building.

12     Q.    And how much was this invoice?

13     A.    It was $2,381.50.

14     Q.    Okay.  Now, for -- looks like that was close to about $4,000.00

15  worth of repairs.

16              The roof is not leaking anymore, is it?

17     A.    No, sir.

18     Q.    Since 2015 that's -- did $4,000.00 fix that roof?

19     A.    It's just temporary repairs.  It's not a permanent fix.

20     Q.    Just a couple of band-aids?

21     A.    Yes, sir.

22     Q.    If anybody would try to suggest to this Jury that the work that

23  you did to put some band-aids on the roof is a permanent fix, would they be

24  right or wrong?

25     A.    They would be wrong, because it's not going to last 20 years.

1      Q.    The roof that Ja-Mar had put on the VA building, the roof that

2  was installed as a mechanically attached roof with all these defects, did

3  Mr. Palmer get an upgrade from the roof that he had?

4      A.    No, sir.

5      Q.    Would you say it was a downgrade?

6      A.    Yes, sir.

7      Q.    The Jury has heard about the GAF manual and specifications and

8  it's described in the warranty, is it not?

9      A.    Yes, sir.

10     Q.    Are you familiar with the GAF manual and specifications?

11     A.    Yes, sir.

12     Q.    And have -- and tell us about it, what's the purpose of that

13  manual for?

14     A.    The manual itself is to show you simple flashing details like

15  where -- I cannot describe it.  Like for instance, around pipe

16  penetrations, A/C roof penetration, parapet wall penetrations, edge -- edge

17  wall flashing details.  And they show you how the steps and the procedures

18  that you need to take in order to make the seal, a proper seal to the GAF

19  standards.

20     Q.    And did whoever installed this roof for Ja-Mar, did they comply

21  with the GAF manual and specifications?

22     A.    No, sir.

23     Q.    Do you recall some of the different ways in which they

24  deviated?

25     A.    Well, on the coping cap area, the coping cap was poorly

1   installed, the membrane wasn't properly wrapped over the top of the parapet

2   wall.  A lot of the parapet wall base flashing is loose.  A lot of loose

3   seams along the parapet wall edge, a lot of loose seams throughout the

4   field of the roof, pipe penetration details weren't properly executed

5   either.

6              And basically that's it.  Those are all the errors --

7   issues that they were having.  It's just pour detailing on their behalf.

8       Q.    And these were all evident to you when you saw the roof?

9       A.    Yes, sir.

10      Q.    It should have been evident to Bobby Whitman when he looked at

11  the roof?

12      A.    Yes, sir.

13      Q.    Did you overhear any conversation between Mr. Bobby Whitman and

14  Mr. McKinney when you guys were there for that inspection?

15      A.    Yes, sir.

16      Q.    And what sort of conversation did you hear with Mr. Mckinney?

17              MR. TREAT:  Object that that's hearsay.

18              THE COURT:  Sustained.

19              MR. THOMAS:  Your Honor, Mr. Mckinney is the corporate

20  representative.

21              THE COURT:  That's right, he is.  Objection is overruled.

22              MR. TREAT:  I am sorry, I thought you said Whitman.

23      Q.    (BY MR. THOMAS:)  What did you hear Mr. McKinney say?

24      A.    Basically they weren't talking anything about the roof.  They

25  were talking about personal issues, about hunting, fishing.  They really

1      Q.    What would it cost?

2      A.    For a new roof, it's over -- right now because of all of the

3   different code upgrades and -- and the guidelines that have been into play

4   through the manufacturers and through the State of Texas, it will probably

5   be over 400,000.

6      Q.    Show you Exhibit 62 and 95.  I'll do 62 first.

7              MR. THOMAS:  May I approach, Your Honor?

8              THE COURT:  Yes, sir.

9      Q.    (BY MR. THOMAS:)  Let me show you what's been marked and

10   previously admitted as Exhibit 62 to your deposition.  And is this one of

11   the -- one of the quotes that you did for -- in connection with this

12   case?

13     A.    In 2014, yes, sir.

14     Q.    September 23rd, 2014?

15     A.    Yes, sir.

16     Q.    And what was this quote for?

17     A.    That was -- this particular quote is for like kind and quality

18   that was there originally.  Built-up roof system with gravel added to the

19   surfacing.

20     Q.    This would be the quote to -- which was the same quote or

21   similar quote that Ja-Mar had given to Mr. Palmer's insurance company to

22   remove the gravel roof and to reinstall the same roof that he had?

23     A.    Yes, sir.

24     Q.    And in 2014 that number would have been $409,000.00?

25     A.    Yes, sir.

1    Q.    And what would it cost to remove the roof that is there and to

2  put it back on.  And I am talking about removing all the insulation, the

3  bad insulation and putting new insulation in and putting a TPO roof on.

4    A.    Well, right now it would cost -- you have the -- and of course,

5  code upgrades that are required now plus the energy code requirements,

6  you'd be over 400,000.

7    Q.    I am going to show you what's been marked as Exhibit 95.  It's

8  not yet admitted.  And is this another estimate that you did -- and this

9  one is dated June 11th of 2018?

10   A.    Yes, sir.

11   Q.    And was this -- was the purpose -- did I ask you to make this

12 quote of June 11th of 2018 to bring your estimate up to current costs for

13 labor and materials -- to bring up to date the one you did in 2014?

14   A.    Yes, sir.

15   Q.    Because it's been almost four years later?

16   A.    Yes, sir.

17   Q.    Or three and a half years later.

18             And did you use the exact same methodology in coming up

19 with this 2018 quote that you did for the September 2014 quote?

20   A.    Yes, sir.

21   Q.    Alls you were doing was updating your calculations to take into

22 account current cost of labor and materials?

23   A.    Yes, sir.

24             MR. THOMAS:  Your Honor, we move to admit Exhibit 95.

25             (Plaintiff's Exhibit No. 95 offered.)

1          MR. TREAT:  Your Honor, I am going to object because this

2   is not the kind of refinement and estimate contemplated by the Rules.  I

3   think it's late supplementation since we only got it yesterday.  It

4   certainly could have been done in a timely basis and so we object to its

5   use at this time.

6          THE COURT:  The objection is overruled.

7          MR. TREAT:  I'm sorry?

8          THE COURT:  The objection is overruled.

9          MR. TREAT:  Thank you, Your Honor.

10          MR. THOMAS:  95 is admitted, Your Honor?

11          THE COURT:  Yes, sir.

12          (Plaintiff's Exhibit No. 95 admitted.)

13          MR. THOMAS:  Thank you.

14     Q.    (BY MR. THOMAS:)  Exhibit 95 is your most recent quote which is

15   for this month?

16     A.    Yes, sir.

17     Q.    And this is June 11th of 2018?

18     A.    Yes, sir.

19     Q.    And according -- explain to the Jury what this quote is,

20   Exhibit No. 95?

21     A.    Basically it's to put back like kind and quality that was up

22   there back in 2013, which would be a built-up -- what we call a built-up

23   roof system.

24     Q.    Okay.  It would be to give Mr. Palmer the roof that he had

25   before but up to current code?

1      A.    Yes, sir.  Well, yeah, I put a line item on the bottom of it

2  for the code upgrades which is another $40,000.00.

3      Q.    Right.  It's got to be brought up to today's codes?

4      A.    Correct.

5      Q.    I don't know whether -- I think you were here when Mr. McKinney

6  was being -- was on the stand, right?

7      A.    Yes, sir.

8      Q.    And did you hear the testimony about if someone who acts as a

9  unlicensed public adjuster, you know, enters into a contract and then he

10  does the work, there is a conflict and the contract can be void.  Do you

11  remember hearing all of that?

12      A.    Yes, sir.

13      Q.    So if Mr. Palmer decides he wants to void that contract with

14  Ja-Mar and go back with his original roof, that's the estimate for that,

15  correct?

16      A.    Correct.

17           MR. TREAT:  Your Honor, I am going to object.  Obviously,

18  now he is literally asking this witness a legal question and he is here as

19  a roofing expert.

20           MR. THOMAS:  No, Your Honor.  Maybe -- the preface may

21  have been legal, but the question was is that -- is Exhibit No. 95 his

22  estimate for putting the roof back the way it was, tar and gravel, if

23  that's what Mr. Palmer wants to do.

24           THE COURT:  If that's your question, okay.

25           MR. THOMAS:  Yes.

1                    MR. TREAT:  The whole predicate part about it.

2                    THE COURT:  I understand that.

3                    MR. TREAT:  Completing asking the witness a legal

4    question.

5                    THE COURT:  For the predicate, the objection is

6    sustained.  You may just want to ask him that way.

7         Q.   (BY MR. THOMAS:)  If Mr. Palmer has the opportunity to say, I

8    want my old roof back, is Exhibit 95 the -- the estimate that will do

9    that?

10        A.   Yes, sir.

11        Q.   And how much is that?

12        A.   $496,531.93 plus another 39,000 for code upgrades.

13        Q.   Okay.  And so that's about a 20 percent increase since the

14   first estimate you made in 2014?

15        A.   Yes, sir.

16        Q.   Okay.  And over four years prices have gone up, labor has gone

17   up, for both material and labor?

18        A.   Correct.

19        Q.   And finally, Mr. Garza, I wanted to ask you something because

20   you heard -- may I approach the Elmo, Your Honor?

21                   THE COURT:  Yes.

22        Q.   (BY MR. THOMAS:)  You heard Mr. McKinney say that the reason

23   why a fully adhered roof wouldn't have been a good idea for this particular

24   building was because of the odor that the glue would cause and that would

25   be bad for the occupants of the building.  Do you recall that testimony?

1   been issued on -- on the VA clinic, at this time once I reviewed the

2   reports, I was then -- from that I -- I was able to determine what course

3   of action to proceed with.

4       Q.    That's all right.  And then you were asked to give opinions and

5   I -- and I have assumed you have given a report and I would say that it is

6   a synopsis.  It looks like your report is saying because water ponds on the

7   roof, it needs to be replaced, right?

8       A.    That's correct.

9       Q.    Is that -- is that sort of the primary basic opinion that --

10  that you're going to be giving in this litigation?  And I'm going to go

11  through it in much more detail, but it seems to me from what I've reviewed

12  to be your primary opinion?

13      A.    Yes, sir.

14      Q.    Okay.  All right.  Exhibit No. 4 then is your sort of CV; is

15  that correct?

16      A.    That is correct.

17      Q.    All right.  And basically tell -- tell us about what your area

18  of expertise is.

19      A.    My area of expertise -- primary area is a -- is roofing, and it

20  would be all roofing types and systems.

21            The secondary to that is the building cladding, you know,

22  anything on the building envelope which would include fenestrations,

23  windows, doors and things like that.  Anything on the exterior with a

24  primarily emphasis on roofing.

25      Q.    Okay.  And I am sure looking at your CV, obviously, it says you

1    Q.    I take it that from looking at your reports, my -- my feeling
2  was that most of the opinions that you generated about this case were based
3  really upon your observations of what you saw on top of the roof?
4    A.    That is correct.
5    Q.    But, again, you're not going to be telling the Jury when any of
6  those leaks were, how bad they were, what had to be done to fix them, how
7  much water went into the building or anything like that.  That's the
8  subject of somebody else.
9    A.    I will be able to say that I see points of entry for leaks,
10 places where I didn't put water, but it would -- it would leak as a result
11 of that, if that's your question.
12   Q.    Okay.  In other words, you think it would leak today?
13   A.    Yes, sir.
14   Q.    And -- and can you point to specifics spots on the roof where
15 you think it would leak?
16   A.    Yes, sir.
17   Q.    Okay.  Do that.  How would you do that?
18   A.    Well, my photographs will show that the parapet cap that's put
19 on the perimeter should have been canted inward and it was flat and in some
20 cases recessed or -- and the joints were not properly bonded together, and
21 I have focused on a probe that would go right through the joint which would
22 indicate water would be able to go through that same -- same point.
23   Q.    And, in fact, Mr. Perry before, which I'm sure you looked at,
24 actually said there needed to be some minor repairs to the -- the parapet
25 wall that you are talking about?

1        A.      I would disagree with minor.

2        Q.      Anyway, he pointed out areas that needed to be repaired so

3   water would not get in.

4        A.      Yes, sir.

5        Q.      All right.  My -- my point is so you think that water would get

6   in under those gaps in the -- in the metal parapet?

7        A.      Yes, sir.

8        Q.      Is there any place else on the roof?

9        A.      The -- the drains -- there's three roof drains and there has

10  been a lot of -- it looked like there -- they -- I was able to view those

11  from the underside as well as from the topside and there was -- it showed

12  evidence of prior water coming in and around those drains.

13       Q.      Uh-huh.

14       A.      Okay.  There was some mitigating repairs that were done -- I

15  wouldn't call them long-term -- at the drains. One of the things about the

16  drains is you have to -- in order to really test the drain, you would have

17  to -- you put a bladder down in there and you would inflate it so that when

18  you put water in, the water will rise up and it will go to any areas at

19  that -- above that where the water could go in and that would be the only

20  way to really do a drain test.  I wasn't there to do that -- a leak test.

21  I was there to --

22       Q.      Yeah, because -- let's back up a little bit about that.  The

23  kind of test you described putting a -- putting a balloon into a drain like

24  that is effectively the kind of test that plumbing inspectors do on sewer

25  systems when they do a statics is to mount the cleanout to make sure the

1     Q.    And it wasn't leaking the day you did the hose test.

2     A.    No.

3     Q.    And you can't tell the Ladies and Gentlemen of the Jury the

4  last time there was any leak at that drain?

5     A.    That is correct.

6     Q.    So we got the drains.  We got the parapet wall.

7               Any place else you saw that might be a potential leak

8  source?

9     A.    At the seams there were several locations where water was

10  ponding on the roof and it occurred at a seam and when you have water

11  ponding on a roof in a seam, you get debris.  You get organic material

12  that -- a seam is where it's been welded.

13     Q.    Right.

14     A.    And any time you -- you put that -- expose that seam to both

15  water and/or organic matter, it will break down the -- the weld on that --

16  at that location. So those would be locations --

17     Q.    That could potentially leak?

18     A.    -- that could potentially leak.

19     Q.    But they didn't leak the day you were there?

20     A.    Not at that -- no, sir.

21     Q.    So, in other words, what you are really sort of talking about

22  it seams to me on the ponding areas is that because of the ponding, there

23  is risk that the seams will come apart because of the organic matter and

24  fail more quickly than it would under its ordinary sort of warranty work

25  life?

CICMSJ0388

```
1        A.    That is correct.

2        Q.    Okay.  Of course, it's kind of difficult to predict exactly how

3   quickly that will happen.  You're not here to say it's going to happen in a

4   year, five years, seven years.  You don't know.

5        A.    That is correct.

6        Q.    All right.  So three areas so far.  Parapet wall drains and

7   then the areas that -- where the water ponds.

8              Any place else that you saw that you thought might leak?

9        A.    Areas in the -- in the very corners at the very end where the

10  drains are at the right and left-hand corners.

11       Q.    The low end of the roof?

12       A.    The low end of the roof.  Where you have an -- it's called an

13  inside corner where you have two that meet and that had evidence of -- of

14  repair.  Any time you have evidence of repair that was done -- and you can

15  tell the difference between a repair done during the course of construction

16  or installation and when it was done afterwards and this was -- was done to

17  stop water primarily.

18             Would it -- would I consider it a permanent fix?  No.

19  But to answer your question directly, there were two locations where

20  repairs had been facilitated stopping probably the current leak, but

21  knowing that that -- at some point that was where water was probably going

22  in, which is why they put the repair there.

23       Q.    Do you know when those repairs were done?

24       A.    My understanding is that it was done sometime within the last

25  six -- six months to a year.
```

CICMSJ0389

1    Q.    By who?

2    A.    It would have been Baldwin Roofing.

3    Q.    And who told you that?

4    A.    I spoke with Lupe Garza of Baldwin Roofing.

5    Q.    And is this -- is this kind of repair -- I mean, I take it you

6 must have photographs of it.  So did you take the repairs --

7    A.    I -- I took pictures of the repairs.

8    Q.    So we'll probably -- at a break what I'll probably ask you to

9 do is some of the pictures we'll get up on the laptop so we can look at

10 them, okay?

11    A.    Sure.

12    Q.    Is this a -- the inside corners that you're talking about, are

13 those repairs -- repairs to seams where the -- where the members were

14 folded over?  Because I know when you get to a corner, you've got to kind

15 of fold the -- the member over?

16    A.    Right.  And the -- the -- there is, obviously, going to be at

17 least one seam that has to be patched, and I -- without looking at the

18 picture, I can't tell how they did that, but it did -- it appeared

19 that that -- that there was something that was leaking there.  Whether it

20 was one seam, whether it was the patch that came up, whether there were two

21 seams there, I couldn't see because I couldn't see underneath the patch.

22    Q.    Were the corner areas where water ponded or is it just that

23 could can see the repairs?

24    A.    You could see that there were repairs.

25    Q.    So this was not a ponding area?

Regina Vasquez, CSR
332nd District Court Reporter

**CICMSJ0390**

1      A.    No.

2      Q.    All right.  So you covered sort of four -- four areas.  I want

3  to make sure I write these down so I -- parapet wall, the three drains, the

4  low spots and in the corner -- the four corners.

5           Anything else that was a potential leak source in your

6  view?

7      A.    There were areas through the roof that were repairs -- and you

8  could tell when repairs were done after the fact, okay?  They're -- they're

9  pretty obvious because they would be out in the middle, and you could tell

10 a couple ways.  Sometimes the material has aged differently in -- in the

11 repair than the area.  There was several areas in the roof that been

12 patched --

13     Q.    Uh-huh.

14     A.    -- okay?  Whether or not -- whether or not those were patched

15 because of a leak --

16     Q.    Uh-huh.

17     A.    -- which would generally be the case and/or if someone were

18 walking on the roof and they dropped an instrument, punched a hole in it,

19 okay, got to go back and fix that.

20           So to answer your question, any place that had patches

21 is, obviously, a place where it -- it had leaked, okay?

22     Q.    All right.  But the problem is a properly placed patch, if it's

23 done right, on a TPO roof is okay, right?

24     A.    That's correct.

25     Q.    I mean, that -- that's the great thing about a TPO roof is that

1    Q.    Okay.  I guess that makes more sense, but -- and I hand't

2   thought about asking it that way. In looking at the materials from GAF, was

3   there anything that you relied upon to come to the conclusion that -- that

4   some of the part of the roof was done improperly?

5    A.    Yes, sir.

6    Q.    Okay.  Why don't you pull those out?

7             MR. TREAT:  And I need some more stickers too, please.

8   You might as well give me a whole bunch more.  I think I've got a whole lot

9   of ground to cover.  There we go.

10    A.    This detail right here for the -- the AC curb.

11    Q.    (BY MR. TREAT:)  Okay.  I've marked Exhibit No. 6. Tell -- tell

12   me looking at exhibit number 6 what was done wrong?

13    A.    Okay.  The -- the clearance and that's referenced noted -- it's

14   cross referenced in here.  From the base of the curb to the top is -- it's

15   supposed to be nine inches according to GAF, and it is not nine inches.  As

16   a matter of fact, it's four inches.

17    Q.    For -- for -- are you talking about at the parapet wall?

18    A.    No, no.  This is the -- those -- the A -- the R -- RTUs,

19   rooftop units --

20    Q.    Uh-huh.

21    A.    -- air conditioning units.

22    Q.    Oh, the curbs --

23    A.    The curbs --

24    Q.    -- at -- at the actual ACs.

25    A.    That is -- that is correct.

1    Q.    All right.  And -- and, also, I know at least at some of those
2  RTUs we saw some ponding around some of those units too, right?
3    A.    Yes, sir, on the back side of that.
4    Q.    Because the cricketing wasn't sufficient enough to let the
5  water move away, right?
6    A.    That is correct.
7    Q.    But you -- you're saying that the actual member itself wasn't
8  high enough?
9    A.    Right.  And it didn't -- did not meet the recommended
10  distance.
11    Q.    All right.  And so I guess the issue there is not that -- that
12  that's going to make the roof leak, however, if water got to be deeper than
13  four inches, then water could leak over the back of the membrane, right?
14    A.    That's correct.
15    Q.    But -- but, I mean, the water's supposed to get fairly deep
16  before you have a leak there?
17    A.    That is correct.
18    Q.    And where does it say four inches?  I just want to make sure --
19    A.    No, it doesn't say four inches.  In other words, that --
20    Q.    Oh, I am sorry.
21    A.    Let me -- let me find it.  Oh, here we go.  Okay.  it's -- I
22  said nine.  It's an eight inch minimum.  Any time you -- a membrane run up
23  any, you know, wall curb flashing, that's where the cricket has to go up,
24  eight inch minimum.
25    Q.    Okay.  Got it.  I'm just going to highlight this so I can see

1    some kind of timing.

2         A.    Yeah.

3         Q.    Right there it's showing a limit that that -- that the membrane

4    should go up, right?

5         A.    Minimum -- yeah, minimum.

6         Q.    Okay.

7         A.    It can go higher than that, but it -- the minimum must be.

8         Q.    And then it needs to be screwed.  It's got a fastening system

9    at the top.

10        A.    Some -- yeah, some type of termination that seals it off,

11   waterproofs it.

12        Q.    And you're saying the RT units on this particular building, it

13   didn't go up that high.

14        A.    That is correct.

15        Q.    I mean, obviously, though that didn't prevent GAF from issuing

16   the warranty in this case, did it?

17        A.    No, it didn't, which I didn't understand.

18        Q.    All right.  All right.  Anything else out of the GAF materials

19   of a -- a negative fashion, meaning, that would show that the roof wasn't

20   put on properly?

21        A.    Well, the -- the -- all the curbs, there was no cricket --

22   there was insufficient drainage -- cricket drainage behind each one of the

23   units.

24        Q.    Uh-huh.

25        A.    There were --

1   Q.   Just -- just so the Jury knows what a cricket is, it ain't a

2   thing that chirps, okay?  Tell them what a cricket is, all right?

3   A.   When you have a -- you have a roof running down, when it

4   strikes an object that comes off out of a roof penetration, if it's 12 or

5   24 inches wide, to keep water from pooling behind that, there has to be

6   some sort of a diverter, okay.  And this diverter is generally a sloped

7   piece of insulation that allows the water to go around instead of pooling

8   behind that particular penetration.

9   Q.   All right.  Basically, what it is it's a mechanical method to

10  allow the water to seep at some level.  That is, you're making gravity work

11  for you to make the water go downhill.

12  A.   Yes, sir.

13  Q.   All Right.  And they -- I saw on Mr. Perry's report, he said

14  rarely do flat roofs ever work perfectly.

15          Do you agree with that statement?

16  A.   No, I don't.

17  Q.   So, in other words, you've seen flat TPO roofs where there's

18  absolutely no ponding of any kind after a rainstorm?

19  A.   Yes, sir.

20  Q.   All right.  You'll still admit to me that's pretty common on a

21  TPO to see some ponding after a rainstorm, even if it's only a minimal

22  amount?

23  A.   The definition of ponding is water that is there after 48

24  hours --

25  Q.   I think --

1      A.    -- again, and -- and so you can put water on a roof and, yes,

2   I've been on roof where there's initial pools of water, but those pools dry

3   up.  And to answer your question, most -- most of what I see for

4   construction defect is going out and determining if that's occurring, but,

5   yes, I have been on roofs that has initial ponding, but after the 48 hours

6   it's a nonissue.

7      Q.    And maybe that's why many flat roofs do have some initial

8   ponding within the first 48 hours?

9      A.    Yes.

10     Q.    All right.  And the point -- and that's the primary opinion

11  you've got here is that we've got ponding on the roof after 48 hours?

12     A.    Yes, sir.

13     Q.    Now, when you have ponding for more than 48 hours, that doesn't

14  mean the roof is leaking, right?

15     A.    No, sir, it doesn't.

16     Q.    It just -- it just means that you have sort of increased the

17  risk.  You might have leaks in the future or that it might age the roof

18  prematurely?

19     A.    That is correct.

20     Q.    Okay.  Now, can you go back and improve the mechanical methods

21  of draining a roof like this?  In other words, can you go back and install

22  cricketing or tapered insulation to improve the drainage?

23     A.    Yes, sir.

24     Q.    And you can also go back and increase scupper sizes or increase

25  drain sizes, that kind of thing too?

1     A.   Yes, sir.

2     Q.   Again, that's the great thing about a TPA -- TPO roof is it

3 literally is flexible, so you can go back and make those kind of repairs.

4     A.   Yes, sir.

5     Q.   The issue there, though, is -- like any kind of roof, though,

6 is you've got to do it properly and make sure that once you have improved

7 the mechanical drainage on a roof like that, you've gone back and sealed

8 all of the seals properly and had all your curbs go up high enough to make

9 the roof watertight?

10     A.   That is correct.

11     Q.   But it can be done?

12     A.   It can be done.

13     Q.   All right.  Mr. McCoy, during the break you were able to go

14 through your photographs on the flash drive and look for some specific

15 things that I was interested in seeing, correct?

16     A.   Yes, sir.

17     Q.   Okay.  Is that going to be -- we're looking at 2567.  Is that

18 going to be a curb pipe that's --

19     A.   That --

20     Q.   -- too short?

21     A.   That's too short.

22     Q.   All right.

23     A.   Okay.

24     Q.   Got it.

25     A.   That's too short.  Let's see.  Oh, and also see this -- again,

1    they've got the air pockets in that -- in the membrane there.

2         Q.   Oh, I see.  All right.

3         A.   It's -- that's not -- generally indicates the membrane hasn't

4    been relaxed properly and put it down and relaxed and let it sit for awhile

5    so it flattens out.

6                   MR. DUBOIS:  What's the number on the too short --

7                   THE WITNESS:  Oh, it's 2567?

8                   MR. TREAT:  Yeah.  Sorry.

9                   MR. DUBOIS:  That's all right.

10        Q.   (BY MR. TREAT:)  That's good.  I --

11        A.   Okay.  That's -- okay.  And, well, then this one here you can

12   see it's not leaves, it's dirt, okay?

13        Q.   And -- and, again, in 2569, what we're looking at there is the

14   high side of an air conditioning unit and we talked about this generally in

15   the first part of your deposition where there needs to be crickets put in

16   that will provide better mechanical drainage around the high side of this

17   AC?

18        A.   That's correct.

19        Q.   And, again, you'll agree with me that that can be done?

20        A.   Yes, sir.

21        Q.   Okay.

22        A.   Yeah.

23        Q.   Then right here -- like 2571, we see an area of ponding

24   around -- I guess that circle is one of the drains?

25        A.   That is correct.  That's one of the drains there.

1      Q.    And is this a photograph of something that's still in existence

2   after 48 hours?

3      A.    Yes, sir.

4      Q.    But, again, if we look at photograph 2571, mechanically the

5   drainage could be improved with tapered fiberboard to make -- to increase

6   the pitch down toward drain?

7      A.    It would have to be done the entire length.  You can't just --

8   in other words, if you're indicating like a little spot repair, no sir.

9      Q.    No?

10     A.    Because you end up creating -- where you stop, you end up

11  creating the problem.

12     Q.    Right.  But -- but you could improve the -- at that low end of

13  the roof, you could do the whole end and make the drainage go better toward

14  the drain.

15     A.    Yeah, the -- the entire end of the roof would have to be done

16  in order -- because each of these drains have the same conditions.  But,

17  yes, as long as it's done on the -- the entire --

18     Q.    All right.  There's a couple of other documents I want to ask

19  you about too.  One of these, Exhibit No. 8, was actually in your file

20  materials, so I'm sure you took a look at it.  It is from January of 2015

21  which reflects an inspection that was done by GAF in January of 2015,

22  right?

23     A.    Right.

24     Q.    And, apparently, the -- I guess somebody had called them out.

25            What was your understanding of how this inspection came

1  fix it?

2        A.    That's correct.

3        Q.    Right?  And you'll agree with me that the -- the inspection

4  report from GAF reflected that it was not leaking January of 2015, right?

5  Or that they didn't find a leak?

6        A.    They didn't find a leak.  Not that it wasn't leaking, but they

7  couldn't verify that it was leaking.

8        Q.    All right.  Now, I'm going to hand you or we will look at

9  together Exhibit No. 9, which is -- was in your materials.

10                      It was a technical advisory bulletin from the

11  manufacturers, right?

12       A.    Right.

13       Q.    And it's actually talking -- this technical advisory is about

14  does ponding water affect the surface of your product?  And it said, yes,

15  it can result in premature deterioration of the -- of the coating, right?

16       A.    Yes, sir.

17       Q.    And we've already talked about that today.  That's what we want

18  to avoid this ponding water after 48 hours, right?

19       A.    Yes, sir.

20       Q.    All right.  What -- what is your view about what --

21       A.    Okay.

22       Q.    -- needs to be done?

23       A.    Well, starting with the -- we've already talked about the

24  parapet cap.  I believe that all the parapet cap has to come off and -- and

25  done properly, okay?

```
1        Q.      Uh-huh.

2        A.      The other thing that I believe is the -- because the

3   air-conditioning units are not high enough, the only way that you can

4   facilitate that repair to bring them up to what they need is to disconnect

5   the units and lift them off the roof and put a bigger curb underneath it.

6                So that fix is a little bit more extensive.  So each one

7   of those A/C units would have to be disconnected and removed and a higher

8   curb raised up.

9        Q.      But let me ask you about that.  Do -- is that something that

10  should have been done initially?  I didn't even talk to you about that

11  because I didn't sort of realize it.

12               Are the air-conditioning units at the same curb height

13  that they were when Ja-Mar was contracted to do these repairs?

14       A.      I have no way of knowing that.

15       Q.      Let's assume they were because I'm -- I'm pretty sure that my

16  client told me that, but I don't want -- I don't want to say something to

17  you that I don't actually know the answer --

18       A.      So I'll be answering on your assumption.

19       Q.      Right.  Exactly.  If we assume that that was the curb height

20  when my client was contracted with to put in this roof, are they

21  required -- well, first of all, were they required for contract with Palmer

22  Craven to raise the air-conditioning units?

23       A.      They would be required to do that to grade, yes, sir.

24       Q.      Well, then how come GAF gave the warranty?

25       A.      Which is one of the reasons why I don't put a lot of stock
```

1    in -- I -- I -- I'm very critical of the -- of the observations made by GAF

2    and the approval process by GAF on this.  Since there was so many things

3    that -- that I don't -- GAF should have picked up the crickets behind the

4    units.  They did not.  GAF should have picked up the height to the curb.

5    They did not.  GAF should have picked up that parapet cap.  They did not.

6                    So when I hear they got a 10 out of a 10, I'm thinking

7    what criteria did they use?  And so, I -- I really am suspect of the

8    inspection and -- and approval of GAF of the system.

9        Q.    So are you saying it is your opinion that the entire roof needs

10   to be replaced and a new one needs to be put down or can there be repairs

11   done on to the roof?

12       A.    The scope and the extent of the repairs on the roof to correct

13   all the problems, it would be so involved that you may end up being --

14   working on 30 percent of that roof quite easily, so -- and -- and as

15   opposed to a five percent, whatever that number was.

16                    The scope of the work isn't just going in and raising

17   things up.  It's what is -- what is entailed in doing that.  You can't just

18   can't put a cricket behind the A/C unit.  You've got to do -- raise up the

19   entire A/C unit, okay?

20                    But -- and having said that, with all the parapet and

21   everything else, I guess on a -- on a cost analysis basis, if -- and that's

22   what I would boil it down to.

23       Q.    And you haven't done that cost analysis?

24       A.    No, sir.

25       Q.    All right.  So -- so the repairs that you think need to be done

1    are raise the A/C, right?

2         A.    All A/C units, yes, sir.

3         Q.    All right.  All right.  But you'll agree that you don't know

4    whether my client was either paid for that or contract -- contractually

5    agreed to do that?

6         A.    No, sir.

7         Q.    All right.  Then, obviously, we need to mechanically improve

8    the drainage in -- in -- sort of in two ways.  That is, we -- we need to

9    have crickets so to divert water around the A/C and then we also need to

10   improve the mechanical drainage at the low end of the roof where those

11   three drains are?

12        A.    That is correct.

13        Q.    And that could be -- the crickets can, obviously, be installed

14   underneath the TPO by the A/C units, right?

15        A.    Yes, Sir.

16        Q.    And then presumably what we would do with the low end of the

17   roof is use some kind of tapered insulation, get the drainage right so that

18   you can -- so you can push the water in toward the drains?

19        A.    Which would require taking up that entire area.

20        Q.    Right.  You've got to -- you've got to pull back that whole

21   lower end, right?

22        A.    That whole lower end from -- from one parapet wall to the other

23   going out -- I believe it -- it goes out about 20, 30 feet out.

24        Q.    And then you're saying the entire parapet cap would have to be

25   replaced?

CICMSJ0403

1     A.     Yes, sir.

2     Q.     Obviously, you've sort of already told me in relation to the

3  Perry report that you're sort of -- your primary disagreement with him -- I

4  mean, he, obviously, says a repair can be done.  You agree repairs cans be

5  done.  You just think they're more expensive than he's suggesting?

6     A.     Exactly.

7     Q.     All right.  Was there anything else that you remember that you

8  really had a big disagreement with about Perry?

9     A.     Can I see his report?

10    Q.     Right.  I am going to -- I'm going to mark that as Exhibit No.

11 11, so we are on page four of Exhibit 11.

12    A.     Right.  Which you can see was it pasted -- you know, the -- the

13 original report, which I'm sure was eight and a half by eleven has been

14 pasted on there, and he has circled, "Project Quality, 10.0."  "Contractor

15 Action Required."  "No action is needed at this time."

16              Then, you know, again, he is basing his opinion on GAF's

17 opinion.

18    Q.     Right.

19    A.     Okay.  So -- but and I -- so I disagree with -- with what he

20 has seen and what GAF has told him, I disagree with the fact that he went

21 with this as opposed to good roofing practices.

22    Q.     But --

23    A.     So I disagree with -- when using this and saying that this

24 shows that the roof is fine.

25    Q.     Obviously, you -- we -- you and I have no disagreement that

1   what he has cut and pasted into his report is an accurate copy of the GAF

2   inspection report as given to Palmer Craven?

3        A.    Right.

4        Q.    Right.  But what you're saying is you disagree with his

5   reliance on that report?

6        A.    Exactly.

7              I disagree with his commentary on page 7 and 8, that

8   the --

9        Q.    Which paragraph?

10       A.    Okay.  It's number -- No. 4.  It says, "The report states that,

11   in quotation marks, 'ponding water was observed at several locations

12   throughout the roof.'  As stated above, our inspection determined that most

13   of the ponding water will likely evaporate within the industry standard

14   recommendation of 48 hours."

15       Q.    Right.  And you -- and you observed in your report and you

16   actually fashioned a test that showed that there was water still there

17   after 48 hours in some areas, especially there on the low end of the

18   roof?

19       A.    Yes, sir.  In addition, I -- on one of my visits there was

20   ponding water there, and I looked at the weather for that time period and

21   the last rain had been five days prior to seeing ponding water on there.

22              So those are -- and I guess my -- Mr. Perry even

23   qualified -- and don't misunderstand that professionally I can disagree

24   with -- with his -- his findings. So -- but I -- I -- I would not have come

25   to that same conclusion.

CICMSJ0405

1      Q.    All right.  And -- and you -- and your view is based on your
2  observation you have seen water that has been up there longer than 48
3  hours?
4      A.    Yes, sir.
5      Q.    Okay.  I got it.
6      A.    Okay.  Okay.  In his conclusion on page 8 of 8 --
7      Q.    Uh-huh.
8      A.    -- he said, "The TPO roof system on the Palmer Craven's Office
9  Building is preforming as intended and generally installed in accordance
10 with industry standards and the roofing manufacturer's requirements."
11            Obviously, I disagree with that -- I mean, that the
12 roofing manufacturer's requirements, they didn't even adhere to their own
13 in my opinion, so I -- I -- I disagree with that.
14            "A few minor deficiencies were observed that can be
15 easily repaired."
16            I guess his definition, what is minor, and I -- and I'm
17 not going to say --
18     Q.    Right.
19     A.    -- that --
20     Q.    That's -- that's -- that's a question -- that -- the minor
21 deficiencies can be repaired is actually from a question of which language
22 to use.
23            You certainly agree that there are deficiencies and they
24 can be repaired?
25     A.    Yes, sir.

237

1   THE STATE OF TEXAS                )

2   COUNTY OF HIDALGO                 )

3        I, Regina Vasquez, Official Court Reporter in and for the 332nd

4   District Court of Hidalgo County, State of Texas, do hereby certify that

5   the above and foregoing contains a true and correct transcription of all

6   portions of evidence and other proceedings requested in writing by counsel

7   of the parties to be included in this volume of the Reporter's Record, in

8   the above-styled and numbered cause, all of which occurred in open court or

9   in chambers and were reported by me.

10       I further certify that this Reporter's Record of the proceedings truly

11  and correctly reflects the exhibits, if any, admitted, tendered in an offer

12  of proof or offered into evidence.

13       WITNESS MY OFFICIAL HAND this the 20th day of September, 2019.

14

15

16                      /s/Regina Vasquez_____
                        REGINA VASQUEZ, TEXAS C.S.R. 7227
17                      Expiration Date:  12-31-19
                        Official Court Reporter, 332nd District Court
18                      Hidalgo County, Texas
                        100 North Closner, Texas
19                      Edinburg, Texas 78541
                        Phone: (956) 318-2275
20                      Fax:  (956) 318-2698

21

22

23

24

25

CICMSJ0407

```
 1                         REPORTER'S RECORD
                          VOLUME 5 OF 12 VOLUMES
 2                  TRIAL COURT CAUSE NO. C-6015-14-F

 3  PALMER CRAVENS,                 )      IN THE DISTRICT COURT
                                    )
 4          Plaintiff(s),           )
                                    )
 5  VS.                             )      HIDALGO COUNTY, TEXAS
                                    )
 6  NATIONAL FIRE INSURANCE COMPANY )
    OF HARTFORD AND D.L. PHILLIPS   )
 7  CONSTRUCTION D/B/A JA-MAR ROOFING, )
                                    )
 8          Defendant(s),           )      332ND JUDICIAL DISTRICT

 9

10  _____

11

12

13                     JURY TRIAL PROCEEDINGS

14

15

16  _____

17

18

19      On the 15th day of June, 2018, the following excerpted proceedings

20  came on to be heard in the above-entitled and numbered cause before the

21  Honorable Mario E. Ramirez, Jr., Judge presiding, held in Edinburg, Hidalgo

22  County, Texas:

23      Proceedings reported by stenograph method.

24

25
```

Regina Vasquez, CSR
332nd District Court Reporter

CICMSJ0408

1                     A P P E A R A N C E S

2  Mr. Raymond L. Thomas
   SBOT NO. 19865350
3  Mr. David O. Sanchez
   SBOT NO. 24102457
4  Ms. Kristen Lamar Vela
   SBOT NO. 24107950
5  RAY THOMAS, PC
   4900-B North 10th Street
6  McAllen, Texas 78504
   Phone: (956) 686-8797
7  Fax: (956) 630-5199
   rthomas@raythomaspc.com
8  ATTORNEY FOR THE PLAINTIFF

9       - AND -

10 Mr. David L. Treat
   SBOT NO. 20205300
11 Ms. Amanda N. James
   SBOT NO. 24092570
12 LINDOW STEPHENS TREAT, LLP
   One Riverwalk Place
13 700 N. St. Mary's St., Suite 1700
   San Antonio, Texas 78205
14 Phone: (210) 227-2200
   Fax: (210) 227-4602
15 dlt@lstlaw.com
   ATTORNEY FOR THE DEFENDANT
16
          - AND -
17
   Mr. Wesson H. Tribble
18 TRIBBLE | ROSS
   SBOT NO. 20213960
19 6371 Richmond Avenue
   Houston, Texas  77057
20 Phone: (713) 622-0444
   Fax: (713) 622-0555
21 wtribble@tribblelawfirm.com
   ATTORNEY FOR THE DEFENDANT
22 D.L. PHILLIPS CONSTRUCTION, INC.

23

24

25

                    Regina Vasquez, CSR
                332nd District Court Reporter

CICMSJ0409

3

1

                            I N D E X

2
                             VOLUME 5
                      JURY TRIAL PROCEEDINGS
3
    JUNE 15, 2018                                    PAGE   VOL.
4   Proceedings -------------------------------------   4    5

5   PLAINTIFF'S WITNESSES        DIRECT    CROSS    VOIR DIRE   VOL.
    GUERRA-PRATS, RICHARD DAVID    4,  94,  58, 101   ---, ---   5
6                                103

7   GARZA, GUILLERMO           105, 131   123, ---   ---, ---   5

8                                                   PAGE   VOL.
    Adjournment -------------------------------------  133    5
9
    Court Reporter's Certificate -------------------------  134    5
10
                          EXHIBIT INDEX
11
    PLAINTIFFS'
12  NO.  DESCRIPTION                    OFFERED    ADMITTED   VOL.
    94.  Report by Richard Guerra-Prats     41         41       5
13
    104. Guerra-Prats Diagram              105        105       5
14
    105. Diagram and Photographs           105        105       5
15

16

17

18

19

20

21

22

23

24

25

                      Regina Vasquez, CSR
                  332nd District Court Reporter

CICMSJ0410

1       Q.    (BY MR. THOMAS:)  Why not, sir?

2       A.    Well, it's a conflict of interest.

3       Q.    All right.  Can you tell us how is it that you got involved on

4  this particular project involving the building that's owned by Palmer

5  Craven, L.L.C., which was formally the VA Clinic?

6       A.    Well, whoa, I guess back in '13 after the big storm, hailstorms

7  that hit here, a couple of them back-to-back, I was working for a lawyer,

8  his name is Greg Dietzmann.  And Mr. Dietzmann was basically doing a lot of

9  Mr. Palmer's cases, quite a few of them.  I can't remember how many.

10 But we were looking at all of his properties and doing the damage

11 assessments, and that's basically how I got involved.

12      Q.    Okay.  But how did you get involved in this particular -- on

13 this particular project, the former VA Clinic?

14      A.    I was asked by Mr. Dietzmann to go by there and take a look at

15 because apparently there were some leaks in this brand new roof system that

16 was put on the -- on the building.

17      Q.    So by the time you got involved on the VA project, the work had

18 already been done?

19      A.    Yes, sir.

20      Q.    The hailstorm had occurred in March of 2012, and then again in

21 April of 2012.  And you didn't come onto this scene with the VA Clinic

22 building until 2013?

23      A.    That's correct.

24      Q.    After Ja-Mar or whoever they hired completed the work?

25      A.    That's correct.

Regina Vasquez, CSR
332nd District Court Reporter

1    Q.    And after this new roof system had been installed, was the

2    building experiencing multiple leaks?

3    A.    Yes, sir.

4    Q.    And that's why you got called?

5    A.    That's why I got called to go take a look at it.

6    Q.    And so you went to take a look at it.  And what did you find?

7    A.    Well, we found that basically when we first looked at the site,

8    there was an indention in the roof.  And they were complaining of leaks in

9    several areas and they had a lot of security in there so we had to kind of

10   walk with a security guard to kind of take a quick look and see.

11           And what we did, you know, I said, look, we are going to

12   need some help.  So I got -- I think it was Whitten, Jim Whitten involved

13   and I got Baldwin involved.

14   Q.    Okay.  Now, Jim Whitten is a roofing consultant?

15   A.    Yes, sir.

16   Q.    Out of where?

17   A.    Oh, I am not sure.  I think it's out of Austin.

18   Q.    And they are known as roofing experts?

19   A.    Yes, sir.

20   Q.    And you also called, you said, Baldwin?

21   A.    Baldwin.

22   Q.    Baldwin Roofing?

23   A.    Yes, sir.

24   Q.    And who is Baldwin Roofing?

25   A.    That's Lupe Garza.

12

1      Q.    The gentleman -- he -- he's the gentleman who testified here
2  yesterday right before you, were you aware of that?
3      A.    Yes, I was.
4      Q.    All right.  And so why did you call Lupe Garza, and why did you
5  call the Jim Whitten Consultants?
6      A.    Well, basically when we run across a site that has issues like
7  -- like this, for example, I like to get a roof consultant involved.  I am
8  not a roof expert.  I know a lot about roofs, but I don't claim to be an
9  expert.  But I like to get the proper people involved.

10              And we weren't only doing this one, we were doing a whole
11  bunch of them down here.  So it wasn't just the Palmer properties, we were
12  doing a massive amount of other real estate.

13      Q.    You say you are not -- you don't claim to be a roofing expert.
14  You know a lot about roofs, but you don't claim to be a roofing expert.

15              Are you an expert in cost estimating for repair of
16  projects like this one?

17      A.    Yes, sir, I'm a general contractor.  I know how to put together
18  an estimate.

19      Q.    All right.  And what is it that was initially found when you
20  brought out Baldwin and Whitten?

21      A.    Well, initially they tried to locate -- they found some leaks
22  in that one area.  And I believe the first thing they wanted to do was
23  raise that area that was too low.  And I think that was about the brunt of
24  it on the roof.

25      Q.    Let me show you what's been marked, but not entered, as

1   Plaintiff's Exhibit 60.

2                   MR. THOMAS:  May I approach, Your Honor?

3                   THE COURT: Yes, sir.

4       Q.    (BY MR. THOMAS:)  Mr. Guerra-Prats, I am handing you what's

5   been marked, but not entered, as Plaintiff's Exhibit 60.  And is this

6   the -- the expert report that you commissioned from Mr. Jim Whitten Roof

7   Consultants, L.L.C.?

8       A.    Yes, sir.

9       Q.    And what is the date of this report from your -- the roof

10  consultant that you -- that you commissioned?

11      A.    February 17th, 2014.

12      Q.    All right.  Now, if we look -- if we are imagining the time

13  line, the Ja-Mar people had finished installing the roof right at the very

14  beginning of February of 2014.  Do you recall that?

15      A.    Was it 2014?

16      Q.    I am sorry, 2013.

17      A.    2013, I believe.

18      Q.    Correct.  I am sorry, 2013.

19                  And -- and so this was about a year later?

20      A.    Yes, sir, this would be about a year later because it's

21  February.

22      Q.    Right.

23                  And what is it that you learned from this roofing expert

24  that you consulted?

25      A.    The roof had some problems.  It had quite a few problems in

14

1    it.

2         Q.    And does -- does the roof expert identify what those problems

3    were?

4         A.    Yes, sir, and there is conclusions.

5         Q.    Okay.  And what were his conclusions for this expert that was

6    commissioned?

7         A.    Let's see here, No. 1, the roof membrane installed at subject

8    property was not installed in a good and workmanlike manner.

9                   MR. TREAT:  Your Honor, excuse me, sir.

10                  Obviously, experts can rely or hearsay, they are experts.

11   But it wouldn't really be appropriate for him to just read from a report.

12   Mr. Whitten could be called.  I mean, if he wants to summarize or to

13   refresh his memory so he could discuss it, that's fine.

14                  THE COURT:  Do that, Mr. Thomas.

15        Q.    (BY MR. THOMAS:)  Yeah, just summarize his -- his -- what you

16   found -- or what he found rather than reading it.

17        A.    Well, basically he found all kinds of defects in the roof and

18   he said it's not likely to perform as intended, in a nutshell.

19        Q.    And are these little minor defects, or are they serious

20   defects?

21        A.    I'd leave that up to the experts on that, but apparently there

22   is a lot -- a lot of problems with the roof.

23        Q.    All right.  And this is in February of '14, correct?

24        A.    Yes, sir.

25        Q.    And then you also asked -- you said Lupe Garza to come out.

CICMSJ0415

1   And did Lupe Garza take a look at the roof and -- and come up with a couple

2   of estimates in order to address some of the concerns that were being

3   raised by the roofing expert?

4        A.    Yes, sir.

5        Q.    There were two reports or estimates that were provided by

6   Mr. Garza.

7             MR. THOMAS:  I don't want to take Your Honor's because

8   they're yours.

9             MR. TREAT:  And we'll misplace them.

10            MR. THOMAS:  Yes.

11            These are Regina's officials.

12       Q.    (BY MR. THOMAS:)  Yesterday Mr. David Treat, the attorney for

13  Ja-Mar, spent some time with Mr. Lupe Garza asking him about Defense

14  Exhibit No. 9, which is an estimate from Lupe Garza; is that correct?

15       A.    That's true, yes.

16            MR. THOMAS:  Can you set me up on the Elmo, Carlos?

17       Q.    (BY MR. THOMAS:)  Now, this estimate is dated March the 3rd of

18  2014; is that right?

19       A.    Yes, sir.

20       Q.    And this is just a couple of weeks after the -- you got the

21  report from the roofing expert, Mr. Whitten, correct?

22       A.    Yes, sir.

23       Q.    So you get the report from the roofing expert because this roof

24  has all of these unresolved leaks that had been occurring since the roof

25  was installed and you get an estimate from Mr. Lupe Garza to fix the

1   problems at that time?

2        A.    Yes, sir.

3        Q.    Okay.  And what was -- this is the estimate for $130,000.00

4   that Mr. Garza said -- he testified yesterday was a partial repair?

5        A.    That's correct.

6        Q.    So what was the -- why is it -- this is addressed to you.  Are

7   you the one that requested this estimate?

8        A.    Yes, sir, I did.

9        Q.    And tell the Jury why you requested this particular estimate?

10       A.    Well, when we first got involved I wanted to try to address the

11  report and see if the roof could be fixed.  And Mr. Garza -- Lupe sent me

12  this estimate.

13             And I called Lupe up and said that's fine, Lupe, can you

14  warranty the entire repair and the rest of the roof?

15             He told me, no, he couldn't.

16             I said, well, then you are going to need to give me a

17  replacement cost for the whole roof.

18       Q.    And did he do that?

19       A.    Yes, sir, he did.

20       Q.    Let me show you what has been previously marked and admitted as

21  Defense Exhibit 10.  On the same day, March the 3rd of 2014, a couple of

22  weeks after you got Mr. Whitten's expert report, you got two different

23  estimates from Lupe Garza, didn't you?

24       A.    Yes, sir, I did.

25       Q.    The first one you said was for the partial to repair part of

1   the roof for $130,000.00?

2       A.   That's correct.

3       Q.   And the -- and the second one was to do complete re-roof using

4   the same TPO roof that was already there, right?

5       A.   Yes, sir --

6       Q.   And that --

7       A.   -- to replace it with like kind of it.

8       Q.   Yes, sir.

9           And this came out to 265,771, right sir?

10      A.   That's correct.

11      Q.   Something I want to do is go to this chart over here and I am

12  going to mark down the date of those estimates.  Okay.  Those -- March the

13  3rd, 2014 was the date of Lupe Garza's first two estimates, right, sir?

14      A.   Yes, sir.

15      Q.   Then the Jury heard yesterday that Mr. Lupe Garza had come up

16  with a different estimate.  I am going to show you what's been marked as

17  Plaintiff's Exhibit No. 62, which is another estimate from Mr. Garza.  And

18  this one is for $409,224.75.  Do you see that?

19      A.   Yes, sir.

20      Q.   And what was this one for?  This one is also addressed to you.

21  What was this estimate for?

22      A.   This is basically to put the roof back like it was.

23      Q.   Okay.  To remove the built-up and roof insulation down to the

24  roof deck.  This is what -- like would have been quoted to the insurance

25  company in order to remove and replace like kind --

1    A.   That's correct.

2    Q.   -- back at that -- back when the claim was first made?

3    A.   That's correct.

4    Q.   The date of this is September the 23rd of 2014, correct, sir?

5    A.   Yes, sir.

6    Q.   Several months later.

7         So now we have Lupe estimates No. 1 in March, and Lupe

8  estimates No. 2 in September, correct?

9    A.   Yes, sir.

10   Q.   Here to do the reroof was $234,000.00.  And here to do the

11 reroof was $409,000.00, right?

12   A.   Yes, sir.

13   Q.   And there is not that many months in between here.  So what is

14 it that would account for that great increase in price from March the 20th

15 of 2014 to December of 2014?  What happened?

16   A.   I was basically asked to give a price of like kind and

17 quality.

18   Q.   Yes, sir.

19   A.   And that's what we did.

20        Of what was there, not -- not the TPO, but what was

21 there.

22   Q.   I understand.

23        Let me show you some -- Exhibit No. 25, which has been

24 previously admitted.  This is a page -- this is a work order.

25        MR. THOMAS:  Can everybody see that?

1    Q.    (BY MR. THOMAS:)   This is a Work Order for Baldwin Roofing from

2    Palmco for Mr. Lupe Garza on 9-24 of '14.  Do you see that?

3    A.    Yes, sir.

4    Q.    It says, Details of the Work:  At Park Place Ventures, L.L.C.

5    heavy rains caused roof leaks over the south side of the building.  Baldwin

6    Roofing through Rick Guerra-Prats required the leaks -- or repaired the

7    leaks -- I'm sorry -- repaired the leaks.  There was an initial cost

8    estimate of $1900.00 to put some little patches and some band-aids to make

9    some -- a temporary fix, correct?

10   A.    To my -- yes, I didn't see them.  But, yes.

11   Q.    Well, $1900.00 wouldn't fix the roof, would it?

12   A.    No, it -- it was just stopping the leaks.

13   Q.    All right.  And so do you recall that in September there was a

14   very significant rainstorm in the McAllen area that caused a lot of water

15   intrusion into the VA building?

16   A.    Yes, sir, I do.

17   Q.    And as a result of the -- this rainstorm that came in September

18   and allowed all this water to get in, did another service company have to

19   come out and do some immediate activity to remove the water -- the standing

20   water and -- and -- and remediate from what's going on?

21   A.    Yes, sir, I believe Servpro went in and did the removal of all

22   the wet material.

23   Q.    And what is Servpro?

24   A.    Basically they are a company that goes out and deals with water

25   restoration claims.  Insurance companies use them all the time.

1    Q.    And is it important to get in and get all the wet stuff out?

2    A.    Yes, sir, it is.

3    Q.    Why is that?

4    A.    Because then it will start turning into mold.

5    Q.    Okay.  So would you say something significant happened between

6  the first estimate that you asked Lupe Garza to give and the second

7  estimate that Mr. Lupe Garza had to give?

8    A.    When was that storm again?

9    Q.    September 23rd, 2014.

10            I'm sorry.  You can't see it.

11   A.    That's Lupe's estimate, though?

12   Q.    Yes, sir.

13   A.    The storm date?

14   Q.    Yeah, the storm happened in earlier September, didn't it?

15   A.    I don't remember the date.

16   Q.    Oh.

17   A.    I believe you gave me that date, but there was a storm.

18   Q.    Right.

19            Well, we saw from Exhibit No. 25 that Mr. Lupe Garza was

20  doing the repairs --

21   A.    Right.

22   Q.    -- on September the 24th?

23   A.    That's right.

24   Q.    As a result of the big rainstorm?

25   A.    That's right.

1      Q.    So we know that the rainstorm happened before he did the

2   repairs because that's what the invoice says.

3      A.    That's correct.

4      Q.    If Ja-Mar had properly installed the roof, should there have

5   been the kind of water intrusion into the VA building that we saw in

6   September of 2014?

7      A.    No, sir.

8      Q.    And why is it there was so much water intrusion in September of

9   2014?

10      A.    Apparently there was a lot of leaks.  That's all I can say is

11   there was a lot of leaks for it to have that much water come in.

12      Q.    I think it's -- did you see a map that -- or you gave Mr. Lupe

13   Garza a floor plan, did you not?

14      A.    Yes, sir, I did.

15      Q.    And in his deposition what he did was he indicated the places

16   where he found evidence of water intrusion from a number of roof defects,

17   were you aware of that?

18      A.    I am now.

19      Q.    Mr. Garza --

20            MR. THOMAS:  Elmo, please, Carlos.

21      Q.    (BY MR. THOMAS:)  Yesterday the Jury saw this floor plan that

22   you created, did you not -- or -- or was created on your behalf by your

23   company?

24      A.    Yeah, my company created it.  Yes.

25      Q.    And then -- and then Mr. Lupe Garza was asked to identify with

CICMSJ0422

22

1    a yellow highlight all of the different areas where he said there was water

2    intrusion.  Do you see that?

3         A.   Yes, sir, I do.

4         Q.   Would you expect with that kind of water intrusion -- with that

5    kind of water intrusion, are you going to expect to see additional property

6    damage that is caused?

7         A.   Yes, sir.

8         Q.   Okay.  And as a result of that additional damage that was

9    caused by the -- by the water that got in the building from the defects

10   from the roof, would that cause the cost to go up?

11        A.   Yes, sir.

12        Q.   The cost to repair?

13        A.   Yes, it would.

14        Q.   And the scope of the repair?

15        A.   Yes, sir.

16        Q.   Just for the record, we were looking at Plaintiff's 86, that is

17   the Lupe Garza floor plan with the highlights, all right?

18        A.   Okay.

19        Q.   So then what happened after the September storm?

20        A.   Uh.

21        Q.   You came out in -- in -- in I believe it was in December of

22   that same year of 2014 and took some additional photographs, did you not?

23        A.   I believe that was my next visit after Servpro had removed all

24   of the material, dried down -- I guess dried down the building, basically

25   got the demolition done at that point.

1    Q.    So when -- you probably don't know this, but we toured the --

2  together with the Jury and Your Honor we toured the VA building and we saw

3  a bunch of the dry walls pulled out and torn out.  Was that as a result of

4  the September storm?

5    A.    Uh, I believe --

6    Q.    Not as a result of the storm, but as a result of Servpro

7  cleaning it up after the September storm?

8    A.    That is correct.

9    Q.    Because you were in that building before the storm and after

10  the September storm; is that right?

11    A.    That's correct.

12    Q.    And did you see additional damages after the September storm

13  that didn't exist before that storm?

14    A.    Yes, sir, all of it was torn out.

15    Q.    And did you carefully document in December -- No. 8 -- did you

16  carefully document the damage that you saw in -- when you went to

17  photograph in December of 2014?

18    A.    Yes, sir.

19    Q.    Meticulously documented all the damage --

20    A.    Yes, sir.

21    Q.    -- that you could visibly see?

22    A.    I took pictures of everything.

23    Q.    Was -- let me show you what's been previously marked and

24  entered into evidence as Defendant's Exhibit No 8.

25          And is this a part of the floor plan with the

1    documentation that you made of the damages that you -- that were visible to

2    you?

3         A.    Yes, sir.

4         Q.    And not just damages but photos of the area?

5         A.    Yes, sir.

6                    That was before the tear out, I believe.

7         Q.    Well, take a look through these photographs.

8         A.    Yeah, this would have been before the tear out, 7-30.  This

9    right here.

10        Q.    Oh, this one is before the tear out?

11        A.    Yes, sir.

12        Q.    Okay.

13                    And so if the Jury wants to see a good comparison between

14   the damages that -- that took place after the September storm, and before

15   the September rain, they can compare the photographs on Defendant's Exhibit

16   8 with the photographs that you took after in December of 2014?

17        A.    That's correct.

18                    MR. THOMAS:  Okay.  Can you bring up, Carlos, the

19   interactive map?

20        Q.    (BY MR. THOMAS:)  I am showing you a -- Carlos, is showing you

21   a map that we have marked as Exhibit 104.

22                    And can you tell us what we are looking at there?

23        A.    That's basically a plan with our pictures plotted to where we

24   took the pictures from.  That was before the storm.

25        Q.    And then there was another one that you did after the storm?

1  by Ja-Mar's defect -- defects on that roof?

2      A.   Yes, sir, I was.

3      Q.   All right.  I am going to show you what's been marked as

4  Plaintiff's 94.

5                MR. THOMAS:  May I approach, Your Honor?

6                THE COURT:  Yes.

7      Q.   (BY MR. THOMAS:)  And is this a true and correct copy of your

8  latest estimate that you prepared?

9      A.   Yes, sir, with today's prices.

10     Q.   Yes.

11                And I was going to ask you that.  Did I ask you --

12  because the first -- the first reports -- estimate you did -- you've done a

13  number of estimates, have you not?

14     A.   Yes, I have.

15     Q.   And prior to this one it had been a number of years since you

16  had done an estimate?

17     A.   Yes, sir, it has.

18     Q.   Have prices of labor and for materials increased since that

19  time?

20     A.   Yes.

21     Q.   And did I ask you to bring your estimate current to today's

22  prices?

23     A.   Yes, you did.

24     Q.   Did you do that?

25     A.   Yes, sir.

1      Q.     And is your -- are your estimate -- is your estimate now

2  reflected -- your current estimate reflected here in Plaintiff's Exhibit

3  94?

4      A.     Yes, sir.

5              MR. THOMAS:  Your Honor, we would move to admit Exhibit

6  No. 94.

7              (Plaintiff's Exhibit No. 94 offered.)

8              MR. TREAT:  And, Your Honor, I am going to make the same

9  objection I did yesterday to Mr. Garza's updated estimate that it was

10 supplemented late and that it's actually more than a mere refinement of the

11 numbers.  There has also been some additions to that report, some

12 additional types of damages.

13             THE COURT:  All right.  And that objection is overruled.

14 It's admitted.

15             (Plaintiff's Exhibit No. 94 admitted.)

16             MR. TREAT:  Thank You.

17     Q.     (BY MR. THOMAS:)  And is -- I was going to ask you, Mr. Guerra,

18 just to be sure, the methodology that you used for this report and this

19 estimate is the same as you have used before, you just updated the prices?

20     A.     Correct.

21     Q.     All right.  Can you then run through -- let's go to -- run

22 through your estimate and how you put it together.

23     A.     Well, from the very beginning?  Are you going to --

24             MR. TREAT:  Let me get this out of the way.

25             MR. THOMAS:  Thank you.  Thank you, Mr. Treat.

```
 1                  MR. TREAT:  You bet.

 2                  MR. THOMAS:  First page.

 3      Q.    (BY MR. THOMAS:)  Tell us what we are looking at.

 4      A.    That is the cover page.  And it's our opinion of probable

 5   construction costs for the repairs to the building.

 6      Q.    Okay.  And I notice here on the first page you say date entered

 7   January 15, 2014 type of estimate hail.  That was the original estimate,

 8   was it not?

 9      A.    Original start date, yes.  And then we just basically used this

10   one and expanded on it.  But that's the original date.  The estimate will

11   have the updated number at the bottom of each page.

12      Q.    Okay.  Let's look at the bottom of the second page.

13      A.    The date is 6-13, which was a couple of days ago.

14      Q.    Okay.  Great.

15            And so at the bottom of this page, for example, it shows

16   that you've updated your numbers as of June the 13 of 2018?

17      A.    That's correct at your request.

18      Q.    And just go through the process, the methodology that you used

19   in order to come up with this estimate.

20      A.    Well, in this case basically what we did is when we realized

21   when they changed the roof style from a TPO -- I mean, from a built-up roof

22   to a TPO roof and this work was completed, I was asked to put together a

23   bid on what should have been paid in the first place.

24            And that's when we realized that the first -- there is

25   several estimates, and that's why I am talking about several of them to get
```

1    your estimate?

2         A.    I do.

3               And for -- you know, basically from a standpoint of

4    working with other adjustors, and contractors that we meet together and do

5    appraisals, I've talked to six or seven of them about this area and the

6    prices that we have.  And they have no problems with the prices that we

7    have right now in our system.

8         Q.    All right.  And in order -- and what is the reasonable and

9    necessary cost to repair the building that is the subject of this lawsuit

10   for the damages that were caused by Ja-Mar?

11        A.    Our estimate is at $2,091,208.40.

12              MR. THOMAS:  Can you put up that last page.

13        Q.    (BY MR. THOMAS:)  It should be the last page, right?

14        A.    Yes, sir, it's the last page.

15              But there is going to be a small credit.  I talked to

16   Lupe yesterday as a matter of fact.

17              I am sorry.  And Lupe pointed out to me that he had an

18   error in his estimate.  So I'm -- there would be a credit on that.  I

19   haven't had time to revise it.  But --

20        Q.    Well, let's start with the end, though.  You've got 2,091,208.

21   And that includes overhead of 10 percent, right?

22        A.    I think the page you want to go to -- oh, yeah, that's --

23   that's it.  Yes, ten percent overhead, 10 percent profit.

24        Q.    And is that standard in your industry 10 percent profit?

25        A.    Yes, that is standard.

1      Q.    You don't remember?

2      A.    But I have a whole stack of depositions I just can't

3  remember.

4      Q.    There is one other -- there is one other important fact between

5  March and September that Mr. Thomas didn't ask you about.  Do you remember

6  what that is?  What else happened in between there?  Do you know?

7      A.    You are real jogging my mind.  That's four years ago.

8      Q.    Right.

9            I am going to hand you the Plaintiffs' First Amended -- I

10 mean, the First Original Petition.  It's a certified copy.  Can you tell me

11 when it was filed?  It's on the top right.

12     A.    Top right?  Oh, right here?

13     Q.    That's it right there.

14     A.    Oh, I am sorry.  6-26-14.

15     Q.    All right.  So we also had Mr. Palmer filing suit against my

16 client in between the lower -- and I'll represent to you that in his

17 deposition he said these were both acceptable ways -- that was an

18 intervening fact before we get the larger estimate to do the built-up roof

19 that's no longer there, right?

20     A.    I -- I guess.  I mean --

21     Q.    Well, I mean --

22     A.    You're talking about the date of --

23     Q.    This right --

24     A.    -- of this in between them?

25            Okay.  I got you.

134

1   THE STATE OF TEXAS                    )

2   COUNTY OF HIDALGO                      )

3       I, Regina Vasquez, Official Court Reporter in and for the 332nd

4   District Court of Hidalgo County, State of Texas, do hereby certify that

5   the above and foregoing contains a true and correct transcription of all

6   portions of evidence and other proceedings requested in writing by counsel

7   of the parties to be included in this volume of the Reporter's Record, in

8   the above-styled and numbered cause, all of which occurred in open court or

9   in chambers and were reported by me.

10      I further certify that this Reporter's Record of the proceedings truly

11  and correctly reflects the exhibits, if any, admitted, tendered in an offer

12  of proof or offered into evidence.

13      WITNESS MY OFFICIAL HAND this the 20th day of September, 2019.

14

15

16                  /s/Regina Vasquez_____
                    REGINA VASQUEZ, TEXAS C.S.R. 7227
17                  Expiration Date:  12-31-19
                    Official Court Reporter, 332nd District Court
18                  Hidalgo County, Texas
                    100 North Closner, Texas
19                  Edinburg, Texas 78541
                    Phone: (956) 318-2275
20                  Fax:  (956) 318-2698

21

22

23

24

25

CICMSJ0431

REPORTER'S RECORD
VOLUME 6 OF 12 VOLUMES
TRIAL COURT CAUSE NO. C-6015-14-F

PALMER CRAVENS,                    )        IN THE DISTRICT COURT
                                   )
        Plaintiff(s),              )
                                   )
VS.                                )        HIDALGO COUNTY, TEXAS
                                   )
NATIONAL FIRE INSURANCE COMPANY    )
OF HARTFORD AND D.L. PHILLIPS      )
CONSTRUCTION D/B/A JA-MAR ROOFING, )
                                   )
        Defendant(s),              )        332ND JUDICIAL DISTRICT

_____

JURY TRIAL PROCEEDINGS

_____

    On the 18th day of June, 2018, the following excerpted proceedings

came on to be heard in the above-entitled and numbered cause before the

Honorable Mario E. Ramirez, Jr., Judge presiding, held in Edinburg, Hidalgo

County, Texas:

    Proceedings reported by stenograph method.

CICMSJ0432

1                      A P P E A R A N C E S

2    Mr. Raymond L. Thomas
     SBOT NO. 19865350
3    Mr. David O. Sanchez
     SBOT NO. 24102457
4    Ms. Kristen Lamar Vela
     SBOT NO. 24107950
5    RAY THOMAS, PC
     4900-B North 10th Street
6    McAllen, Texas 78504
     Phone: (956) 686-8797
7    Fax: (956) 630-5199
     rthomas@raythomaspc.com
8    ATTORNEY FOR THE PLAINTIFF

9         - AND -

10   Mr. David L. Treat
     SBOT NO. 20205300
11   Ms. Amanda N. James
     SBOT NO. 24092570
12   LINDOW STEPHENS TREAT, LLP
     One Riverwalk Place
13   700 N. St. Mary's St., Suite 1700
     San Antonio, Texas 78205
14   Phone: (210) 227-2200
     Fax: (210) 227-4602
15   dlt@lstlaw.com
     ATTORNEY FOR THE DEFENDANT
16
          - AND -
17
     Mr. Wesson H. Tribble
18   TRIBBLE | ROSS
     SBOT NO. 20213960
19   6371 Richmond Avenue
     Houston, Texas  77057
20   Phone: (713) 622-0444
     Fax: (713) 622-0555
21   wtribble@tribblelawfirm.com
     ATTORNEY FOR THE DEFENDANT
22   D.L. PHILLIPS CONSTRUCTION, INC.

23

24

25

CICMSJ0433

3

I N D E X

VOLUME 6
JURY TRIAL PROCEEDINGS

JUNE 18, 2018                                                PAGE    VOL.
Proceedings ----------------------------------------------    4      6

PLAINTIFF'S WITNESSES          DIRECT     CROSS     VOIR DIRE    VOL.
SCHNEIDER, DOUG                  4,  46,   29,  55,   ---, ---     6
                                58         61

PALMER, RANDAL JAY              62, ---   123, ---    ---, ---     6

                                                            PAGE    VOL.
Hearing outside the Presence of the Jury --------------------  149    6
Hearing outside the Presence of the Jury concluded -----------  151    6

PLAINTIFF'S WITNESSES          DIRECT     CROSS     VOIR DIRE    VOL.
PALMER, RANDAL JAY             178, 189,  151, 188,  ---, ---     6
                               193        190, 194

                                                            PAGE    VOL.
Hearing outside the Presence of the Jury on Offer of Proof ---  196    6

OFFER OF PROOF WITNESS          EXAMINATION                     VOL.
PALMER, RANDAL JAY              197, ---                          6

                                                            PAGE    VOL.
Hearing on Offer of Proof and Proceedings concluded ----------  199    6

Court Reporter's Certificate --------------------------------  200    6

EXHIBIT INDEX
PLAINTIFFS'
NO.  DESCRIPTION                         OFFERED     ADMITTED    VOL.
106. Photograph                            118          118       6

107. Lease for Real Property                68           68       6

109. List                                  110          110       6

1    A.   Okay.

2    Q.   But you don't remember him?

3    A.   No, sir.

4    Q.   And --

5    A.   Might have seen him but I don't remember him, no.

6    Q.   What about the guy on the bottom right, Mr. Joel Ortegon?

7    A.   Ortegon.  No, sir.

8    Q.   Don't remember seeing him either?

9    A.   No, sir.

10   Q.   The people that were working on the roof doing the roof work,

11   did you think they were employees of Ja-Mar?

12   A.   Sure.

13   Q.   Did they ever tell you different?

14   A.   No, sir.

15   Q.   After the roof was installed -- well, first of all, do you

16   remember how many -- how many months it took them to do the roof and to

17   complete the repairs?

18   A.   Probably about four, I believe.

19   Q.   Four months?

20   A.   Yes, sir.

21   Q.   And do you remember when they finished?

22   A.   It was some time in early '13, 2013.  Probably January,

23   February.  I don't remember exactly.

24   Q.   And immediately after the repairs were done, or was supposedly

25   done and the new roofing system was installed, did you have any more

1    trouble with the building?

2         A.    From time to time, yes, sir.

3         Q.    And what happened?

4         A.    That would be contacted by Mr. Quintero and we would take care

5    of the leaks.  I'd call Ja-Mar, Mr. Bloomer, and let him know what was

6    going on.  And they'd go to take care of the situation.

7                   MR. THOMAS:  May I approach, Your Honor?

8                   THE COURT:  Yes, sir.

9                   MR. THOMAS:  Let me get your pointer.

10        Q.    (BY MR. THOMAS:)  Mr. Schneider, we've got a time line up here.

11   And repairs were completed approximately February the 1st of 2013 just as

12   you testified.  Do you recall that?

13        A.    Yes, sir.

14        Q.    And as soon as March we already started having roof leaks that

15   were being reported to you?

16        A.    Yes, sir.

17        Q.    Who reported the roof leaks to you?

18        A.    Mr. Quintero.

19        Q.    From the VA?

20        A.    Yes, sir.

21        Q.    And then in April, and May, and in June did you -- were more

22   leaks being reported to you?

23        A.    Yes, sir.

24        Q.    All of these by Mr. Quintero?

25        A.    Right.

1    Q.    And then September, additional roof leaks.  And these are
2    documented --
3    A.    Sure.
4    Q.    -- e-mails, are they not?
5    A.    Sure.  Yes, sir.
6    Q.    And these e-mails are in evidence?
7    A.    Yes, sir.
8    Q.    Ultimately, did Mr. Palmer decide to bring in some other
9    roofing experts to take a look at the roof to see why there were continuing
10   problems?
11   A.    Yes, sir.
12   Q.    And -- and that would have been some time in -- in 2014; is
13   that correct?
14   A.    Correct, yes, sir.
15   Q.    Okay.  So what happened in September of 2014 as it relates to
16   this building?
17   A.    There was a major rainstorm in McAllen at that time.  And I
18   think probably the entire area, entire city.  But it rained a whole lot on
19   the south side of McAllen that affected the building.
20   Q.    How did it affect this building?
21   A.    A lot of water on the roof, a lot of leaks on the inside on the
22   south side of the building, on the southwest, southeast, and south.  And,
23   you know, ceiling tiles wet, some of the floors, wet, walls had some water
24   inside.  It was a heck of a storm.
25   Q.    So you had water not only on the roof but you had -- you found

1  water on the walls?

2      A.   Yeah.

3      Q.   In the walls?

4      A.   Yes, sir, and the floors.  Yes, sir.

5      Q.   And the floors?

6      A.   Yes, sir.

7      Q.   And on the ceiling tiles?

8      A.   Right.

9      Q.   And did it make a big mess?

10      A.   Yes, sir.

11      Q.   What did you --

12      A.   Some of the ceiling tiles even dropped onto the floor, yes,

13  sir.

14      Q.   And what did you do to help mitigate the damage that was being

15  caused by that September storm?

16      A.   Well, contacted -- through the owners contacted a remediation

17  company to take care of it, okay, and to clean up the storm or clean up the

18  damages from the storm.

19      Q.   You are talking about Servpro?

20      A.   Yes, sir.

21      Q.   And they came in and what does Servpro do?

22      A.   They came in and dried everything up.  And -- including taking

23  the gyp board off the walls on those areas from the south, southwest and

24  southeast, and just cleaned it up.

25      Q.   Okay.

1       A.      Whatever they were supposed to do to bring it back again.

2       Q.      And since that time -- and I guess that would have been in late

3    2014 when Servpro did their work, did -- since that time, have you done all

4    that you can to keep the humidity low and the moisture -- as much moisture

5    as you can out of that building?

6       A.      Yes, sir.

7       Q.      And how do you do that?

8       A.      Well, we run the air-condition.  We run them high.  They are on

9    high temperatures, but we run the A/C's.  And then just to -- just to keep

10   it as comfortable -- not comfortable, no, but to keep it -- keep it dry as

11   dry as we can, yes, sir.

12      Q.      To keep any mold growth from developing?

13      A.      Yes, sir.

14      Q.      You've got this -- you ever get up on the roof?

15      A.      Sure.

16      Q.      Did you get up on the roof of the building before the

17   hailstorms?

18      A.      Yes, sir.

19      Q.      And what kind of roofing system was on that building before the

20   hailstorms?

21      A.      It was a gravel -- gravel roof.

22      Q.      Tar-and-gravel?

23      A.      Tar-and-gravel, yes, sir.

24      Q.      And what sort of roof -- do you know what kind of roof system

25   Ja-Mar installed?

1  whatnot, we had to get in there and take care of that, so Servpro was a

2  company that made that happen.  But most things we did, yes, sir.

3       Q.   Let me show you some pages out of Exhibit No. 25.  And can you

4  tell us what this is?

5       A.   Okay.  Well, it's a document from Servpro that shows --

6       Q.   Is it an estimate?

7       A.   Well, it shows the -- yeah, it shows an estimate, yes, sir.

8       Q.   And what's the date of the estimate?

9       A.   Okay.  October 7th of 2014.  There you go.

10      Q.   All right.  And so in response to the estimate, did you prepare

11  a work order?

12      A.   I did, yes, sir.

13      Q.   Let me put this up on the -- on the Elmo.

14               Is this the work order form that you use --

15      A.   Yes, sir, it is.

16      Q.   -- for the work that you do?

17      A.   Yes, sir.

18      Q.   Who's handwriting is this?

19      A.   That's my handwriting.  Yes, sir.

20      Q.   All right.  And it says, As a result of roof leaks, Servpro to

21  provide cleaning, general demolition, water extraction, and remediation at

22  VA O.C. building.  Is that your handwriting?

23      A.   Outpatient clinic.  Yes, sir, it is.

24      Q.   Okay.  It says -- it says Servpro to provide.  Does that mean

25  that they haven't done it yet, you need to write this work order and then

1    they're going to do the work?

2         A.    Right.  You do the work order first and then they provide --

3    yeah, they provide services.

4         Q.    So the work order comes before the work?

5         A.    Yes, sir.

6         Q.    What is the date of this work order?

7         A.    11-19.

8         Q.    November 19th of 1914 -- 2014, correct?

9         A.    Yes, sir.

10        Q.    That's my mother's birthday by the way, November 19th.  So we

11   know that the soonest that Servpro could have done this work would have

12   been November the 19th based on the way you do your work orders?

13        A.    Well, yes, sir.

14        Q.    Or it was on or after November the 19th that Servpro did the

15   work; is that correct?

16        A.    Right.

17        Q.    Let me take those back.

18        A.    Yes, sir.

19        Q.    Now, you were asked whether or not after the September storm

20   you had personally made a phone call to any of the folks at Ja-Mar about

21   the damage -- about the water intrusion in the building.  And you said you

22   personally did not, correct?

23        A.    Correct.

24        Q.    Do you know whether anybody at corporate made any -- any calls

25   to Ja-Mar?

1    A.    Not that I know of.

2    Q.    By September of 2014 the lawsuit was already underway.   The

3    lawsuit was filed in June in the Summer of 2014.   And there were already

4    lawyers involved.   Do you recall that?

5    A.    Yes, sir.   Now, I do, yeah.

6    Q.    And so by September of 2014 any communication with Ja-Mar would

7    have been coordinated through the lawyers, correct?

8    A.    Yes, sir.   That's correct.

9    Q.    And with all the massive water intrusion that came in to the

10   building as a result of this September 2014 storm, does it make sense that

11   you would want to go back to the same old company that created the problem

12   in the first place to fix the problem that they couldn't correct, or would

13   you want to go with somebody who could really fix it?

14   A.    I want to go with somebody who would fix it, yes, sir, get it

15   done.

16   Q.    You were asked about the -- your services that you provided in

17   connection with being a liaison on that -- on that job for on that contract

18   between Ja-Mar and Palmco where you agreed -- or Palmco agreed that they

19   would lend you as a sort of a liaison between the VA and Ja-Mar and to act

20   as, you know, as a -- to be there to open the building and close the

21   building and be at their services, correct?

22   A.    Do whatever, yes, sir.

23   Q.    Ja-Mar entered into that contract with Palmco?

24   A.    Right.

25   Q.    Did you have anything to do with negotiating that agreement?

1      Q.    And you were present at his deposition when we took it at

2   Austin, weren't you?

3      A.    I was right there sitting ten feet away from him.

4      Q.    And he was asked wether or not he thought the remedy that he

5   and David Bloomer proposed to you was illegal in any way and what was his

6   answer?

7      A.    He was asked if the remedy was what, I am sorry?

8      Q.    Whether he -- whether he thought the remedy was illegal or

9   whether it was an acceptable way to do deal with it?

10     A.    He thought it was fine.  He'd seen Mr. Schneider on the job.

11  He thought he had done -- either he or Mr. Bloomer indicated that they had

12  no problem with the way he conducted himself.

13     Q.    Mr. Bloomer also said that Doug Schneider did everything they

14  asked, right?

15     A.    Yeah.

16     Q.    And so in your mind was the matter resolved?

17     A.    I thought it was.

18     Q.    Let's look at Exhibit 12.  This is the second contract that you

19  signed with Ja-Mar, is it not?

20     A.    Yes.

21     Q.    So the first contract that we saw was the one where you

22  authorized them to negotiate with the insurance company on your behalf.

23  And then after that negotiations was done, you signed a second contract for

24  them to put in this TPO roof upgrade.  Do you recall that?

25     A.    I recall it.

1  had hired Frank and -- and Blake Dietzmann to assist us on various roofs

2  that had been leaking in the McAllen area.

3              And Rick Guerra-Prats was a expert Certified Public

4  Adjustor that could come in and also identify with his forensic expertise

5  the cause of the problems.  Actually, he sent over, I believe, Lupe Garza

6  to check it out as well and provide us some recommendations on how to fix

7  this roof.

8      Q.    You mentioned Frank Enriquez.  Who is Frank Enriquez?

9      A.    Frank Enriquez is my attorney sitting in the back of the

10 room.

11     Q.    I'd point a laser at him but that might be dangerous.

12     A.    I was getting ready to do just that.

13     Q.    So Mr. Enriquez is the gentleman who was asking the questions

14 of Mr. Guillermo Garza, right?

15     A.    That's correct.

16     Q.    All right.  And -- and through Mr. Frank Enriquez is that how

17 you found Blake Dietzmann?

18     A.    That's correct.

19     Q.    And how you found Rick Guerra-Prats?

20     A.    Yes, sir.

21     Q.    And how you found me?

22     A.    Yes, sir.

23     Q.    And so in February that roof expert came out and we saw that

24 expert report.  And then March, Lupe Garza came out and gave these two

25 quotes.  Do you recall that?

1      A.     I do.

2      Q.     And did Ja-Mar want anything to do with either one of these

3  quotes?

4      A.     I believe those two options were provided to Ja-Mar.  Keep in

5  mind, this was before we got further into some of the hidden damages.

6      Q.     Right.

7      A.     But, yes, we provided two -- two options to Ja-Mar.

8      Q.     These are the things that were being discussed, what your

9  experts were finding, the problems with the building, and they were

10  presented to Ja-Mar?

11      A.     That is correct.

12      Q.     And when we got no response what had to happen?

13      A.     A lawsuit was filed against Ja-Mar and their insurance.

14      Q.     In June of 2014?

15      A.     Yes, sir.

16      Q.     And against Ja-Mar and your insurance company, correct?

17      A.     That's correct.

18      Q.     All right.  And then after the lawsuit was filed we had this

19  September rain, did we not?

20      A.     Yes, sir.

21      Q.     And what happened to your building in September when we had

22  this big rainstorm?

23      A.     We had a lot of water that came pouring in through the roof.

24      Q.     You heard Doug Schneider say that the water -- there was water

25  on the floors, water in the walls, water on the roof?

1    A.    That's correct.

2    Q.    And did you have to hire somebody to come and take that out?

3    A.    We did.

4    Q.    And --

5    A.    We hired Servpro at some point in time, yes.

6    Q.    And who paid for all that out of his pocket?

7    A.    I did.

8    Q.    Why didn't -- well, you've heard some -- this stuff about the

9    GAF warranty, right?  Do you recall that discussion?

10   A.    Yes.

11   Q.    And we've been hearing about this warranty thing for a long

12   time, haven't we?

13   A.    That's correct.

14   Q.    Have you looked at the warranty to determine whether or not it

15   would even cover the damages, the kind of damages that this building has

16   sustained?

17   A.    I've looked at the warranty, yes, sir.

18   Q.    And what is -- what is clear from the warranty whether or not

19   it will cover your damages or not?

20            MR. TREAT:  Your Honor, that's asking the witness for a

21   legal conclusion.

22            THE COURT:  That's overruled.

23   A.    One of the first things I believe that I noticed was that the

24   warranty required that the roof be installed by certified approved licensed

25   GAF installers.  And I don't believe that was the case.

```
 1        Q.    (BY MR. THOMAS:)  Well, it -- and it certainly says that the

 2   roof has to be installed in accordance with GAF specification in their

 3   manual.  Do you recall that?

 4        A.    Yes, sir.

 5        Q.    Does it also have a limitation of liability?  Do you want to

 6   take a look at it?

 7        A.    Yes.

 8              MR. THOMAS:  Let's look at Exhibit 22.  Down at the

 9   bottom it says limitational liability.  No -- those are exclusions.  The

10   very last paragraph.

11        Q.    (BY MR. THOMAS:)  Limitations of liability.  In no event shall

12   GAF be liable for any consequential or incidental damages of any kind -- of

13   any kind including but not limited to interior or exterior damages or mold

14   growth.  Do you see that?

15        A.    Yes, sir.

16        Q.    And the vast, vast majority of the damages that are included --

17   that exist there at the building, are those interior and exterior

18   damages?

19        A.    They are.

20        Q.    Specifically excluded from this warranty?

21        A.    That is correct.

22        Q.    All right.  Can you tell the Jury what steps have you taken

23   after Ja-Mar's roof installation was, you know, was evidently a problem,

24   what steps have you taken to try and mitigate your damages?

25        A.    Well, with the help of my attorneys we've had experts that have
```

1   come out and analyzed what they believed caused the damages with the roof

2   system.  And I think that's one of the biggest parts of the mitigation that

3   I was involved in.

4        Q.    So you brought in your own expert team?

5        A.    We brought in our own expert team.

6        Q.    And then what else?

7        A.    We -- we have had members of our team in the roofing business,

8   Lupe Garza, in particular do a series of patches to try to provide a short

9   term remedy to the -- to the leaking.

10        Q.    So right after the September storm when the rain -- all the --

11   the roof let all that rain in, you hired Baldwin Roofing and paid Baldwin

12   Roofing to put temporary patches on the roof?

13        A.    That's correct.

14        Q.    And what else did you do immediately after the storm?

15        A.    We -- we hired Servpro to come out to the job.  You've got to

16   understand there was a lot of business going on.  But Servpro ultimately

17   came over and cleaned up the damage created from that storm.

18        Q.    Okay.  There were a lot of other homes and businesses impacted

19   by that September storm, correct?

20        A.    That's correct.

21        Q.    And so you got on Servpro's schedule and they ultimately came

22   out and dried out the building?

23        A.    That's correct.

24        Q.    So far all of that has been at your expense?

25        A.    Yes, sir.

1     Q.    The hiring of the expert team, the hiring of Lupe Garza and

2  Baldwin to do the repairs, and Servpro to do the drying up -- the

3  remediation and dry out, that was all at your expense?

4     A.    Yes, sir.

5     Q.    And what else have you done to mitigate damages?  And what I

6  mean by that, too, is, I mean, this building has been sitting empty for how

7  long?

8     A.    Four years.

9     Q.    Okay.  And during the four years that it's been sitting empty

10  with no income, have you undertaken -- has your company undertaken to

11  maintain this building in -- in the best -- in reasonable shape?

12     A.    We have.  We -- there is continuous repairs that need to be

13  made.  We've continued to upkeep the exterior of the building.  We have run

14  our A/C systems to try to minimize any mold that could grow in wet areas.

15     Q.    Four years of air-conditioning in an unoccupied building?

16     A.    That's true.

17     Q.    And, of course, Doug Schneider continues to -- you pay him to

18  manage the property?

19     A.    Yes.

20     Q.    And have you also during these four years taken some steps to

21  try and market the building either to sell it or to -- or to rent it?

22     A.    We've continuously tried to do both.  Since the VA -- before

23  the VA moved out and after the VA moved out.

24     Q.    Well, how come you don't have a big For Sale sign, or how come

25  you haven't listed the property with a realtor like Willy Garza?

1      A.    That's correct.

2      Q.    Mr. Palmer, if we look at Mr. Rick Guerra-Prats' latest and

3  updated estimate of what it will take to do your repairs on this

4  building --

5            MR. THOMAS:  94.  And let's go to his last page.

6  Actually go to the page before that one.  There it is.  That one.

7      Q.    (BY MR. THOMAS:)  This is a summary of his latest estimate with

8  the prices for labor and materials brought up to current.  You see that his

9  estimate is $1,585,039.00, plus taxes, plus overhead and profit for whoever

10  the general contractor ends up being.  Do you see that?

11      A.    Yes, sir.

12      Q.    Would you hire Rick Guerra-Prats to do this job?

13      A.    No.

14      Q.    Wish you could?

15      A.    I wish I could.  He is --

16      Q.    Why can't you?

17      A.    It's against the law for a Certified Public Adjustor to make

18  money off of a construction contract of the same building.

19      Q.    And so do you agree and believe with Mr. Guerra-Prats that

20  you've got about at $1,585,039.00 in damages that need to be repaired?

21      A.    I do.

22      Q.    Now, I believe he testified that that, obviously, includes the

23  reroof, right?  You got to take off the existing roof and all of that

24  isoboard and replace it.  It also includes all the interior damage, and it

25  also includes having to replace the brick on the out -- exterior of the

Regina Vasquez, CSR
332nd District Court Reporter

**CICMSJ0450**

1  building.  Do you recall that?

2      A.    Yes, sir.

3      Q.    So if only the south wall of the building that only that brick

4  needs to be taken off to replace the sheathing which got wet, according to

5  Mr. Schneider as a result of the September storm, why do you want to have

6  to take the brick off the whole building?

7      A.    Well, I think the only way that you can get to that sheathing

8  is to take it off and put the new sheathing on the exterior would be to

9  take the brick off.

10     Q.    Well -- well, that's what -- that's what Mr. Guerra-Prats said.

11 But why not just do that on the south wall, why do you have to take the

12 brick off all the way around?

13     A.    Well, because you can't match up that brick.  They make a

14 certain amount of that brick when -- when it's manufactured.  And we had

15 been assured by the manufacturer when we started the project in the early

16 '80's that that brick would be available, and we've used it over and over

17 again, but now it's changed in 25 years and --

18     Q.    Well, your neighbor immediately to your south, is the -- is the

19 bank building?

20     A.    Yes.

21     Q.    And this is Exhibit 106 that's been previously -- I believe

22 it's been entered.  I know we talked about it with -- with

23 Mr. Guerra-Prats.  And so --

24         MR. THOMAS:  Your Honor, Ms. Regina told me that it may

25 not have been admitted so we move to admit 106.

```
 1              THE COURT:  Mr. Thomas.

 2                    REDIRECT EXAMINATION

 3  BY MR. THOMAS:

 4      Q.    Mr. Palmer, you know Mr. Treat has gone to great lengths to

 5  talk about how you're only looking at the highest estimates.  Do you recall

 6  that --

 7      A.    Yes, sir.

 8      Q.    -- line of questioning?

 9      A.    Yes, sir.

10      Q.    And, of course, Mr. Treat continues to focus on the very lowest

11  estimates, is he not?

12      A.    That's correct.

13      Q.    He continues to focus on Mr. Garza's $130,000.00 estimate in

14  2014, and the $500,000.00 estimate by Mr. Guerra-Prat also in 2014.  Do you

15  recall that?

16      A.    Yes, sir.

17      Q.    Both of those were March of 2014 estimates, were they not?

18      A.    That's correct.

19      Q.    And has there been a rainstorm that has caused substantial

20  damage because of water that came into this building because of the

21  defective roof that was put on by Ja-Mar?

22      A.    That's correct.

23      Q.    Has that increased the amount of damages that exist today?

24      A.    Yes.

25      Q.    And according to Mr. Guerra-Prat is that number about 1.5
```

182

```
 1      Q.   And that was Mr. James McKinney who hasn't been with the

 2  company for how many years?

 3      A.   Since 2005, I believe.

 4      Q.   You were asked about the GAF warranty.  And I don't want to

 5  spend a lot of time on that again but just since Mr. Treat asked you about

 6  the notice provision.  It's Exhibit No. 22.

 7           And if we look right underneath Owner's Responsibilities

 8  it talks about notifying them in writing within 30 days of any leaks.  Do

 9  you recall that?

10      A.   Yes, sir.

11      Q.   Okay.  But you've also heard the testimony that for the first

12  two years after the installation of the roof who -- who is responsible for

13  making the repairs?

14      A.   Ja-Mar Roofing.

15      Q.   All right.  And were all of the leaks that occurred in the

16  first two years -- were all of the leaks that occurred that were reported,

17  were those in the first two years?

18      A.   Yes, sir.

19      Q.   And is that why you contacted Ja-Mar?

20      A.   Yes, sir.

21      Q.   And did Ja-Mar come out for several of the leaks in 2013?

22      A.   That's correct.

23      Q.   But could they stop the leaking?

24      A.   No, they could not.

25      Q.   And after the September storm when there was massive water
```

1    intrusion, was GAF called out to the building?

2         A.    They came out to the building.

3         Q.    Do you remember in January of 2015?

4         A.    In January of 2015, yes.

5         Q.    And they came out with Lupe Garza and the Jury got to hear

6    about that?

7         A.    Yes, sir.

8         Q.    With the GAF inspector?

9         A.    That's correct.

10        Q.    This is the same GAF inspector who -- who gave this roof

11   installed by Ja-Mar's people a ten out of ten, correct sir?

12        A.    That is correct.

13              MR. TREAT:  Your Honor, he is leading the witness again.

14              THE COURT:  All right, sir.

15        Q.    (BY MR. THOMAS:)  What was the -- what was the score that the

16   roof inspector for GAF gave this -- gave this building?

17        A.    Initially?

18        Q.    Yeah.

19        A.    Perfect.

20        Q.    Ten out of ten?

21        A.    Ten out of ten.

22        Q.    And it started leaking how many days thereafter?

23        A.    Less than a month.  A week, maybe two weeks.  I've got it

24   somewhere.

25        Q.    Within days?

1    A.    Okay.

2    Q.    Well, I am asking you?

3    A.    Within days.  They were -- every month had a leak.

4    Q.    All right, sir.  And this is the same roof inspector who scored

5  it ten out of ten on a roof that Mr. McKinney and even Mr. Treat

6  acknowledges has defects?

7    A.    In January of 2015 he gave it another perfect score.

8    Q.    Well, is -- would you give this roof a perfect score?

9    A.    No, I would not.

10   Q.    Mr. Treat started off his cross-examination of you asking you

11  about Rick Guerra-Prat and asked you whether or not you had a contract with

12  him to hire him as a -- that says he is a Licensed Public Adjustor.  Do you

13  remember that line of questioning?

14   A.    I do.

15   Q.    Did Mr. Guerra-Prat help you negotiate with the insurance

16  companies on these various claims?

17   A.    Yes, he did.

18   Q.    Did he do it for compensation?

19   A.    Yes, he did.

20   Q.    Who paid him that compensation ultimately?

21   A.    Ultimately it came out of the settlements from the insurance

22  companies.

23   Q.    Okay.  And so did -- that would be part of your settlement?

24   A.    That would be me paying it.

25   Q.    That's right.

1  THE STATE OF TEXAS                    )

2  COUNTY OF HIDALGO                     )

3      I, Regina Vasquez, Official Court Reporter in and for the 332nd

4  District Court of Hidalgo County, State of Texas, do hereby certify that

5  the above and foregoing contains a true and correct transcription of all

6  portions of evidence and other proceedings requested in writing by counsel

7  of the parties to be included in this volume of the Reporter's Record, in

8  the above-styled and numbered cause, all of which occurred in open court or

9  in chambers and were reported by me.

10      I further certify that this Reporter's Record of the proceedings truly

11  and correctly reflects the exhibits, if any, admitted, tendered in an offer

12  of proof or offered into evidence.

13      WITNESS MY OFFICIAL HAND this the 20th day of September, 2019.

14

15

16                    /s/Regina Vasquez_____
                      REGINA VASQUEZ, TEXAS C.S.R. 7227
17                    Expiration Date:  12-31-19
                      Official Court Reporter, 332nd District Court
18                    Hidalgo County, Texas
                      100 North Closner, Texas
19                    Edinburg, Texas 78541
                      Phone: (956) 318-2275
20                    Fax:  (956) 318-2698

21

22

23

24

25

CICMSJ0456

```
 1                         REPORTER'S RECORD
                        VOLUME 8 OF 12 VOLUMES
 2                  TRIAL COURT CAUSE NO. C-6015-14-F

 3   PALMER CRAVENS,                )       IN THE DISTRICT COURT
                                    )
 4          Plaintiff(s),           )
                                    )
 5   VS.                            )       HIDALGO COUNTY, TEXAS
                                    )
 6   NATIONAL FIRE INSURANCE COMPANY)
     OF HARTFORD AND D.L. PHILLIPS  )
 7   CONSTRUCTION D/B/A JA-MAR ROOFING, )
                                    )
 8          Defendant(s),           )       332ND JUDICIAL DISTRICT

 9

10   _____

11

12

13                      JURY TRIAL PROCEEDINGS

14

15

16   _____

17

18

19      On the 20th day of June, 2018, the following excerpted proceedings

20   came on to be heard in the above-entitled and numbered cause before the

21   Honorable Mario E. Ramirez, Jr., Judge presiding, held in Edinburg, Hidalgo

22   County, Texas:

23      Proceedings reported by stenograph method.

24

25
```

2

```
 1                    A P P E A R A N C E S

 2  Mr. Raymond L. Thomas          Ms. Brandy Wingate Voss
    SBOT NO. 19865350              LAW OFFICE OF BRANDY
 3  Mr. David O. Sanchez           WINGATE VOSS, PLLC
    SBOT NO. 24102457              SBOT NO. 24037046
 4  Ms. Kristen Lamar Vela         820 E. Hackberry Avenue
    SBOT NO. 24107950              McAllen, Texas 78501
 5  RAY THOMAS, PC                 Phone:  (956) 688-9033
    4900-B North 10th Street       Fax:  (956) 331-2230
 6  McAllen, Texas 78504           brandy@brandyvosslaw.com
    Phone: (956) 686-8797          ATTORNEY FOR THE PLAINTIFF
 7  Fax: (956) 630-5199
    rthomas@raythomaspc.com
 8  ATTORNEY FOR THE PLAINTIFF

 9        - AND -

10  Mr. David L. Treat
    SBOT NO. 20205300
11  Ms. Amanda N. James
    SBOT NO. 24092570
12  LINDOW STEPHENS TREAT, LLP
    One Riverwalk Place
13  700 N. St. Mary's St., Suite 1700
    San Antonio, Texas 78205
14  Phone: (210) 227-2200
    Fax: (210) 227-4602
15  dlt@lstlaw.com
    ATTORNEY FOR THE DEFENDANT
16
          - AND -
17
    Mr. Wesson H. Tribble
18  TRIBBLE | ROSS
    SBOT NO. 20213960
19  6371 Richmond Avenue
    Houston, Texas  77057
20  Phone: (713) 622-0444
    Fax: (713) 622-0555
21  wtribble@tribblelawfirm.com
    ATTORNEY FOR THE DEFENDANT
22  D.L. PHILLIPS CONSTRUCTION, INC.

23

24

25
```

Regina Vasquez, CSR
332nd District Court Reporter

CICMSJ0458

1                          I N D E X

2                             VOLUME 8
                       JURY TRIAL PROCEEDINGS
3
   JUNE 20, 2018                                        PAGE    VOL.
4  Proceedings ------------------------------------------  4      8

5  Objection to Court's Charge --------------------------  4      8

6  Court's Charge ---------------------------------------  13     8

7  Closing Arguments by Mr. Thomas ----------------------  24     8

8  Closing Arguments by Mr. Treat -----------------------  36     8

9  Rebuttal Closing Arguments by Mr. Thomas -------------  56     8

10 Jury retired for deliberations -----------------------  64     8

11 Hearing Outside the Presence of the Jury on Offer of Proof ---  64  8

12 OFFER OF PROOF WITNESS          EXAMINATION                    VOL.
   PALMER, GREGORY WAYNE           65, ---                         8
13
   Offer of Proof Ruling --------------------------------  69     8
14
   Plaintiff's Motion For Mistrial ----------------------  69     8
15 Court's Ruling ---------------------------------------  69     8

16 Hearing Outside the Presence of Concluded ------------  69     8

17 Verdict ----------------------------------------------  70     8

18 Jury Polled ------------------------------------------  71     8

19 Adjournment ------------------------------------------  74     8

20 Court Reporter's Certificate -------------------------  75     8

21               OFFER OF PROOF EXHIBIT INDEX

22 PLAINTIFFS'
   NO.  DESCRIPTION                    OFFERED    ADMITTED   VOL.
23 114. CD                               67          67       8

24 115. Photographs                      67          67       8

25

1   comply with the construction contract?  And the answer is very simply, yes.

2                   They agreed to provide an upgraded roof.  And the

3   evidence is really undisputed that what they provided there is hardly an

4   upgrade from what we had.  Maybe had they done it the way they were

5   supposed to, the experts could argue whether a mechanically attached TPO is

6   better than a tar-and-gravel roof.  But they didn't even install it the way

7   they were supposed to according to the contract in a good and workmanlike

8   manner in compliance with all of the GAF specifications and manual.  They

9   didn't do that.

10                  And so we got a terribly defective roof.  And as a result

11  of that terribly defected roof, we didn't get an upgrade.  And if we didn't

12  get an upgrade, and they didn't install that roof in a good and workmanlike

13  manner, then the answer is they didn't comply with their contract.

14                  They got paid $597,000.00 by my client's insurance

15  company to do this work.  And they didn't spend that money on the roof and

16  in that building.  They spent about half of it.  Because you heard the

17  testimony of Mr. Dave Phillips where he admitted that they made about a 50

18  percent profit on this job.

19                  And if they made about a 50 percent profit on this job,

20  that means somebody that got screwed.  And the one that got screwed was my

21  client.  And they are the ones who got enriched.

22                  Question No. 2:  What sum of money, if any, if paid now

23  in cash would fairly and reasonably compensate Park Place Ventures, my

24  client, for its damages that resulted from the failure to comply with the

25  contract.

CICMSJ0460

1          Well, I mentioned there is two things that we are looking

2  for:  The cost to repairs to restore the building to the condition it was

3  supposed to be had Ja-Mar done what it was supposed to do with the

4  $600,000.00 that were given to them by the insurance company.  And the

5  other is compensation for the 45 months from September of 2014 when the

6  roof completely failed until today.

7          The cost of repairs is a big dispute during this trial.

8  Their expert, Mr. Killion, who we heard from yesterday, his report, the one

9  that he gave to us, the one that he presented in this lawsuit says

10  $22,000.00 would make it all right, said there was nothing wrong with the

11  roof.

12          And, I guess, that narrative didn't really work anymore

13  based on the evidence that was coming out and their new thing about

14  accepting responsibility so they come and then they wrap themselves around

15  Lupe Garza's first initial report and then they say, Well, it's really

16  going to be 200 to $400,000.00 to repair the roof, to make the repairs.

17          So you've got to compare and decide between the

18  credibility of their experts and the credibility of ours.  It's either 2 to

19  $400,000.00 according to them, or it's two million ninety-one thousand

20  according to Mr. Rick Guerra-Prats which incorporates Lupe Garza, Baldwin

21  Roofing.

22          Now, there is -- our expert admitted a human error in

23  Mr. Lupe Garza's report where he said -- where -- because of my fault I had

24  asked him to include -- I said, we want to go back to what we had, just go

25  back to original proposal and give us an update.  And so he went back to

29

1   the original insurance estimate that Ja-Mar put together which was to

2   remove the tar-and-gravel and to replace the tar-and-gravel.  And we

3   shouldn't have put in the remove tar-and-gravel because there is a --

4   because there is a TPO roof there.

5              But if you take those two estimates that -- that Lupe

6   Garza did where he includes the cost of removing the existing roof that's

7   there, the TPO, he said that's $71,000.00.  Compare that to his current

8   estimate to remove a tar-and-gravel roof which is $88,000.00, that takes

9   more.  The difference is $17,000.00.

10              And so from Mr. Rick Guerra-Prats number, his estimate,

11   which is $2,091,208.00, it's appropriate to back off $17,000.00 which

12   Mr. Lupe Garza shouldn't have included.  And he did because it was my

13   fault, and I didn't tell him to make that adjustment.  And it comes out to

14   $2,074,208.00.

15              How does that break down?  You know, why is that so much

16   money?   And in very basic terms that 2 million is broken down like this.

17   Lupe Garza says it will be about 500 -- just short of $500,000.00 to remove

18   the crappy roof we have, to get rid of all of that isoboard that

19   shouldn't -- that should have been removed in the first place and replace

20   it and to put back a tar-and-gravel roof or something equivalent.  That's

21   about 500 of it.

22              Another 500 is for the interior, for all of of those

23   interior damages that were caused because of the massive water intrusion

24   that came in September of 2014.  Because that's something that's not

25   supposed to happen.

1         Even Mr. Killion says that wasn't something that's

2 supposed to happen.  The fact that all of that water came in in September

3 of 2014 is evidence that that roof system failed.  And so that's about 500

4 thousand.

5         Now, Mr. Killion, who says, Oh, it's just $22,000.00, and

6 really interior damage is about $17,000.00.  When I took his report and --

7 and took each of those rooms where he admitted there was evidence of water

8 damage, whether it be ceiling tiles, or some other evidence that he found

9 of water damage, and I plotted them, and I colored them, and I put them on

10 the map of the building, I bet he wasn't expecting that it was going to

11 look something like what's been marked and entered as Plaintiff's Exhibit

12 110.

13         This is something that maybe my expert would have --

14 would have done because this is -- this is what -- this is the evidence of

15 what is actually wrong.  In terms of damage, it shows the extensive damage

16 to the building.  But I wasn't expecting it out of Mr. Killion.  Especially

17 when he says $22,000.00 is what it would take to fix it.

18         And interestingly the yellow, where he admits -- where

19 their expert admits there is evidence of water damage, very closely mirrors

20 what Lupe Garza said when he got up on the roof and he examined all the

21 defects in the roof and where he found all of these different places not

22 where -- I -- I thought he was talking about there was a potential for

23 water intrusion in those defects that he found.  And Mr. Garza corrected me

24 in front of the Jury and he said, no, that's where I found water was

25 getting in.  And so he was asked to mark that with his highlights, and he

1    did.

2                         And Mr. Killion, their expert's own findings of evidence

3    of water damage throughout the building, corresponds and correlates exactly

4    with what Lupe Garza was finding.  But he wants to say, Oh, it could be

5    done for $22,000.00.

6                         If any of you have had any repairs or remodeled your

7    house whether it be a kitchen, or a bathroom, or any kind of remodeling,

8    you know $22,000.00 doesn't go very far in remodeling a house.

9                         You saw the very extensive damages that are throughout

10   that building.  Some of those are visible and a lot of them are -- are not.

11   They are still hidden behind the walls and hidden above the ceiling tiles.

12   But our experts have looked at that and have come up with about $500,000.00

13   interior damages.  So that's 1 million of the 2 million.

14                        The other -- another 500,000 is for the exterior.  And we

15   have a big debate about that.  There is a dispute in the evidence as to

16   whether the brick needs to come off.  And if the brick does need to come

17   off, does it have to be the brick all the way around the building?  And

18   there are two issues on that.

19                        Our experts say -- Rick Guerra says the sheathing has

20   been compromised.  That's that film that is on the outside of the metal

21   studs and between the bricks.  And he says that has to come off because

22   it's been compromised.

23                        We know it's been compromised because Servpro put that

24   white stuff on there to try and stop the mold growth.  That needs to come

25   off because it will affect the age of the building.

32

1          The only way to get it off, according to my experts, is

2   to pull the brick off the south wall.  That's how you get to the sheathing.

3          I asked Mr. Killion to confirm that and he says like, Oh,

4   no, no, you don't have to do that.

5          I said, What do you have to do?  What's the other way to

6   do it?

7          And he says, Well, you know, I mean, most of the time we

8   just leave it there.

9          I know that, but if you got to take it off, how do you do

10  it, can you do it?

11          Oh, yeah, it's a simple solution.

12          THE COURT:  Three minutes, Mr. Thomas.

13          MR. THOMAS:  Thank you.  And he never offered us what

14  that solution was.  He never told us.  How do you get this sheathing off

15  from behind those metal studs without taking the brick off?  He wouldn't

16  tell me.  I thought when we passed him back to opposing Counsel they were

17  going to explain it away.  He never did.

18          So the only evidence that's been presented is the only

19  way to get that sheathing off is to pull the brick off to get to the

20  sheathing and replace it.

21          And then the issue is, is it okay for Mr. Palmer to have

22  a two-tone building.  One wall that's one color and the other three walls

23  that are the other color.  You can decide.

24          I think if any of us had a $5 million investment, we

25  wouldn't want it to be two-toned like something like that.  That's -- I

1   mean, it's not Mr. Palmer's fault.  He didn't ask for any of this.  Alls he

2   wanted was for them to spend the $600,000.00 the way they had promised to

3   from the very beginning.

4            The next two questions -- one is about negligence,

5   whether or not Ja-Mar was negligent.  And I think hopefully I would expect

6   based on what Mr. McKinney said, they are going to get up and answer, yes.

7            You were asked about Guy Hardy and Mr. Ortegon and, you

8   know, whether or not they are negligent or not.  They are the ones that did

9   the installing, but they also testified that they are the ones that

10  followed the instructions of Ja-Mar.

11           Poor Mr. Ortegon says, I was just doing what I was told.

12  I didn't agree with it, but I was doing what I was paid for.

13           We asked Mr. Hardy, Mr. Hardy says, Hey, man, there is a

14  lot of problems on that roof.  You know, but I was just doing what I was

15  told.  Ja-Mar was the one who was telling me to cut corners.  And the

16  corners I was told to cut was because we thought we were saving money for

17  Mr. Palmer.  So whether you want to call that negligence on their part,

18  yeah, it was negligence on their part.

19           But when it comes to the percentage of responsibility,

20  what did David Phillips says?  The buck stops at Ja-Mar.  The buck stops at

21  Ja-Mar.  So 100 percent of the responsibility needs to be assessed where it

22  belongs, and that's with Ja-Mar.

23           If you find negligence on the part of Ja-Mar, then you

24  are asked what damages, if any, would fairly and reasonably compensate Park

25  Place for its damages that resulted from the injury.  And it's the same two

1    questions, cost to repairs and loss of use.  Cost of repairs, loss of use.

2           The loss of use is the -- is that 45 months from

3    September, the rainstorm -- and we are not even going back all the way to

4    when the VA moved out when we were not bringing a tenant in because we were

5    having problems with leaks that were still unresolved.  I am talking about

6    from when we had that massive water intrusion event in September to today.

7    That's 45 months.  And at $40,000.00 a month, that's $1.8 million in lost

8    rental income.

9           And if that sounds like a lot of money to you, it is.

10   But imagine if you had a $5 million investment -- if there -- if any of us

11   have a $5 million investment or a $1 million investment, you expect an

12   annual rate of return.  So $40,000.00 a month times 12 months is

13   $480,000.00.

14          If we had a $5 million investment, a $480,000.00 annual

15   return is less than ten percent per year.  So it is -- and then if you take

16   out his expenses that he's had to pay in each of the four years, it's about

17   a six and a half percent return per year.  Well within what's accepted --

18   what's reasonable.

19          And so it's the same 2 million for cost to repairs.

20   We've got 2,091,000 from the Guerra-Prat estimate, minus 17,000.00 for the

21   mistake that was my fault.  That comes down to 2,074,000.

22          Mr. Treat keeps wanting to talk about, Well, the VA moved

23   out.  We got to get the building make-ready, you know, you got to freshen

24   it up.  You got to paint it up.  You got to do all these things and that

25   costs something.

CICMSJ0467

1              Doug Schneider said, We kept the building in great shape.

2    We did that for the VA because that's what the lease called for us to do

3    and that's what we provided them, good service.

4              But, okay.  If you want to make an adjustment for the

5    make-ready, and to make -- you know, that's why I rounded it down from

6    2,074,000 just straight 2 million just to make it easy.

7              74,000 -- $75,000.00, set it aside for the make -- for

8    the make-ready, the freshening up of the building.  So 2 million on cost to

9    repair.  That takes into account my mistake.  That takes into account the

10   make-ready.  And then 1.8 million for the loss of income.

11             And then the final question is did Ja-Mar make a

12   negligent misrepresentation on which Park Place Ventures relied.  Made a

13   lot of misrepresentations.  It's all that bait and switch stuff.  And

14   Mr. Palmer testified he relied on that in making the decision to contract

15   with these guys and it ended up being a disastrous decision.

16             And if you answered "yes" to the negligent

17   misrepresentation, you are asked the same two damage questions:  Cost to

18   repairs and loss of rental income $1.8 million.

19             Those are three different theories or of causes of

20   action, or three different claims that get to the same damages.  It's only

21   one set of damages, it's not three.

22             So -- but the instructions are you don't divide that by

23   three.  You wouldn't take -- okay, we are going to award $2 million for the

24   cost to repairs, but -- but we got to divide it in three because there

25   is -- you know, there is three blanks for it.  No, you answer each one

1  separately and independently and you don't have to worry about any kind of

2  double or triple recovery because that's what the Judge takes care of when

3  he takes your verdict and converts it to a judgment.

4           And so now I've got to sit down and we are going to hear

5  from my opposing Counsel.  And when he finishes, I'll have an opportunity

6  to get up and address the things that he brings up and to close this out.

7           Thank you for your time and for being here.

8           THE COURT:  Okay.  Mr. Treat.

9           MR. TREAT:  Thank you, Your Honor.  May I proceed?

10          THE COURT:  Yes.

11                    DEFENDANT'S CLOSING STATEMENT

12          MR. TREAT:  Good morning, Ladies and Gentlemen.

13          JURY PANEL:  Good morning.

14          MR. TREAT:  I, too, want to start off with a little bit

15  of a family story.  As I've already told you, you've heard me allude I have

16  four children.  They grew up under my roof, and hopefully they felt safe

17  and secure about it.  And I want to tell you a story that I -- that I love

18  to tell.  It's one of my favorite stories about my second daughter.  And

19  her name is India.

20          And I am sure all of you that have had children, you

21  know, probably have your problem child.  This is always my problem child.

22  This is the one I've always had things happen to her.

23          She is 25 years old today.  But many, many years ago she

24  was in preschool and she would never go to sleep.  You know, preschool has

25  nap time, I'm sure, and -- and she would never nap.  And so they always let

1  from there?  I don't care.  You want to do it from there or you want to

2  take the stand?

3                    MR. THOMAS:  He can get on there, but Ms. Voss has

4  something.

5                    THE COURT:  You-all sit down please in the back.

6                    MR. VOSS:  I just want to make sure that the record is

7  clear that the Defense Counsel has agreed in chambers that this would be

8  considered timely.  I think that our --

9                    THE COURT:  Yes, I -- I consider it timely.  And let me

10 ask Mr. Treat.

11                    MR. TREAT:  But -- but -- but if there was any dispute

12 about it, I completely agree that it's timely so when we can get to the

13 Jury argument, we can do it in an economical matter that this is timely

14 done as far as an offer.

15                    (Witness sworn.)

16                    THE COURT:  Go ahead and have a seat, sir.

17                    This is an Offer of Proof by the Plaintiffs.

18                    MR. THOMAS:  Yes.  Outside the presence of the Jury.

19                         GREGORY WAYNE PALMER,

20 having been first duly sworn, testified as follows:

21                         EXAMINATION

22 BY MR. THOMAS:

23     Q.    Please state your name.

24     A.    Gregory Wayne Palmer.

25     Q.    And are you an attorney?

1      A.    Yes, sir.

2      Q.    Are you the son of Mr. Jay Palmer?

3      A.    Yes, sir.

4      Q.    And do you work with Mr. Palmer?

5      A.    Yes, sir.

6      Q.    Were you at the VA building this morning, what was the VA

7    building, this morning which is the property subject to this dispute?

8      A.    Yes, sir.

9      Q.    Did we have a significant rainstorm this morning?

10     A.    Yes, sir.

11     Q.    Is that why you went out there?

12     A.    That's correct.

13     Q.    And what did you find?

14     A.    We found water leaking in.  We found water puddles on the

15   ground, water along some of the insulation, some of the walls.  We saw some

16   damaged ceiling tile that showed evidence of -- new evidence of water that

17   was wet.  And so we tried to document that.

18     Q.    All right, sir.  And I am going to hand you what has been

19   marked as an Exhibit 114 and ask you whether this is a copy of the video

20   that was taken of the water intrusion that you witnessed this morning?

21     A.    I believe so.  I don't have any reason to think otherwise.

22     Q.    Yes, sir.  There was video taken this morning?

23     A.    Yes, sir.

24     Q.    And you had that e-mail -- that video e-mailed to me?

25     A.    Yes, I e-mailed it.

1    Q.    All right.  And then we downloaded that to this so we could

2  make it part of the record.  Do you understand that?

3    A.    Yes.

4    Q.    All right.  Now, I am going to show you exhibits -- Exhibit

5  115, which consists of -- consists of four photographs.  And are these

6  photographs that were taken this morning at the VA building?

7    A.    Yes, sir.

8    Q.    And are these photographs that evidence water intrusion into

9  that building as of this -- new water intrusion as of this mornings

10  storm?

11    A.    Yes, sir.

12            MR. THOMAS:  Your Honor, for purpose of the offer, we

13  have Court Exhibits 114 and 115 which we ask the Court to admit for

14  purposes of the Bill.

15            (Plaintiff's Bill Exhibit Nos. 114 and 115 offered on

16  Offer of Proof.)

17            THE COURT:  All right.  I mean, no objection --

18            MR. TREAT:  Yeah, as long as --

19            THE COURT:  -- for purposes of --

20            MR. TREAT:  -- as long as it's only for the purposes of

21  the Bill I have no objection.

22            THE COURT:  For the purposes of the Bill it's admitted

23  into evidence.  They are admitted into evidence.

24            (Plaintiff's Bill Exhibit Nos. 114 and 115 admitted for

25  Offer of Proof.)

1    MR. THOMAS:  Yes.  Thank you, Your Honor.  That concludes

2  our offer from this witness.

3                 THE COURT:  Okay.

4                 MR. TREAT:  No questions, Your Honor.

5                 THE COURT:  You can step down.

6                 MR. THOMAS:  So, Your Honor, pursuant to the Rule that

7  allows for reopening of the evidence, we would ask that the evidence be

8  reopened.  The Rule makes clear that the evidence can be reopened if it's

9  in the interest of justice and if it can be -- and -- and -- and if it's

10 done before the Jury reaches a verdict.

11                The Jury has not yet reached a verdict and just barely

12 started deliberating.  So we'd ask that the evidence be reopened so that

13 this very significant issue and this very significant material and relevant

14 evidence can be brought to their attention particularly in light of the

15 Defense's position throughout this case that there hadn't been any leaks

16 and there is no more problems with the building as of -- as of as early of

17 2015.  And -- and so we'd ask to reopen the -- reurge our motion to reopen

18 the evidence.

19                MR. TREAT:  Your Honor, obviously, I am going to say the

20 same thing I said earlier this morning.  I urge you not to do that because

21 if you do that -- the pictures are not sufficient.  We are going to have to

22 get out there with experts to evaluate what happened.  We are going to have

23 new damage estimates.

24                And just showing the pictures would be incredibly

25 prejudicial.  I don't even know what happened.  It is certainly potentially

Regina Vasquez, CSR
332nd District Court Reporter

**CICMSJ0473**

1   germane to the issue that's going on, but I don't have any way to respond

2   to it if we reopen the evidence at this point in time.

3                    THE COURT:  Anything else?

4                    MR. THOMAS:  Your Honor, one of the questions is whether

5   or not the drains have been clogged.  I know that was brought up in

6   chambers and so I believe the video that we have shows that somebody got on

7   the roof to show that the drains are not clogged and so that this is a

8   result of water intrusion from the defective roof.

9                    THE COURT:  Anything else?

10                   MR. THOMAS:  That's all, Your Honor.

11                   MR. TREAT:  No, Your Honor.

12                   THE COURT:  Once again the objection is sustained.

13                   MR. THOMAS:  Thank you, Your Honor.

14                   THE COURT:  You have your Bill.

15                   MR. THOMAS:  Yes.

16                   And then one last thing, Your Honor.  In light of the

17  fact that the Court is not willing to reopen the evidence, then we --

18  because of this very significant water event and this is essential to the

19  dispute, we would ask for a mistrial so that we could have a chance to

20  present this testimony to the Jury.

21                   THE COURT:  All right.

22                   MR. TREAT:  Obviously, Your Honor, we don't -- we are not

23  in favor of a mistrial.  We've already been here.  We'd like the Jury to

24  decide this.

25                   THE COURT:  Your motion for mistrial is denied.

Regina Vasquez, CSR
332nd District Court Reporter

CICMSJ0474

1   THE STATE OF TEXAS                )

2   COUNTY OF HIDALGO                  )

3       I, Regina Vasquez, Official Court Reporter in and for the 332nd

4   District Court of Hidalgo County, State of Texas, do hereby certify that

5   the above and foregoing contains a true and correct transcription of all

6   portions of evidence and other proceedings requested in writing by counsel

7   of the parties to be included in this volume of the Reporter's Record, in

8   the above-styled and numbered cause, all of which occurred in open court or

9   in chambers and were reported by me.

10      I further certify that this Reporter's Record of the proceedings truly

11  and correctly reflects the exhibits, if any, admitted, tendered in an offer

12  of proof or offered into evidence.

13      WITNESS MY OFFICIAL HAND this the 20th day of September, 2019.

14

15

16                     /s/Regina Vasquez_____
                       REGINA VASQUEZ, TEXAS C.S.R. 7227
17                     Expiration Date:  12-31-19
                       Official Court Reporter, 332nd District Court
18                     Hidalgo County, Texas
                       100 North Closner, Texas
19                     Edinburg, Texas 78541
                       Phone: (956) 318-2275
20                     Fax:  (956) 318-2698

21

22

23

24

25

Regina Vasquez, CSR
332nd District Court Reporter

CICMSJ0475